## DUNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| GARY FRISCH, TAMMY OTTO, BRIAN KREB, HARRY VASQUEZ, JADE AND CHRISTOPHER WADLEIGH, DAVID PERRERA, DENNIS BERNS, JONATHAN LISCANO, and ROBERT STUEVE on behalf of themselves and all those similarly situated, | Case No. _____ |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| FCA US, LLC, | |
| Defendant. | |

## <u>CLASS ACTION COMPLAINT</u>

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................... 1

II.   JURISDICTION ....................................................................... 6

III.  VENUE .................................................................................... 7

IV.   PARTIES ................................................................................. 7

    A.    Plaintiffs .......................................................................... 7

        Gary Frisch (Arizona) ................................................. 7

        Tammy Otto (Arizona) ................................................. 9

        Robert Stueve (Arizona) ............................................. 11

        Brian Kreb (California) ............................................... 13

        Harry Vasquez (Florida) ............................................. 14

        Jade and Christopher Wadleigh (New Jersey) ................. 16

        David Perrera (North Carolina) ................................... 18

        Dennis Berns (Pennsylvania) ..................................... 19

        Jonathan Liscano (Texas) ........................................... 21

    B.    Defendant ...................................................................... 22

V.    FACTUAL ALLEGATIONS ................................................ 23

    A.    FCA marketed the Jeep Wrangler 4xe as a rugged, high-performing, and emissions-friendly hybrid-electric vehicle ................................................................................ 23

    B.    The Fire Defect is likely the result of defective high-voltage lithium-ion batteries .......................................... 30

    C.    FCA knew or should have known of the Fire Defect long before it disclosed the problem to Plaintiffs. .................. 34

  i. Lithium-ion batteries are dangerous without appropriate safeguards .................................................................... 34

  ii. The National Highway Traffic Safety Administration (NHTSA) warned of safety risks for lithium-ion batteries well before the Class Vehicles entered the market. ................ 37

  iii. FCA launches the Class Vehicles, and fires result. ................ 43

  iv. FCA had actual and/or constructive knowledge of the Fire Defect but was slow to recall the Class Vehicles and still has not provided an actual fix to correct the defect. ......... 44

VI. DISCOVERY RULE TOLLING OF THE STATUTE OF LIMITATIONS ............................................................................. 46

VII. CLASS ALLEGATIONS ................................................................ 47

 A. Numerosity ............................................................................ 49

 B. Commonality and Predominance ....................................... 49

 C. Typicality ............................................................................... 50

 D. Adequacy ............................................................................... 50

 E. Superiority ............................................................................. 51

VIII. NATIONWIDE CLAIMS ............................................................. 52

  COUNT I VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT (15 U.S.C. § 2301, *et seq.*) (Alleged by all Plaintiffs on behalf of the Nationwide Class or, in the alternative, the State Subclasses) ...................................... 52

IX. STATE-SPECIFIC CLAIMS ......................................................... 56

 A. Arizona ................................................................................. 56

  COUNT II BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER ARIZONA LAW (Ariz. Rev. Stat. § 47-2314)  (Alleged by Plaintiffs Frisch, Otto, and Stueve on behalf of the Arizona Subclass) ................................................................................. 56

COUNT III VIOLATIONS OF THE CONSUMER FRAUD
ACT (Ariz. Rev. Stat. § 44-1521, *et seq.*) (Alleged by
Plaintiffs Frisch, Otto, and Stueve on behalf of the
Arizona Subclass) ...................................................................... 58

COUNT IV UNJUST ENRICHMENT (COMMON LAW)
(Alleged by Plaintiffs Frisch, Otto, and Stueve on behalf
of the Arizona Subclass) ........................................................... 62

B.      California........................................................................................... 63

COUNT V VIOLATION OF THE CALIFORNIA
CONSUMER LEGAL REMEDIES ACT (Cal. Civ. Code
§ 1750, *et seq.*) (Alleged by Plaintiff Kreb on behalf of
the California Subclass) ............................................................. 63

COUNT VI VIOLATIONS OF THE CALIFORNIA UNFAIR
COMPETITION LAW (Cal. Bus. & Prof. Code § 17200)
(Alleged by Plaintiff Kreb on behalf of the California
Subclass) .................................................................................... 67

COUNT VII VIOLATIONS OF CALIFORNIA FALSE
ADVERTISING LAW (Cal. Bus. & Prof. Code § 17500,
*et seq.*) (Alleged by Plaintiff Kreb on behalf of the
California Subclass) ................................................................... 70

COUNT VIII VIOLATION OF SONG-BEVERLY
CONSUMER WARRANTY ACT FOR BREACH OF
IMPLIED WARRANTY OF MERCHANTABILITY
UNDER CALIFORNIA LAW (Cal. Civ. Code §§ 1791.1
& 1792) (Alleged by Plaintiff Kreb on behalf of the
California Subclass) ................................................................... 72

COUNT IX UNJUST ENRICHMENT (COMMON LAW)
(Alleged by Plaintiff Kreb on behalf of the California
Subclass) .................................................................................... 75

C.      Florida................................................................................................ 76

COUNT X VIOLATION OF FLORIDA'S UNFAIR &
DECEPTIVE TRADE PRACTICES ACT (Fla. Stat.
§ 501.201, *et seq.*) (Alleged by Plaintiff Vasquez on
behalf of the Florida Subclass) ................................................. 76

COUNT XI BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER FLORIDA LAW (Fla.
Stat. § 672.314)  (Alleged by Plaintiff Vasquez on behalf
of the Florida Subclass) ............................................................ 80

COUNT XII UNJUST ENRICHMENT (COMMON LAW)
(Alleged by Plaintiff Vasquez on behalf of the Florida
Subclass) ................................................................................. 82

D.   New Jersey ......................................................................... 83

COUNT XIII VIOLATION OF NEW JERSEY CONSUMER
FRAUD ACT (N.J. Stat. Ann. § 56:8-1, *et seq.*) (Alleged
by Plaintiffs Jade and Christopher Wadleigh on behalf of
the New Jersey Subclass) ........................................................ 83

COUNT XIV BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER NEW JERSEY LAW
(N.J. Stat. Ann. § 12A:2-314) (Alleged by Plaintiffs Jade
and Christopher Wadleigh on behalf of the New Jersey
Subclass) ................................................................................. 86

COUNT XV UNJUST ENRICHMENT (COMMON LAW)
(Alleged by Plaintiffs Jade and Christopher Wadleigh on
behalf of the New Jersey Subclass) ......................................... 88

E.   North Carolina ................................................................... 89

COUNT XVI VIOLATION OF NORTH CAROLINA
UNFAIR AND DECEPTIVE ACTS AND PRACTICES
ACT (N.C. Gen. State §§ 75-1.1, *et seq.*) (Alleged by
Plaintiff Perrera on behalf of the North Carolina
Subclass) ................................................................................. 89

COUNT XVII BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER NORTH CAROLINA
LAW (N.C. Gen. Stat. § 25-2-314) (Alleged by Plaintiff
Perrera on Behalf of the North Carolina Subclass) ................ 93

COUNT XVIII UNJUST ENRICHMENT (COMMON LAW)
(Alleged by Plaintiff Perrera on behalf of the North
Carolina Subclass).................................................................. 95

F.   Pennsylvania....................................................................... 96

COUNT XIX VIOLATION OF THE PENNSYLVANIA
    UNFAIR TRADE PRACTICES AND CONSUMER
    PROTECTION LAW (73 Pa. Cons. Stat. § 201-1,
    *et seq*.) (Alleged by Plaintiff Berns on behalf of the
    Pennsylvania Subclass) .................................................................. 96

COUNT XX BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY UNDER PENNSYLVANIA
    LAW (13 Pa. Cons. Stat. Ann. § 2314) (Alleged by
    Plaintiff Berns on behalf of the Pennsylvania Subclass) ......... 99

COUNT XXI UNJUST ENRICHMENT (COMMON LAW)
    (Alleged by Plaintiff Berns on behalf of the Pennsylvania
    Subclass) ............................................................................... 102

G.    Texas.................................................................................. 103

COUNT XXII BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY UNDER TEXAS LAW (Tex.
    Bus. & Com. Code § 2.314) (Alleged by Plaintiff
    Liscano on behalf of the Texas Subclass)............................. 103

COUNT XXIII UNJUST ENRICHMENT (COMMON LAW)
    (Alleged by Plaintiff Liscano on behalf of the Texas
    Subclass) ............................................................................... 105

X.    REQUEST FOR RELIEF.......................................................... 106

XI.    DEMAND FOR JURY TRIAL ................................................. 107

Plaintiffs file this lawsuit individually and on behalf of a proposed nationwide class and statewide classes. Plaintiffs allege the following based on personal knowledge as to their own acts and experiences and, as to all other matters, based on the investigation of counsel:

## I.    INTRODUCTION

1.    FCA US, LLC ("FCA") sold dangerous and defective Jeep Wrangler 4xe plug-in hybrid electric vehicles ("PHEV") that are prone to catching fire and exploding. Model years 2021 through 2023 Jeep Wrangler 4xe vehicles (the "Class Vehicles") contain a defect in the hybrid propulsion system that can cause vehicle fires and explosions, even when the vehicles are parked with the ignition in the "off" position (the "Fire Defect"). Despite the ongoing safety risk that the Fire Defect poses, FCA has not yet corrected the problem and did nothing to warn owners and lessees until very recently.

2.    The Fire Defect exposes putative class members to an unreasonable risk of accident, injury, death, or property damage if their vehicle catches fire while in operation or, perhaps more commonly, spontaneously ignites while the vehicle is parked at the class member's home, on a public street, or in a public parking lot. The Fire Defect also exposes passengers, other drivers on the road, neighbors, owners of other cars parked near the Class Vehicles, and other

bystanders to an unreasonable risk of accident, injury, death, and/or property damage.

3.     Some (but not all) of the known fire incidents have occurred while the vehicles were charging.[1] While FCA contends that the root cause of the fires is unknown, alarmingly to consumers, it appears virtually certain that the defect is connected to the vehicles' high-voltage lithium-ion battery packs and related components used to propel the vehicles when they are operating in electric mode.

4.     The high-voltage lithium-ion battery packs in the Class Vehicles (the "Battery Pack") were made by Samsung SDI America Inc. ("Samsung"). Samsung has a history of issues with its high-voltage EV batteries and FCA has had notice since at least 2020. In August 2020, for instance, Ford recalled its Kuga PHEV due to fire risk and, in a familiar refrain, owners were told not to charge the battery. The battery manufacturer was Samsung.[2] Similarly, BMW recalled over 26,000 of its vehicles due to fire risk because "the battery production process allowed impurities to enter the cells."[3]

---

[1] Ex. 1, Guillaume Rivard, *Jeep Wrangler 4xe Recalled Following Eight Fires*, THE CAR GUIDE (Nov. 22, 2023), https://www.guideautoweb.com/en/articles/72779/jeep-wrangler-4xe-recalled-following-eight-fires/ (last visited March 3, 2024).

[2] Ex. 2, Gustavo Henrique Ruffo, *Samsung SDI Might Be The Root of Ford And BMW PHEV Recalls*, INSIDEEVS (Oct. 16, 2020), https://insideevs.com/news/449322/samsung-sdi-root-ford-bmw-phev-recalls/ (last visited March 3, 2024).

[3] *Id.*

5.    Around 2022, Samsung recalled more than 1,000 of its EV batteries (including in FCA vehicles) because of poor manufacturing quality.[4]

6.    Though FCA now admits to having received reports of at least eight (8) fires connected with the hybrid propulsion system (all occurring while the vehicles were parked and turned off[5]), it has not offered owners and lessees of the Class Vehicles any remedy to correct the defect.

7.    Instead, with its first notification to Class Vehicle owners, FCA "advised [owners] to refrain from recharging these vehicles and not to park them inside of buildings or structures, or near other vehicles until the vehicle has the final repair completed." To be clear, there is no repair.

8.    A plug-in electric hybrid that cannot be parked at its home or operated in electric mode is not fit for its ordinary purpose. FCA does not tell Class Vehicle owners just what constitutes a "safe" distance from an exploding vehicle or explain what owners should do with their vehicles if they have no such place to park their vehicles. This places an unfair burden on class members who are unable to use the electric propulsion system they paid thousands of dollars of premium for and are unable to park in their garage (and may have to park quite far away from their

---

[4] Ex. 3, Jung Min-Hee, *Samsung SDI Voluntarily Recalls EV Batteries in the U.S.*, BUSINESSKOREA (Feb. 7, 2022), https://www.businesskorea.co.kr/news/articleView.html?idxno=87120 (last visited March 3, 2024).

[5] Ex. 1.

homes in order to park away from other vehicles). And while owners and lessees cannot use the Class Vehicles, they must continue to make loan, lease, and insurance payments that can add up to thousands of dollars each month.

9.     Many Plaintiffs and putative class members cannot realistically comply with FCA's directive to park their Class Vehicles a "safe" distance from structures or other vehicles near their residences, let alone at places they might wish to drive their vehicles. And, especially in light of spiking gas prices, many class members see little choice but to charge their vehicles rather than wait for FCA to come up with a fix.

10.     Not being able to plug in and charge the Class Vehicles defeats the central purpose of a plug-in hybrid electric vehicle. Absent charging, the Class Vehicles must run exclusively on their gasoline engine, which eliminates the benefits of having a hybrid vehicle. Again, this defect renders a plug-in hybrid electric vehicle unfit for its ordinary purpose.

11.     FCA knew or should have known about the Fire Defect before the Class Vehicles went to market. It certainly knew well before it issued its confounding "recall," through, among other things, studies on the fire risks of lithium-ion battery packs prior to the time the Class Vehicles hit the market;[6] the

---

[6] *See generally* Ex. 4, *Lithium-Ion Battery Safety Issues for Electric and Plug-in Hybrid Vehicles*, NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION (Oct. 2017) ("2017 NHTSA Report").

rigorous pre-launch testing of the Class Vehicles and their hybrid propulsion that any responsible manufacturer would have conducted (including testing that would have revealed the batteries' propensity to simultaneously combust); and similar fire issues in other electric vehicles with Samsung lithium-ion battery packs.

12.     If FCA had conducted adequate pre-launch testing of the hybrid propulsion system in the Jeep Wrangler 4xe, including stress and durability testing of the sort that is the norm for automobile manufacturers planning to market vehicles using volatile lithium-ion batteries for propulsion, it would have learned of the unreasonable and catastrophic risks posed by these lithium-ion battery packs and the related components meant to enable the safe operation of the vehicles in electric mode. FCA was therefore, at a minimum, reckless (and likely worse) in its rush to release a PHEV Jeep Wrangler. If FCA did not conduct the type of pre-launch testing suggested by NHTSA, as detailed below, FCA likewise did not disclose this failure to test to consumers and such failure to test is material.

13.     Owners and lessees of Class Vehicles are injured in fact, incurred damages, and suffered ascertainable losses in money and property because of the Fire Defect. Had Plaintiffs and the putative class members known of the Fire Defect, then they would not have purchased or leased those vehicles; paid substantially less for them; or purchased non-hybrid versions of the vehicles, which are significantly less expensive.

14. Plaintiffs bring this class action to redress FCA's misconduct. Plaintiffs seek damages and a repair under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301-2312, for FCA's violations of state consumer protection acts, breaches of implied warranies, and unjust enrichment.

## II.   **JURISDICTION**

15. This Court has original jurisdiction over this lawsuit under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) and (6), because Plaintiffs and Defendant are citizens of different states; there are more than 100 members of the Class and each Subclass (as defined herein); the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest, and costs; and class members reside across the United States. The citizenship of each party is described further below in the "Parties" section.

16. This Court has personal jurisdiction over the Defendant by virtue of its transactions and business conducted in this judicial district, and because Defendant is headquartered in Michigan. Defendant has transacted and done business, and violated statutory and common law, in the State of Michigan and in this judicial district.

### III.   VENUE

17.    Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendant transacts substantial business and is headquartered in this district.

### IV.   PARTIES

**A.    Plaintiffs**

**Gary Frisch (Arizona)**

18.    Plaintiff and proposed class representative Gary B. Frisch is a citizen of Arizona, residing in Scottsdale, Arizona.  Plaintiff Frisch leased a 2021 Jeep Wrangler 4xe on May 18, 2021, from an authorized FCA dealer in Phoenix, Arizona.  Mr. Frisch leased the car for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or operating under ordinary use.

19.    Before acquiring the Class Vehicle, Plaintiff Frisch conducted extensive research, which included reading literature on the FCA website, a test drive, discussions with the dealer sales representative and his manager as well as reading online reviews regarding the vehicle. Based on this research, Plaintiff Frisch believed FCA's representations regarding the dependability and safety of the Class Vehicle, as well as the fuel economy savings and benefits of it being a hybrid vehicle with the ability to be driven in full electric mode. Plaintiff also believed that the Class Vehicle's plug-in functionality could be used to safely

recharge the Class Vehicle's electric battery indoors or at home. These were among the reasons why Plaintiff leased the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicle and the benefits of using the vehicle in its electric mode, at no point did FCA or its agents, dealers, or other representatives disclose to Plaintiff the Fire Defect.

20.     Plaintiff Frisch is now concerned about driving, charging, and parking the Class Vehicle due to the dangers resulting from the Fire Defect. Plaintiff is unable to park the car in his garage, charge the vehicle for fear of fire, or drive the vehicle for short excursions from home utilizing the electric only functionality due to the Fire Defect. In addition, it is impossible for Plaintiff to park the Class Vehicle away from structures and other vehicles as FCA has instructed because of concerns that the vehicle may cause damage to nearby vehicles. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle as he ordinarily would, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have otherwise needed if the hybrid propulsion system was able to operate as intended. Plaintiff requested that FCA fix the Class Vehicle to address the Fire Defect or provide an alternate vehicle to drive, but FCA has not remedied the Fire Defect or provided Plaintiff with another vehicle.

21.     Had Plaintiff Frisch known of the Fire Defect, he would not have leased the Jeep Wrangler 4xe, but would have instead chosen a safer vehicle.

Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiff cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiff in the untenable position of having to drive an unsafe vehicle and has not provided any concrete repair to address the Fire Defect.

### **Tammy Otto (Arizona)**

22.     Plaintiff and proposed class representative Tammy Otto is a citizen of Arizona, residing in Sedona, Arizona. Plaintiff Otto purchased a 2021 Jeep Wrangler 4xe on October 8, 2021, from an authorized FCA dealer in Flagstaff, Arizona. Ms. Otto purchased the vehicle for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or otherwise operating under ordinary use.

23.     Before acquiring the Class Vehicle, Plaintiff Otto conducted extensive research, including reviewing the vehicle's features on the Jeep website. Based on this research, Plaintiff Otto believed FCA's representations regarding the dependability and safety of the Class Vehicle, as well as the fuel economy savings and benefits of it being a hybrid vehicle with the ability to be driven in full electric mode. Plaintiff also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors or at home. These were among the reasons why Plaintiff purchased the Class Vehicle.

However, despite touting the safety and dependability of the Class Vehicles and the benefits of using the vehicle in its electric mode, at no point did FCA or its agents, dealers, or other representatives disclose to Plaintiff the Fire Defect.

24.    Plaintiff Otto is now concerned about driving, charging, and parking the Class Vehicle due to the dangers resulting from the Fire Defect. Plaintiff limits when she charges the vehicle and she cannot park the vehicle freely because she is concerned it might catch on fire in the wooded area where she lives. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle as she ordinarily would, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed otherwise was the hybrid propulsion system able to operate as intended. Plaintiff requested that FCA provide her with a loaner vehicle due to the safety risk from the fire defect, but FCA did not provide her with one.

25.    Had Plaintiff Otto known of the Fire Defect, she would not have purchased the Jeep Wrangler 4xe, but would have instead chosen a safer vehicle. Plaintiff has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiff cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiff in the untenable position of having to drive an unsafe vehicle and has not provided any concrete repair to address the Fire Defect.

**Robert Stueve (Arizona)**

26.     Plaintiff and proposed class representative Robert Stueve is a citizen of Texas, residing in Dallas, Texas.  Plaintiff Stueve purchased a 2021 Jeep Wrangler 4xe on or about November 24, 2023, from an authorized FCA dealer in Phoenix, Arizona.  Mr. Stueve purchased the car for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or operating under ordinary use.

27.     Before acquiring the Class Vehicle, Plaintiff Stueve conducted extensive research, which included reading literature on the FCA website, reviewing a set of buyback disclosure notices from FCA regarding the vehicle, discussions with the dealer sales representative, and reading other materials regarding the vehicle. Based on this research, Plaintiff Stueve believed FCA's representations regarding the dependability and safety of the Class Vehicle, as well as the fuel economy savings and benefits of it being a hybrid vehicle with the ability to be driven in full electric mode. Plaintiff also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors or at home. These were among the reasons why Plaintiff purchased the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicle and the benefits of using the vehicle in its electric mode, at no

point did FCA or its agents, dealers, or other representatives disclose to Plaintiff the Fire Defect.

28.     Plaintiff Stueve is now concerned about driving, charging, and parking the Class Vehicle due to the dangers resulting from the Fire Defect. Plaintiff is unable to park the car in his garage, charge the vehicle for fear of fire or drive the vehicle for short excursions from home utilizing the electric only functionality due to the Fire Defect. In addition, it is impossible for Plaintiff to park the Class Vehicle away from structures and other vehicles as FCA has instructed because of concerns that the vehicle may cause damage to nearby vehicles. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle as he ordinarily would, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed otherwise was the hybrid propulsion system able to operate as intended. FCA has not remedied the Fire Defect or provided Plaintiff with another vehicle.

29.     Had Plaintiff Stueve known of the Fire Defect, he would not have purchased the Jeep Wrangler 4xe, but would have instead chosen a safer vehicle. Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiff cannot operate the vehicle in a manner in which it was intended to be used. FCA has put

Plaintiff in the untenable position of having to drive an unsafe vehicle and has not provided any concrete repair to address the Fire Defect.

### Brian Kreb (California)

30.     Plaintiff and proposed class representative Brian Kreb is a citizen of California, residing in Chico, California. Plaintiff Kreb purchased a 2021 Jeep Wrangler 4xe on September 8, 2021, from an authorized FCA dealer in San Jose, California. Mr. Kreb purchased the vehicle for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or otherwise operating under ordinary use.

31.     Before acquiring the Class Vehicle, Plaintiff Kreb conducted extensive research, including going on the Jeep website and building out his individual vehicle for purchase, looking at the reported mileage and the specifics of the hybrid engine, and test driving the car itself. Based on this research, Plaintiff Kreb believed FCA's representations regarding the dependability and safety of the Class Vehicle, as well as the fuel economy savings and benefits of it being a hybrid vehicle with the ability to be driven in full electric mode. Plaintiff also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors and at home. These were among the reasons why Plaintiff purchased the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles and the benefits of using the vehicle

in its electric mode, at no point did FCA or its agents, dealers, or other representatives disclose to Plaintiff the Fire Defect.

32.     Plaintiff Kreb is now concerned about driving, charging, and parking the Class Vehicle due to the dangers resulting from this defect. Plaintiff is forced to refrain from using the electric mode of the Class Vehicle due to the Fire Defect and avoids parking it inside his garage at home or near other cars he owns. Moreover, because Plaintiff can no longer charge the battery on the plug-in hybrid vehicle as he ordinarily would, Plaintiff must pay for gasoline he otherwise would not have needed was the hybrid propulsion system able to operate as intended.

33.     Had Plaintiff Kreb known of the Fire Defect, he would not have purchased the Jeep Wrangler 4xe, but would have instead chosen a safer vehicle. Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiff cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiff in the untenable position of having to drive an unsafe vehicle and has not provided any concrete repair to address the Fire Defect.

**Harry Vasquez (Florida)**

34.     Plaintiff and proposed class representative Harry Vasquez is a citizen of Florida, residing in New Port Richey, Florida. Plaintiff Vasquez purchased a 2021 Jeep Wrangler 4xe on September 15, 2023, from a dealer in Tampa, Florida.

Mr. Vasquez purchased the vehicle for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or otherwise operating under ordinary use.

35.    Before acquiring the Class Vehicle, Plaintiff Vasquez conducted extensive research, including reviewing the vehicle's features on the Jeep website. Based on this research, Plaintiff Vasquez believed FCA's representations regarding the dependability and safety of the Class Vehicle, as well as the fuel economy savings and benefits of it being a hybrid vehicle with the ability to be driven in full electric mode. Plaintiff also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors or at home. These were among the reasons why Plaintiff purchased the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles and the benefits of using the vehicle in its electric mode, at no point did FCA or its agents, dealers, or other representatives disclose to Plaintiff the Fire Defect.

36.    Plaintiff Vasquez is now concerned about driving, charging, and parking the Class Vehicle due to the dangers resulting from the Fire Defect. Plaintiff Vasquez avoids driving the Class Vehicle as much as possible, but cannot reasonably park the Class Vehicle away from buildings or other vehicles. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle as he

ordinarily would, Plaintiff must pay for additional gas that Plaintiff would not have otherwise needed if the hybrid propulsion system was able to operate as intended.

37.     Had Plaintiff Vasquez known of the Fire Defect, he would not have purchased the Jeep Wrangler 4xe, but would have instead chosen a safer vehicle. Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiff cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiff in the untenable position of having to drive an unsafe vehicle and has not provided any concrete repair to address the Fire Defect.

### Jade and Christopher Wadleigh (New Jersey)

38.     Plaintiffs and proposed class representatives Jade and Christopher Wadleigh are a married couple and citizens of New Jersey, residing in Sussex, New Jersey. Plaintiffs purchased a 2021 Jeep Wrangler 4xe on or about July 5, 2021, from an authorized FCA dealer. Plaintiffs purchased the vehicle for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or otherwise operating under ordinary use.

39.     Before acquiring the Class Vehicle, Plaintiffs conducted extensive research, including reviewing the vehicle's features on the Jeep website. Based on this research, Plaintiffs believed FCA's representations regarding the dependability and safety of the Class Vehicle, as well as the fuel economy savings and benefits

of it being a hybrid vehicle with the ability to be driven in full electric mode. Plaintiffs also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors or at home. These were among the reasons why Plaintiffs purchased the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles and the benefits of using the vehicle in its electric mode, at no point did FCA or its agents, dealers, or other representatives disclose to Plaintiffs the Fire Defect.

40.    The Wadleigh Plaintiffs are now concerned about driving, charging, and parking the Class Vehicle due to the dangers resulting from the Fire Defect. Moreover, because Plaintiffs can no longer charge the plug-in hybrid vehicle as they ordinarily would, Plaintiffs must pay for additional gas that they would not have otherwise needed if the hybrid propulsion system was able to operate as intended.

41.    Had the Wadleigh Plaintiffs known of the Fire Defect, they would not have purchased the Jeep Wrangler 4xe, but would have instead chosen a safer vehicle. Plaintiffs have lost confidence in the ability of the Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiffs cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiffs in the untenable position of having to drive an unsafe vehicle and has not provided any concrete repair to address the Fire Defect.

**David Perrera (North Carolina)**

42.    Plaintiff and proposed class representative David Perrera is a citizen of North Carolina, residing in Charlotte, North Carolina. Plaintiff Perrera leased a 2021 Jeep Wrangler 4xe on December 4, 2021, from an authorized FCA dealer. Mr. Perrera leased the vehicle for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or otherwise operating under ordinary use.

43.    Before acquiring the Class Vehicle, Plaintiff Perrera conducted extensive research, including reviewing the vehicle's features on the Jeep website. Based on this research, Plaintiff Perrera believed FCA's representations regarding the dependability and safety of the Class Vehicle, as well as the fuel economy savings and benefits of it being a hybrid vehicle with the ability to be driven in full electric mode. Plaintiff also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors or at home. These were among the reasons why Plaintiff leased the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles and the benefits of using the vehicle in its electric mode, at no point did FCA or its agents, dealers, or other representatives disclose to Plaintiff the Fire Defect.

44.    Plaintiff Perrera is now concerned about driving, charging, and parking the Class Vehicle due to the dangers resulting from the Fire Defect.

Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle as he ordinarily would, Plaintiff must pay for additional gas that Plaintiff would not have otherwise needed if the hybrid propulsion system was able to operate as intended.

45.    Had Plaintiff Perrera known of the Fire Defect, he would not have leased the Jeep Wrangler 4xe, but would have instead chosen a safer vehicle. Plaintiff has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiff cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiff in the untenable position of having to drive an unsafe vehicle and has not provided any concrete repair to address the Fire Defect.

### **Dennis Berns (Pennsylvania)**

46.    Plaintiff and proposed class representative Dennis Berns is a citizen of Pennsylvania, residing in Milford, Pennsylvania. Plaintiff Berns purchased a 2021 Jeep Wrangler 4xe on or about December 30, 2022, from an authorized FCA dealer. Mr. Berns purchased the vehicle for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or otherwise operating under ordinary use.

47.    Before acquiring the Class Vehicle, Plaintiff Berns conducted extensive research, including reviewing the vehicle's features on the Jeep website. Based on this research, Plaintiff Berns believed FCA's representations regarding

the dependability and safety of the Class Vehicle, as well as the fuel economy savings and benefits of it being a hybrid vehicle with the ability to be driven in full electric mode. Plaintiff also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors or at home. These were among the reasons why Plaintiff purchased the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles and the benefits of using the vehicle in its electric mode, at no point did FCA or its agents, dealers, or other representatives disclose to Plaintiff the Fire Defect.

48.    Plaintiff Berns is now concerned about driving, charging, and parking the Class Vehicle due to the dangers resulting from the Fire Defect. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle as he ordinarily would, Plaintiff must pay for additional gas that Plaintiff would not have otherwise needed if the hybrid propulsion system was able to operate as intended.

49.    Had Plaintiff Berns known of the Fire Defect, he would not have purchased the Jeep Wrangler 4xe, but would have instead chosen a safer vehicle. Plaintiff has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiff cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiff in the untenable position of having to drive an unsafe vehicle and has not provided any concrete repair to address the Fire Defect.

**Jonathan Liscano (Texas)**

50.     Plaintiff and proposed class representative Jonathan Liscano is a citizen of Texas, residing in McAllen, Texas. Plaintiff Liscano leased a 2023 Jeep Wrangler 4xe on or about April 19, 2023, from a dealer in McAllen, Texas. Mr. Liscano leased the vehicle for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or otherwise operating under ordinary use.

51.     Before acquiring the Class Vehicle, Plaintiff Liscano conducted extensive research, including but not limited to reviewing the vehicle's features on the Jeep website. Based on this research, Plaintiff Liscano believed FCA's representations regarding the dependability and safety of the Class Vehicle, as well as the fuel economy savings and benefits of it being a hybrid vehicle with the ability to be driven in full electric mode. Plaintiff also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors or at home. These were among the reasons why Plaintiff leased the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles and the benefits of using the vehicle in its electric mode, at no point did FCA or its agents, dealers, or other representatives disclose to Plaintiff the Fire Defect.

52.     Plaintiff Liscano is now concerned about driving, charging, and parking the Class Vehicle due to the dangers resulting from the Fire Defect. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle as he ordinarily would, Plaintiff must pay for additional gas that Plaintiff would not have otherwise needed if the hybrid propulsion system was able to operate as intended.

53.     Had Plaintiff Liscano known of the Fire Defect, he would not have leased the Jeep Wrangler 4xe, but would have instead chosen a safer vehicle. Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiff cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiff in the untenable position of having to drive an unsafe vehicle and has not provided any concrete repair to address the Fire Defect.

**B.     Defendant**

54.     Defendant FCA US, LLC ("FCA"), formerly known as Chrysler Group, is a Delaware limited liability company organized and existing under the laws of the State of Delaware, and is wholly owned by Stellantis N.V., a Dutch corporation headquartered in Amsterdam, Netherlands. FCA's principal place of business and headquarters is at 1000 Chrysler Drive, Auburn Hills, Michigan 48326.

55.     FCA is a motor vehicle manufacturer and a licensed distributor of new, previously untitled Chrysler, Dodge, Jeep, and Ram brand motor vehicles. FCA's Chrysler brand is one of the "Big Three" American automobile brands. FCA engages in commerce by distributing and selling new and used passenger cars and motor vehicles under its Chrysler, Dodge, Jeep, and Ram brands.

56.     FCA, through its various entities, designs, manufactures, markets, distributes, and sells automobiles throughout the United States and worldwide. FCA and/or its agents designed and manufactured the Class Vehicles. FCA also developed and disseminated the owner's manuals and warranty booklets, advertisements, brochures, and other promotional materials relating to the Class Vehicles, with the intent that such documents be purposely distributed throughout all fifty states. FCA is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

## V.     FACTUAL ALLEGATIONS

**A.     FCA marketed the Jeep Wrangler 4xe as a rugged, high-performing, and emissions-friendly hybrid-electric vehicle.**

57.     The Jeep Wrangler is a popular compact sport utility vehicle that FCA designs, manufactures, and sells under the Jeep brand. The Jeep Wrangler features a four-wheel drive drivetrain (also known as "4x4" or "four-by-four"), which transmits torque to all four of its wheels simultaneously, allowing the vehicle to be driven off-road or on rough terrain.

58.    In 2021, FCA released a "4xe" plug-in hybrid-electric version of the Jeep Wrangler as part of the growing trend in the automotive industry towards electrification and hybrid vehicles. The 4xe (or "four-by-e") name is a play-on of "4x4" that highlights the vehicle's four-wheel drive and electric capabilities.

59.    FCA advertised the Jeep Wrangler 4xe as offering the same rugged features as the Jeep Wrangler, but with the benefits of a plug-in hybrid electric battery. Plug-in hybrid-electric vehicles like the Class Vehicles have significant environmental advantages over conventional vehicles with internal combustion engines. While operating in electric mode, the Class Vehicles do not produce any of the noxious tailpipe emissions—such as nitrogen oxides and other smog-forming pollutants, other pollutants harmful to human health, and greenhouse gases such as carbon dioxide and methane—that vehicles with internal combustion engines produce. In addition to the environmental benefits, the plug-in hybrid-electric design consumes less fuel and is supposed to provide more power and torque than traditional internal combustion engines, giving the Class Vehicles better acceleration and performance.

60.    FCA's marketing for the Class Vehicles conveyed to consumers that they could have the best of both worlds—an adventurous vehicle that was also emissions friendly and technology driven.

- 24 -

61.     For example, the vehicle brochure for the 2021 Jeep Wrangler 4xe touts that the vehicle "is a shining example of hybrid innovation, handing you tomorrow's progressive technology, today," while also providing "the rugged, open-air freedom and legendary capability that Jeep Wrangler is revered for, the world over":



62.     The brochure also boasted that the vehicle was "strong," "quick,"

"expansive," and "easy on the planet":



63.     FCA promoted the same bundle of features in the vehicle brochures

for the 2022 and 2023 Jeep Wrangler 4xe:

**2022:**



**2023:**



64.     In addition to highlighting the off-road capabilities of the Jeep Wrangler 4xe, FCA also marketed the vehicle as fit for city driving. For example, the vehicle brochure for the 2021 Jeep Wrangler 4xe highlighted how the driver could choose between different modes of the hybrid drivetrain under the banner of "POWER x2," including an electric-only mode and an "E-SAVE" mode for "low-emission zones in cities."



65.     The purported benefits of the plug-in hybrid-electric design came at a hefty premium to consumers: the Jeep Wrangler 4xe models cost thousands of dollars more than similarly equipped Jeep Wranglers with conventional, non-

hybrid internal combustion engines. And while FCA highlighted the electric battery features to justify this premium cost, FCA's marketing never disclosed to consumers that the Class Vehicles were equipped with dangerous batteries susceptible to spontaneous fire.

66.     Nor did FCA's marketing disclose to consumers that they would not be able to park or charge their vehicles indoors due to battery fire risk.  Instead, FCA advertised the high-tech charging features of the Class Vehicles, and ironically described the vehicle interiors as "a place to recharge."



67.     Instead of being a "place to recharge," Plaintiffs and class members are justifiably afraid to be anywhere near their Jeep Wrangler 4xe, much less inside of it.

**B.     The Fire Defect is likely the result of defective high-voltage lithium-ion batteries.**

68.     FCA failed to adequately research, design, test, and manufacture the Class Vehicles before warranting, advertising, promoting, marketing, and selling the Class Vehicles as suitable and safe for use in an intended and reasonably foreseeable manner.

69.     As FCA now admits in a November 22, 2023, notification of a safety recall sent to the National Highway Traffic Safety Administration ("NHTSA") (of which consumers were apprised later in 2023),[7] the Class Vehicles contain a "high voltage ('HV') battery which may fail internally" and could "lead to a vehicle fire with the ignition on or off."

70.     Although FCA claims that the "root cause" of the Fire Defect is unknown, the nature of the fires and the fact they can occur even while the vehicle is not running—together with FCA's direction to refrain from charging the vehicle until it is willing and able to provide a fix—strongly suggests that the defect is

---

[7] Ex. 5, November 22, 2023 Part 573 Safety Recall Report for NHTSA Recall No. 23V-787.

connected to the high-voltage lithium battery pack that powers the electric propulsion of the Class Vehicles.

71.     At a high level, the fire risk posed by the use of lithium-ion batteries stems from a phenomenon known as "thermal runaway." A lithium-ion cell can heat up and catastrophically fail under one of several scenarios: a manufacturing defect in a cell; improper electrical charging and/or discharging; mechanical damage associated with significant bending or puncturing of a cell; or thermal abuse, wherein the cell is subjected to high temperatures. All of these scenarios generate local heating in the cell. The local heating induces locally high temperatures, which accelerate additional chemical reactions that can promote the degradation of the organic liquid electrolytes in the cell; these electrolytes and their decomposition products are volatile and flammable at high temperatures.[8]

72.     Significantly, the documented fires in the Class Vehicles do not appear to be the result of external abuse. Upon information and belief, all reported fires to date have resulted from an internal failure while the cars are parked and turned off.[9] Reports suggest that this type of spontaneous combustion is caused by

---

[8] Ex. 6, Heekyon Yang, *Explainer: Are lithium-ion batteries in EVs a fire hazard?*, REUTERS (Aug. 23, 2021), https://www.reuters.com/business/autos-transportation/are-lithium-ion-batteries-evs-fire-hazard-2021-08-23/#:~:text=Lithium%2Dion%20batteries%2C%20whether%20they,battery%20is%20not%20designed%20correctly (last visited March 3, 2024).

[9] Ex. 1.

the internally initiated thermal runaway process. Given that a single cell failure that may occur because of cell manufacturing defects, good engineering design should limit the thermal runaway propagation to adjacent cells. Catastrophic failure occurs when multiple cells become engaged in thermal runaway. It has been estimated that thermal runaway has caused as many as 80% of lithium-ion battery fires.[10]

73.     The high-voltage batteries in the Class Vehicles are 400v lithium-ion batteries made by Samsung that have an MSRP of $16,910.00 each.[11] FCA and Samsung have recently touted their $2.5 billion joint venture in manufacturing these battery packs in Kokomo, Indiana.[12]

74.     Samsung also made the cells contained in batteries that allegedly caused fires in certain BMW and Ford models that have been recalled and subject

---

[10] *See* Ex. 7, Adreesh Ghoshal, *How Lithium Ion Batteries in EVs Catch Fire*, MEDIUM (Aug. 16, 2020), https://medium.com/the-innovation/how-lithium-ion-batteries-in-evs-catch-fire-9d166c5b3af1 (last visited March 3, 2024); *see also* Ex. 8, Ryan Fogelman, *April 2020 Fire Report: How & Why Do Lithium-Ion Batteries Fail, Insight from the Jedi Master of Lithium Power!*, WASTE360 (May 5, 2020), https://www.waste360.com/safety/april-2020-fire-report-how-why-do-lithium-ion-batteries-fail-insight-jedi-master-lithium (last visited March 3, 2024).

[11] Ex. 9, Mild Hybrid Motor Generator Unit Battery Pack, MYMOPARPARTS, https://www.mymoparparts.com/oem-parts/mopar-mild-hybrid-motor-generator-unit-mgu-battery-pack-68488244aa (last visited March 3, 2024).

[12] Ex. 10, *Stellantis and Samsung SDI to Invest Over $2.5 Billion in Joint Venture for Lithium-Ion Battery Production Plant in United States*, STELLANTIS PRESS RELEASE (May 24, 2022), https://www.stellantis.com/en/news/press-releases/2022/may/stellantis-and-samsung-announce-battery-plant-in-kokomo?adobe_mc_ref= (last visited March 3, 2024).

to litigation.[13] Those Ford and BMW recalls occurred in 2020, and upon information and belief, were caused by similar defective attributes as present here.

75.     According to BMW, the fires that led to recall of their PHEVs were caused by "thermal events" in the Samsung batteries.[14] These facts make it overwhelmingly likely that the Fire Defect is in fact the result of defectively designed, manufactured, or installed batteries.

76.     So far, FCA has recalled only the 2021-2023 Jeep Wrangler 4xe. However, FCA has continuously sold Jeep Wrangler 4xe vehicles to this day and continues to use Samsung's 400v lithium-ion batteries.

77.     Accordingly, Plaintiffs' counsel continue to investigate whether additional model years of the Jeep Wrangler 4xe are also affected by the Fire Defect.

---

[13] Ex. 2.

[14] Ex. 11, *Burbank et al. v. BMW of N. Am.*, No. 2:21-cv-01711 (D.N.J.) (Dkt. No. 1, at ¶ 15) (Dec. 3, 2020).

C.    **FCA knew or should have known of the Fire Defect long before it disclosed the problem to Plaintiffs.**

i.    **Lithium-ion batteries are dangerous without appropriate safeguards.**

78.    Most electric and hybrid electric vehicles, like the Class Vehicles, use lithium-ion batteries because of their "high power-to-weight ratios, high energy efficiency, good high-temperature performance, and low self-discharge."[15]

79.    However, Lithium-ion batteries also carry well-documented risks of spontaneous combustion.[16] Safety concerns related to unexpected fires connected with Lithium-ion batteries are well-documented and were known to FCA at the time it designed, manufactured, and sold the Class Vehicles.[17] Well before 2017, many scientific and engineering articles discussed the thermal-runaway-related safety concerns of lithium-ion cells and battery packs and proposed solutions.[18] (Wen et al., 2012; Feng et al., 2015).

---

[15] Ex. 12, *Batteries for Hybrid and Plug-In Electric Vehicles*, U.S. DEP'T OF ENERGY, https://afdc.energy.gov/vehicles/electric_batteries.html (last visited March 3, 2024).

[16] *See* Ex. 7; *see also* Ex. 8.

[17] *See* Ex. 4, 2017 NHTSA Report at 2-24 through 2-27, 3-9-3 through 3-11 (discussing fire risks of high-voltage lithium-ion batteries in vehicles).

[18] Ex. 13, Wen, Jianwu, *et al.*, *A Review on Lithium-Ion Batteries Safety Issues: Existing Problems and Possible Solutions*, AMERICAN SCIENTIFIC PUBLISHERS (2012); Ex. 14, Feng, Xuning, *et al.*, *Thermal runaway mechanism of lithium ion battery for electric vehicles: A review*, SCIENCEDIRECT, 2015, https://www.sciencedirect.com/science/article/abs/pii/S2405829716303464, (last visited March 3, 2024)

80.     Like other batteries, Lithium-ion batteries are made up of multiple power-generating compartments called "cells."[19] Each cell contains the basic functional components of a simple battery: a positive electrode, a negative electrode, and an electrolyte.[20] In addition, each cell contains a separator designed to keep the positive electrode from contacting and discharging into the negative electrode.[21]

81.     The active materials (either cathode or anode) store the lithium. The electrolyte carries lithium ions between electrodes.[22] When lithium ions flow from the negative electrode, or anode, to the positive electrode, or cathode, energy is discharged from the battery cell in the form of electricity.[23] When the cell is charging, those ions flow in the opposite direction, or from cathode to anode.[24]

82.     Of course, a single cell cannot store nearly enough energy to power an automobile, so cells are grouped into modules and packs. Those modules and packs, together with control systems, constitute the complete battery.[25]

---

[19] Ex. 15, Chris Woodford, *Lithium-ion batteries*, EXPLAINTHATSTUFF! (Nov. 23, 2020), https://www.explainthatstuff.com/how-lithium-ion-batteries-work.html (last visited March 3, 2024).

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] Ex. 4, 2017 NHTSA Report, § 4.

83.     A module ordinarily contains an array of cells, sensors, controls, mounts, communications capabilities, protective safety devices, and cooling elements or cooling provisions.[26]

84.     Beyond this, there are various methods of: (i) arranging the cells into arrays within the module; (ii) managing the flow of electrical current to and from the module or arrays within the module; and (iii) monitoring and managing the temperature of the cells within the module. Finally, there are various other necessary safety features, and integration with vehicle with the vehicle also plays an important role in the safety of the Lithium-ion battery.[27]

85.     Just as important as the design and safety features used in an Lithium-ion battery pack is rigorous pre-launch testing.[28] The use of better safety systems and more rigorous testing would have prevented the reported battery fire incidents in the Class Vehicles and the significant cost and inconvenience now visited upon Plaintiffs and class members.

86.     On information and belief, FCA knew or should have known about the Fire Defect before it sold the Class Vehicles and certainly long before it disclosed the problem, as evidenced by: (1) the well-documented risks of runaway propagation in lithium-ion batteries; (2) the rigorous pre-launch testing FCA must

---

[26] *Id.* § 4.1.1.

[27] *Id.*, Ch. 4.

[28] *Id.*, Ch. 8.

have done on the batteries and hybrid propulsion system; (3) consumer complaints lodged with NHTSA and elsewhere online; (4) consumer complaints lodged with FCA directly; and (5) other similar fire issues in BMW and Ford-manufactured vehicles that (like the Class Vehicles) use Samsung batteries for electric propulsion.

> ii. **The National Highway Traffic Safety Administration (NHTSA) warned of safety risks for lithium-ion batteries well before the Class Vehicles entered the market.**

87.    In 2017, NHTSA released a report on lithium-ion battery safety issues, which documented well-known battery fire risks, cited to the vast body of academic and engineering studies on those risks, and recommended rigorous design and testing protocols to protect against those risks. All of this would have been known to FCA at the time it launched the Class Vehicles.

88.    NHTSA reiterated that all car manufacturers have a duty "to conduct their own due diligence safety testing and analysis, while the industry is working to develop a consensus."[29] Unfortunately for Plaintiffs and the putative Classes and Subclasses, FCA recklessly or intentionally breached this duty to better pad its profits.

89.    A central focus of the NHTSA Report is the fire risk associated with the use of Lithium-ion batteries, and recommended protection methods and

---

[29] *Id.* at xx.

rigorous testing required to mitigate that risk.[30] The major cause of these fires is the propagation of thermal runaway.

90.     According to the NHTSA Report, thermal runaway "is a phenomenon in which the lithium-ion cell enters an uncontrollable, self-heating state."[31] If a cell short-circuits, the cell electrolyte can combust; pressure in the cell rapidly increases until the cell bursts and releases the flammable electrolyte and other flammable and toxic gases. It is known that rupturing cells release hydrogen gas, carbon monoxide gas, and various other flammable and toxic gases. The temperature of the ruptured cell can increase to above 1,832 degrees Fahrenheit.[32]

91.     As the NHTSA Report stresses:

> [T]hermal runaway of a Lithium-ion cell is one of the fundamental failure mechanisms leading to safety hazards from Lithium-ion batteries. Cell heating is normal, but temperatures must be maintained within a predetermined safe operating level. Thermal runaway is most likely to be realized when an event occurs that results in rapid heating of the cell that outpaces the rate of heat dissipation by the cell. Rapid heating may be caused by internal or external

---

[30] *See id.* at xvi; *see also id.* at Ch. 6 (management and control systems), 8-10 (testing, "gap assessments," and "hazards, risks and risk mitigation strategies").

[31] Ex. 16, *What is Thermal Runaway?*, UNDERWRITERS LABORATORIES (Aug. 24, 2021), https://ul.org/what-we-do/electrochemical-safety/getting-started-electrochemical-safety/what-thermal-runaway#:~:text= (last visited March 3, 2024).

[32] Ex. 17, Alysha Liebscher and Gary Gayman, *Preventing Thermal Runaway in Electric Vehicle Batteries*, MACHINE DESIGN (Dec. 26, 2018), https://www.machinedesign.com/materials/article/21837402/preventing-thermal-runaway-in-electric-vehicle-batteries (last visited March 3, 2024).

> short circuits, overcharging, and general use [among other
> things.] [33]

As the Report further notes, "[t]he thermal and mechanical design of a cell strongly influences its ability to control and dissipate heat, thereby influencing its safety performance."[34]

92.    When thermal runaway spreads from one cell to adjacent cells in the module, the result is what appears to be happening in the Class Vehicles—thermal runaway propagation, causing spontaneous combustion even when the cars are parked. In other words, "the rapid and extreme rise in temperature (thermal runaway) can easily propagate to nearby cells in a domino effect that has been dubbed thermal runaway propagation."[35] Fires and explosions then result.

93.    Given the extreme hazards of runaway propagation in high-voltage Lithium-ion batteries such as those used in the Class Vehicles, it is incumbent upon manufacturers to incorporate strong safety measures and rigorous testing.

94.    As the 2017 NHTSA report noted in a statement that has been prophetic for Plaintiffs and all other owners and lessees of the Class Vehicles, as of 2017, car manufacturers were not adequately designing and testing electric and plug-in-hybrid electric systems powered by highly volatile Lithium-ion batteries—

---

[33] Ex. 4, 2017 NHTSA Report at 3.2.
[34] *Id.*
[35] Ex. 17.

indeed, the "safety standards" employed by car manufactures such as FCA appeared "to trail—rather than lead—technology development."[36]

95.    As of 2017, there were a good number of standards and testing protocols designed to guide manufacturers in constructing Lithium-ion battery systems to be safely used in electric and plug-in hybrid electric vehicles, and many safety technologies and testing protocols existed at the time of the launch of the Class Vehicles.[37]

96.    Appropriate safety measures to prevent thermal runaway at the cellular level included a range of "electrical components and subsystems to prevent heating and overpressure to the cell by opening the circuit, increasing resistance, or changing the chemical composition of the cell."[38]

97.    Protection technology at the module level also existed, including technologies for "charge and discharge management," designed to limit the electric current to and from the battery module or cellular arrays within a module. Such technologies also protect against the potential for abnormal discharge caused by failures such as short circuiting, which can trigger thermal runaway and ultimately runaway propagation.[39]

---

[36] Ex. 4, 2017 NHTSA Report at 1-3.
[37] *See id.* at 3-9 through 3-11, Ch. 8.
[38] *Id.* at 3-10.
[39] *Id.* at 4-6.

98.     Also at the module level, manufacturers must ensure adequate thermal management to monitor and prevent the spikes in temperature associated with thermal runaway. "Thermal management functions at the module level include, first monitoring, then cooling," and various available technologies serve this function.[40] Thermal management must also occur at the battery pack level in order to maintain "an average temperature within the battery's specifications, and with even temperature distribution throughout the pack."[41] Cooling and thermal barrier separation between cells can reduce the rate of thermal runaway propagation and can stop cell-to-cell propagation for properly sized cells and cooling systems.

99.     Other available safety features at the module level included "interlock circuits, pressure sensors, and communication architecture that allows the battery status to be monitored by the automobile electronic control unit."[42]

100.    Other available safety measures operate at the battery pack level, including (but not limited to) thermal management; an array of communication, control, and reporting functions;[43] and the appropriate integration of the battery pack with the vehicle.[44]

_____

[40] *Id.* at 4-10 through 4-15.
[41] *Id.* at 4-24.
[42] *Id.* at 4-16 through 4-19.
[43] *Id.* at 4-28.
[44] *Id.* at 4-34.

101.   On information and belief, any number of combinations of the above-referenced safety protocols, in combination with effective safety testing, would have rendered the Class Vehicles safe and fit for their intended purpose of operating as plug-in hybrid electric vehicles.

102.   The dilemma facing electric and plug-in hybrid electric vehicles is that incorporating adequate safety measures is not only expensive, but also "is likely to reduce the vehicle's range because any protective materials means less space for the electricity-storing cells."[45] On information and belief, FCA skimped on available protection measures in order to tout the high electric mode range and overall range of the Class Vehicles—all to the benefit of FCA's bottom line and to the detriment of owners and lessees of the Class Vehicles.

103.   Regardless of the safety measures incorporated in the battery and related components designed to prevent runaway propagation, before launching an electric or plug-in hybrid electric vehicle, propagation testing is of the utmost importance.[46]

104.   In addition to the 2017 NHTSA report, at the time of the launch of the Class Vehicles, there were a wide array of standards and safety testing of Lithium-ion batteries and vehicles that use them, including those promulgated by the

---

[45] Ex. 17.
[46] Ex. 4, 2017 NHTSA Report at 3-9 (discussing propagation testing *circa* 2014).

Society for Automotive Engineers (SAE), the International Organization for Standardization, Underwriters Laboratories, the Institute for Electrical and Electronics Engineers, the United Nations Economic Commission for Europe, and Sandia National Laboratories for the FreedomCAR program.[47]

105.   Many of these standards and testing protocols protect against runaway propagation and the resulting catastrophe for vehicle owners and anyone or anything in their vicinity.[48]

106.   These standards and testing protocols provided FCA with a wide range of guidelines on design and laboratory testing considerations to ensure the safety of Lithium-ion batteries in the Class Vehicles.

107.   On information and belief, any adequate testing of the Class Vehicle would have revealed the Lithium-ion batteries' propensity to spontaneously combust as the result of runaway propagation. Either FCA followed these standards and testing protocols and discovered the risk, or it failed to follow these protocols.

### iii.     FCA launches the Class Vehicles, and fires result.

108.   Once FCA released the Class Vehicles into the market, owners and lessees began complaining that their Class Vehicles suddenly caught fire. Between

---

[47] *Id.* at 8-1.
[48] *See id.* at Ch. 8.

at least May and October 2023, no less than eight (8) Jeep 4xe's spontaneously caught fire all while parked and turned off.

109.   All vehicle manufacturers, including FCA, routinely monitor and analyze NHTSA complaints to determine whether vehicles or components should be recalled due to safety concerns. Thus, on information and belief, FCA has knowledge of all NHTSA complaints filed concerning the vehicles it manufacturers, including the Class Vehicles. See TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

110.   Complaints submitted to FCA and to NHTSA via Vehicle Owner Questionnaires ("VOQ") reveal multiple instances of Class Vehicles catching on fire.

> **iv.     FCA had actual and/or constructive knowledge of the Fire Defect but was slow to recall the Class Vehicles and still has not provided an actual fix to correct the defect.**

111.   Despite FCA's actual and/or constructive knowledge of the serious risk of explosion and fire in the Class Vehicles, it did nothing to remedy the problem or even warn consumers until many months later.

112.   According to a Part 573 Recall Report that FCA sent to NHTSA on November 22, 2023, FCA's Technical Safety and Regulatory Compliance organization began investigating fire risk from the HV battery pack after receiving numerous reports of spontaneous fires.

113.   By October 2023, FCA had conducted "two vehicle buybacks and have disassembled the HV battery packs. The modules and cells are undergoing additional analysis."

114.   Finally, on November 22, 2023, FCA's Vehicle Regulations Committee decided "to conduct a voluntary safety recall" of the Class Vehicles.

115.   However, in large part due to its slowness to even acknowledge the issue, FCA is not yet offering any remedy for the defect. Instead, FCA continues to advise the Class Vehicle owners and lessees "to refrain from recharging these vehicles and not to park them inside of buildings or structures, or near other vehicles until the vehicle has the final repair completed." FCA does not explain what could constitute a safe distance from an exploding car or what owners should do with their vehicles if they have no such place to park them. FCA is likewise not globally offering to buy back the vehicles or provide loaner or rental vehicles until such time as it can fix the problem.

116.   In particular and as alleged herein, FCA's failure to provide a recall remedy leaves Class Vehicle owners facing three choices: follow FCA's instructions, if possible, at the great inconvenience of parking far from home and the expense and environmental impact of additional consumption of gasoline; ignore FCA's instructions and risk calamity; or sell the vehicles at a substantial loss as a result of FCA's conduct.

117.   Perhaps more commonly, many owners of Class Vehicles are simply unable to find a "safe" place to park their vehicles at home, work, and/or anywhere else they need to take their vehicles. This is especially true for owners who live in apartments or densely populated urban areas, but also rural wooded areas with high fire risk. Often, they have no choice but to park them in unsafe locations. Others, faced with spiking fuel costs, simply cannot afford not to re-fuel them.

118.   All owners and lessees of the Class Vehicles have suffered ascertainable loss in the form of greatly diminished value of their vehicles which are not fit for their ordinary purposes, and excess fuel costs, among other things.

## VI.   DISCOVERY RULE TOLLING OF THE STATUTE OF LIMITATIONS

119.   At the time that they purchased or leased their Class Vehicles, Plaintiffs and class members could not have discovered through the exercise of reaasonable diligence the existence of the Fire Defect or FCA's conduct as complained of herein.

120.   Because FCA itself claims it had no knowledge of the fire risk until at the earliest November 2023 and/or concealed its knowledge regarding the existence of the Fire Defect, class members had no way of knowing about the unreasonable fire risk of the Class Vehicles.

121.   Plaintiffs and the other class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that FCA did

not report information within its knowledge to federal and state authorities, its

dealerships, or consumers; nor would a reasonable and diligent investigation have

disclosed that FCA had concealed information about the unreasonable fire risk of

the Class Vehicles, which was discovered by Plaintiffs only shortly before this

action was filed.

122.   For these reasons, all applicable statutes of limitation have been tolled

by operation of the discovery rule with respect to claims as to the Class Vehicles.

## VII.   <u>CLASS ALLEGATIONS</u>

123.   Plaintiffs bring this action on behalf of themselves and as a class

action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of

Civil Procedure, on behalf of the following class and subclasses:

> **<u>Nationwide Class</u>**: All persons or entities who purchased or
> leased one or more model year 2021-2023 Jeep Wrangler 4xe
> vehicles (the "Class Vehicles").

> **<u>Arizona Subclass</u>:** All persons or entities who purchased or
> leased one or more of the Class Vehicles in the State of Arizona.

> **<u>California Subclass</u>:** All persons or entities who purchased or
> leased one or more of the Class Vehicles in the State of
> California.

> **<u>Florida Subclass</u>:** All persons or entities who purchased or
> leased one or more of the Class Vehicles in the State of Florida.

> **<u>New Jersey Subclass</u>:** All persons or entities who purchased or
> leased one or more of the Class Vehicles in the State of New
> Jersey.

**North Carolina Subclass:** All persons or entities who purchased or leased one or more of the Class Vehicles in the State of North Carolina.

**Pennsylvania Subclass:** All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Pennsylvania.

**Texas Subclass:** All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Texas.

124.   Plaintiffs assert claims under the laws of each state set forth below.

125.   Excluded from the definitions of each Class and Subclass are any personal injury or property damages claims resulting from the fires or explosions caused by the Class Vehicles. Also excluded from the Class and Subclasses are FCA and its subsidiaries and affiliates; all persons who make a timely election to be excluded from this action; governmental entities; the Judge to whom this case is assigned and his/her immediate family; and Plaintiffs' Counsel. Plaintiffs reserve the right to revise the Class and Subclass definitions based upon information learned through discovery.

126.   Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

127.    This action has been brought and may be properly maintained on behalf of the Class and Subclasses proposed herein under Federal Rule of Civil Procedure 23.

## A.    Numerosity

128.    Federal Rule of Civil Procedure 23(a)(1): The members of each Class and Subclass are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. For purposes of this complaint, Plaintiffs allege that there are estimated to be over 32,000 Class Vehicles in the Nationwide Class. The precise number of Class and Subclass members is unknown to Plaintiffs but may be ascertained from FCA's books and records. Class and Subclass members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

## B.    Commonality and Predominance

129.    Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class and Subclass members, including, without limitation:

    a.    Whether FCA engaged in the conduct alleged herein;

    b.    Whether the Fire Defect creates an unreasonable risk of fires in the Class Vehicles;

    c.    When FCA first knew about the Fire Defect;

d.     Whether FCA designed, manufactured, marketed, and distributed the Class Vehicles with defective high-voltage battery packs;

e.     Whether any future FCA purported recall "repair" is a *bona fide* repair of the faulty battery packs;

f.     Whether FCA's conduct renders it liable for breach of warranties;

g.     Whether FCA has been unjustly enriched at the expense of Plaintiffs and the Class and Subclasses;

h.     Whether Plaintiffs and the other Class and Subclass members overpaid for their vehicles at the point of sale; and

i.     Whether Plaintiffs and the other Class and Subclass members are entitled to damages and other monetary relief and, if so, in what amount.

## C.     Typicality

130.   Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class and Subclass members' claims because, among other things, all Class and Subclass members were comparably injured through FCA's wrongful conduct as described above.

## D.     Adequacy

131.   Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class and Subclass representatives because their interests do not conflict with the interests of the other members of the Class and Subclasses they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class and

Subclasses' interests will be fairly and adequately protected by Plaintiffs and their counsel.

## E.   Superiority

132.   Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class and Subclass members are relatively small compared to the burden and expense that would be required to individually litigate their claims against FCA, so it would be impracticable for the members of the Class and Subclasses to individually seek redress for FCA's wrongful conduct. Even if Class and Subclass members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.  NATIONWIDE CLAIMS

### COUNT I
### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq.*)
### (Alleged by all Plaintiffs on behalf of the Nationwide Class
### or, in the alternative, the State Subclasses)

133.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

134.   Plaintiffs bring this claim on behalf of the Nationwide Class.

135.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

136.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiffs and Nationwide Class members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

137.   FCA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

138.   15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

139.   FCA provided Plaintiffs and Nationwide Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-

Moss Warranty Act, 15 U.S.C. § 2301(7). As part of the implied warranty of merchantability, FCA warranted that the Class Vehicles engines were fit for their ordinary purpose as safe plug-in hybrid electric motor vehicles and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

140.    FCA breached its implied warranties, as described in more detail above, and is therefore liable to Plaintiffs pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm, and/or property damage to lessees and owners of the Class Vehicles as well as their homes, passengers, and bystanders. This defect rendered the Class Vehicles, when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of hybrid driving. In fact, as a result of the defect, FCA specifically advised owners and lessees not to charge their batteries and not to drive the Class Vehicles in electric mode.

141.    As discussed above, on information and belief, FCA skimped on available safety technologies that would have precluded the Fire Defect, and, through the sort of testing that any responsible vehicle manufacturer would have done prior to launching the Class Vehicles, FCA knew or should have known of

the defect. Yet, in order to pad its bottom line and launch the first-ever plug-in hybrid electric vehicle with the highest possible electric and overall range, FCA intentionally or recklessly foisted the outrageously dangerous Class Vehicles on unwitting class members.

142.   Any effort by FCA to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

143.   Any limitations FCA might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between FCA and Plaintiffs, as, at the time of purchase and lease, Plaintiffs had no other options for purchasing warranty coverage other than directly from FCA.

144.   Any limitations FCA might seek to impose on its warranties are substantively unconscionable. FCA knew that the Class Vehicles were defective and that the Class Vehicles could spontaneously ignite when used as intended long before Plaintiffs and the Class. FCA failed to disclose this defect to Plaintiffs and the Class. Thus, enforcement of the durational limitations on the warranties is harsh and would shock the conscience.

145.   Plaintiffs have had sufficient direct dealings with either FCA or its agents (dealerships) to establish privity of contract between FCA and Plaintiffs. Nonetheless, privity is not required here because Plaintiffs are intended third-party

beneficiaries of contracts between FCA and its dealers, and specifically, of FCA's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the aforementioned defect, as spontaneous fires present an unreasonable risk of death, serious bodily harm, and/or property damage to lessees and owners of the Class Vehicles as well as their homes, other nearby structures and vehicles, passengers, and bystanders.

146. Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give FCA notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

147. Plaintiffs would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because FCA will not acknowledge any revocation of acceptance and immediately return any payments made, Plaintiffs have not re-accepted their Class Vehicles by retaining them.

148. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum

of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of all other Nationwide Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the Nationwide Class members in connection with the commencement and prosecution of this action.

149.   Plaintiffs also seek the establishment of an FCA-funded program for Plaintiffs and Nationwide Class members to recover out-of-pocket costs incurred in attempting to rectify and/or mitigate the effects of the hybrid propulsion system defect in their Class Vehicles.

## IX.   STATE-SPECIFIC CLAIMS

**A.   Arizona**

**COUNT II**
**BREACH OF IMPLIED WARRANTY OF**
**MERCHANTABILITY UNDER ARIZONA LAW**
**(Ariz. Rev. Stat. § 47-2314)**
**(Alleged by Plaintiffs Frisch, Otto, and Stueve on behalf of the Arizona Subclass)**

150.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

151.   Plaintiffs Frisch, Otto, and Stueve ("Plaintiffs," for purposes of the Arizona claims) bring this claim on behalf of themselves and the Arizona Subclass ("Subclass," for purposes of the Arizona claims).

152.   FCA is and was at all relevant times a merchant with respect to motor vehicles under Ariz. Rev. Stat. § 47-2014.

153.   Under Arizona law, an implied warranty of merchantability attaches to the Class Vehicles. Ariz. Rev. Stat. § 47-2314.

154.   The Class Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to spontaneous combustion, and pose an unreasonable risk of fires due to their spontaneous fire risk as described herein. Without limitation, the Class Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm, and/or property damage to lessees and owners of the Class Vehicles as well as their homes, passengers, and bystanders. This defect renders the Class Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Class Vehicles in electric mode.

155. Plaintiffs and Subclass members were and are third-party beneficiaries of FCA's contracts with FCA-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiff and Arizona Subclass members.

156. As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and Arizona Subclass members have been damaged in an amount to be determined at trial.

**COUNT III**
**VIOLATIONS OF THE CONSUMER FRAUD ACT**
**(Ariz. Rev. Stat. § 44-1521, *et seq.*)**
**(Alleged by Plaintiffs Frisch, Otto, and Stueve on behalf of the Arizona Subclass)**

157. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

158. Plaintiffs Frisch, Otto, and Stueve ("Plaintiffs," for purposes of the Arizona claims) bring this claim on behalf of themselves and the Arizona Subclass ("Subclass," for purposes of the Arizona claims).

159. FCA, Plaintiffs, and the Subclass are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), Ariz. Rev. Stat. § 44-1521(6).

160. The Class Vehicles are "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

161. FCA's actions, as set forth above, occurred in the conduct of trade or commerce.

162.   The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, … misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale … of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A).

163.   FCA's actions, as set forth above, occurred in the conduct of trade or commerce.

164.   In the course of its business, FCA concealed and/or failed to dislcose the Fire Defect in the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

165.   By failing to disclose and actively concealing the Fire Defect in the Class Vehicles, which it marketed as safe, reliable, of high quality, and fit for use as plug-in hybrid electric vehicles, FCA engaged in unfair and deceptive business practices in violation of the Arizona CFA.

166.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Class Vehicles.

167.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and Subclass members, about the true safety and reliability of their vehicles.

168.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead Plaintiffs and the Subclass.

169.   FCA knew or should have known that its conduct violated the Arizona CFA.

170.   As alleged above, FCA made material statements about the safety and reliability of the Class Vehicles when operating as plug-in hybrid electric vehicles that were either false or misleading.

171.   FCA owed Plaintiffs and the Subclass a duty to disclose the true safety and reliability of the Class Vehicles because FCA:

      a.    Possessed exclusive knowledge about the Fire Defect;

      b.    Intentionally concealed the foregoing from Plaintiffs and the Subclass;

      c.    Made incomplete representations about the safety and reliability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations; and/or

      d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defect.

172.   Because FCA fraudulently concealed the Fire Defect, as well as the true nature of the Class Vehicles, Plaintiffs were deprived of the benefit of their bargain because the vehicle they purchased was worth less than it would have been if it were free from defects. Had Plaintiffs been aware of the defects in the vehicle, they would not have bought or leased thei Class Vehicles or would have paid less for it.

173.   FCA's concealment and/or failure to disclose the defects in the Class Vehicles was material to Plaintiffs and the Subclass.

174.   Plaintiffs and the Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose the Fire Defect. Plaintiffs and Subclass members either would have paid less for their vehicles or would not have purchased or leased them at all.

175.   FCA's violations present a continuing risk to Plaintiffs and the Subclass as well as to the general public. In particular and as alleged herein, FCA has yet to offer any fix for the Class Vehicles. FCA's unlawful acts and practices complained of herein affect the public interest.

176.   As a direct and proximate result of FCA's violations of the Arizona CFA, Plaintiffs and the Subclass have suffered injury-in-fact and/or actual damage as alleged above.

177.   Plaintiffs seek monetary relief against FCA in an amount to be determined at trial. Plaintiffs also seek punitive damages because FCA engaged in aggravated and outrageous conduct with an evil mind.

178.   Plaintiffs also seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

**COUNT IV**
**UNJUST ENRICHMENT**
**(COMMON LAW)**
**(Alleged by Plaintiffs Frisch, Otto, and Stueve**
**on behalf of the Arizona Subclass)**

179.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

180.   Plaintiffs Frisch, Otto, and Stueve ("Plaintiffs," for purposes of the Arizona claims) bring this claim on behalf of themselves and the Arizona Subclass ("Subclass," for purposes of the Arizona claims).

181.   FCA has benefitted from selling, leasing, and distributing the Class Vehicles for more than they were worth as a result of FCA's conduct, and Plaintiffs and Subclass members have overpaid for the Class Vehicles and been forced to pay other costs.

182.   Thus, Plaintiffs and the Subclass conferred a benefit on FCA.

183.   It is inequitable for FCA to retain these benefits.

184.   Plaintiffs and the Subclass were not aware of the true facts about the

Class Vehicles and did not benefit from FCA's conduct.

185.   FCA knowingly accepted the benefits of its unjust conduct.

186.   As a result of FCA's conduct, the amount of its unjust enrichment

should be determined in an amount according to proof.

**B.     California**

**COUNT V**
**VIOLATION OF THE CALIFORNIA**
**CONSUMER LEGAL REMEDIES ACT**
**(Cal. Civ. Code § 1750,** *et seq.***)**
**(Alleged by Plaintiff Kreb on behalf of the California Subclass)**

187.   Plaintiffs reallege and incorporate by reference all paragraphs as

though fully set forth herein.

188.   Plaintiff Kreb ("Plaintiff," for purposes of the California claims)

brings this claim on behalf of himself and the California Subclass ("Subclass," for

purposes of the California claims) for injunctive and equitable relief.[49]

189.   FCA is a person as defined in California Civil Code § 1761(c).

190.   Plaintiff and the California Subclass members are consumers as

defined in California Civil Code § 1761(d).

---

[49] Pursuant to California Civil Code § 1780(d), Plaintiff Kreb has provided a declaration attesting to the venue for this claim. *See* Ex. 18.

191.   Defendants engaged in unfair and deceptive acts in violation of the California Consumer Legal Remedies Act (CLRA) through the practices described herein, and by knowingly and intentionally concealing the Fire Defect in the Class Vehicles, as well as the true nature of the Class Vehicles, from Plaintiff and California Subclass members, along with concealing the risks, costs, and monetary damage resulting from the defect. These acts and practices violate, at a minimum, the following sections of the CLRA: (a)(2) misrepresenting the source, sponsorship, approval, or certification of goods or services; (a)(5) representing that goods or services have sponsorships, characteristics, uses, benefits, or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have; (a)(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and (a)(9) advertising goods and services with the intent not to sell them as advertised.

192.   FCA's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk to the public.

193.   FCA knew the Class Vehicles were defectively designed and/or manufactured, were prone to cause fires, and were not suitable for their intended use.

194.   In the course of its business, FCA concealed and/or failed to disclose the Fire Defect in the Class Vehicles, as well as the true nature of the Class Vehicles, and its failure to adequately design and test the vehicles to ensure their safety as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

195.   FCA had a duty to Plaintiff and Subclass members to disclose the defective nature of the Class Vehicles because:

a.   FCA was in a superior position to know the true state of facts about the Fire Defect and associated risks of spontaneous combustion in the Class Vehicles, and the defect affects a core function of the Class Vehicle;

b.   Plaintiff and Subclass members could not reasonably have been expected to learn or discover that the Class Vehicles had a dangerous safety defect until repeated fires forced FCA to finally issue the recall without a remedy;

c.   FCA knew that Plaintiff and Subclass members could not reasonably have been expected to learn or discover the Fire Defect and the catastrophic consequences thereof until repeated fires forced FCA to finally disclose the risk; and

d.   FCA actively concealed the defect and the consequences thereof by knowingly failing to recall the Class Vehicles at an earlier date.

196.   In failing to disclose the Fire Defect and the associated safety risks and repair costs that result from it, FCA has knowingly and intentionally concealed material facts and breached its duty to disclose.

197.   The facts concealed or not disclosed by FCA to Plaintiff and Subclass members are material in that a reasonable consumer would have considered them important in deciding whether to purchase the Class Vehicles or to pay a lesser price. Had Plaintiff and the Subclass members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

198.   FCA's violations present a continuing risk to Plaintiff as well as the general public. In particular and as alleged herein, FCA's failure to provide a recall remedy leaves Class Vehicle owners facing three choices: follow FCA's instructions, if possible, at the great inconvenience of parking far from home and the expense and environmental impact of additional consumption of gasoline; ignore FCA's instructions and risk calamity; or sell the vehicles at a substantial loss as a result of FCA's conduct. FCA's unlawful acts and practices complained of herein affect the public interest.

199.   FCA is on notice of the issues raised in this count and this Complaint by way of investigations conducted by governmental regulators, complaints from consumers, and FCA's own testing. Counsel for Plaintiff has also sent a notice

letter to FCA in accordance with California Civil Code § 1782(a) of the CLRA, notifying FCA of their alleged violations of California Civil Code § 1770(a) and demanding that FCA correct or agree to correct the actions described therein within thirty (30) days of the notice letter. If FCA fails to do so, Plaintiff will amend this Complaint as of right (or otherwise seek leave to amend the Complaint) to include compensatory and monetary damages to which Plaintiff and the Subclass are entitled under the CLRA.

**COUNT VI**
**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**(Cal. Bus. & Prof. Code § 17200)**
**(Alleged by Plaintiff Kreb on behalf of the California Subclass)**

200.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

201.   Plaintiff Kreb ("Plaintiff," for purposes of the California claims) brings this claim on behalf of himself and the California Subclass ("Subclass," for purposes of the California claims).

202.   The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

203.   In the course of its business, FCA concealed and/or failed to disclose the Fire Defect in the Class Vehicles, as well as true nature of the Class Vehicles,

and its failure to adequately design and test the vehicles to ensure their safety as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of material facts with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

204.   FCA engaged in unfair competition and unfair, unlawful, or fraudulent business practices through the conduct, statements, and omissions described herein, and by knowingly and intentionally concealing the Fire Defect in the Class Vehicles, as well as the true nature of the Class Vehicles, from Plaintiff and Subclass members, along with concealing the risks, costs, and monetary damage resulting from the defect. FCA should have disclosed this information because it was in a superior position to know the true facts related to the Fire Defect, and Plaintiff and Subclass members could not reasonably be expected to learn or discover the true facts related to the Fire Defect.

205.   The Fire Defect causes catastrophic fires in the Class Vehicles, and this constitutes a safety issue that triggered FCA's duty to disclose the safety issue to consumers.

206.   FCA's acts and practices deceived Plaintiff and are likely to deceive the public. In failing to disclose the Fire Defect and suppressing other material

facts from Plaintiff and Subclass members, FCA breached its duty to disclose these facts, violated the UCL, and caused injuries to Plaintiff and Subclass members. FCA's omissions and concealment concerned information that was material to Plaintiff and Subclass members, as it would have been to all reasonable consumers.

207.   The injuries suffered by Plaintiff and Subclass members are not greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are the injuries that Plaintiff and Subclass members could or should have reasonably avoided.

208.   FCA's acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750, *et seq.*, and California Commercial Code § 2313. FCA knew or should have known its conduct violated the UCL.

209.   Plaintiff and Subclass members have suffered an injury in fact, including the loss of money or property, because of FCA's unfair, unlawful, and deceptive practices.

210.   Plaintiff seeks to enjoin further unlawful, unfair, and fraudulent acts or practices by FCA, to obtain restitutionary disgorgement of all monies and revenues generated because of such practices, and all other relief allowed under California Business & Professions Code § 17200.

**COUNT VII**
**VIOLATIONS OF CALIFORNIA FALSE ADVERTISING LAW**
**(Cal. Bus. & Prof. Code § 17500,** *et seq.***)**
**(Alleged by Plaintiff Kreb on behalf of the California Subclass)**

211.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

212.   Plaintiff Kreb ("Plaintiff," for purposes of the California claims) brings this claim on behalf of himself and the California Subclass ("Subclass," for purposes of the California claims).

213.   California Business & Professions Code § 17500 states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

214.   FCA caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or through the exercise of

reasonable care should have been known to FCA, to be untrue and misleading to consumers, including Plaintiff and the Subclass members.

215.   FCA violated California Business & Professions Code § 17500 because its misrepresentations and omissions regarding the safety, reliability, and functionality of the Class Vehicles as plug-in hybrid electric vehicles as described herein were material, untrue, and misleading, and likely to deceive a reasonable consumer.

216.   Plaintiff and Subclass members have suffered an injury in fact, including the loss of money or property, because of FCA's deceptive advertising. In purchasing or leasing their Class Vehicles, Plaintiff and Subclass members relied on FCA's misrepresentations and omissions regarding the safety, reliability, and functionality of the vehicles. FCA's representations and omissions were untrue because the Class Vehicles were sold or leased with a defective hybrid propulsion system. Had Plaintiff and the Subclass members known this, they would not have purchased or leased their Class Vehicles or paid as much for them. Accordingly, Plaintiff and the Subclass members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

217.   All the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of FCA's business. FCA's wrongful conduct is part of a

pattern or generalized course of conduct that is still perpetuated and repeated, both in California and nationwide.

218.   Plaintiff, individually and on behalf of the Subclass members, requests this Court enter such orders or judgments as necessary to enjoin FCA from continuing its unlawful and deceptive advertising, to restore to Plaintiff and the Subclass members any money FCA acquired by its deceptive advertising, including restitution and restitutionary disgorgement, and for such other relief as is permitted.

**COUNT VIII**
**VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY**
**ACT FOR BREACH OF IMPLIED WARRANTY OF**
**MERCHANTABILITY UNDER CALIFORNIA LAW**
**(Cal. Civ. Code §§ 1791.1 & 1792)**
**(Alleged by Plaintiff Kreb on behalf of the California Subclass)**

219.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

220.   Plaintiff Kreb ("Plaintiff," for purposes of the California claims) brings this claim on behalf of himself and the California Subclass ("Subclass," for purposes of the California claims).

221.   Plaintiff and the Subclass members are "buyers" within the meaning of California Civil Code § 1791(b).

222.   The Class Vehicles are "consumer goods" within the meaning of California Civil Code § 1791(a).

223.   FCA is the "manufacturer" of the Class Vehicles within the meaning of California Civil Code § 1791(j).

224.   FCA impliedly warranted to Plaintiff and the Subclass that the Class Vehicles were "merchantable" within the meaning of California Civil Code §§ 1791.1(a) & 1792; however, the Class Vehicles do not have the quality that a buyer would reasonably expect, and were therefore not merchantable.

225.   California Civil Code § 1791.1(a) states:

> "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:
>
> (1)   Pass without objection in the trade under the contract description.
>
> (2)   Are fit for the ordinary purposes for which such goods are used.
>
> (3)   Are adequately contained, packaged, and labeled.
>
> (4)   Conform to the promises or affirmations of fact made on the container or label.

226.   The Class Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to spontaneous combustion and pose an unreasonable risk of fires due to the Fire Defect as described herein. Without limitation, the Class Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious

bodily harm, and/or property damage to lessees and owners of the Class Vehicles as well as their homes, passengers, and bystanders. This defect renders the Class Vehicles when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries, not to drive the Class Vehicles in electric mode, and not to park the vehicles in the vicinity of their homes or other vehicles.

227.   FCA breached the implied warranty of merchantability by selling Class Vehicles containing defects leading to the sudden combustion of the vehicles during ordinary operating conditions, or while parked. This defect has deprived Plaintiff and the Subclass members of the benefit of their bargain.

228.   Notice of breach is not required because Plaintiff and the Subclass did not purchase their automobiles directly from FCA. Regardless, Plaintiffs' counsel sent notification to FCA prior to filing this Complaint.

229.   Plaintiff and the other Subclass members were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiff and Subclass members.

230.   As a direct and proximate result FCA's breach of the implied warranty of merchantability, Plaintiff and the Subclass members received goods whose dangerous condition now renders them at least partially inoperable and

substantially impairs their value. Plaintiff and the Subclass members have been damaged as they overpaid for their vehicles, and now suffer the partial or complete loss of use of their Class Vehicles.

231.   Under California Civil Code §§ 1791.1(d) & 1794, Plaintiff and the Subclass members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

232.   Under California Civil Code § 1794, Plaintiff and the Subclass members are entitled to costs and attorneys' fees.

**COUNT IX**
**UNJUST ENRICHMENT**
**(COMMON LAW)**
(**Alleged by Plaintiff Kreb on behalf of the California Subclass**)

233.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

234.   Plaintiff Kreb ("Plaintiff," for purposes of the California claims) brings this claim on behalf of himself and the California Subclass ("Subclass," for purposes of the California claims).

235.   FCA has received and retained a benefit from Plaintiff and Subclass members and inequity has resulted.

236.   FCA has benefitted from selling, leasing, and distributing the Class Vehicles for more than they were worth as a result of FCA's conduct, and Plaintiff

and Subclass members have overpaid for the Class Vehicles and been forced to pay other costs.

237.   Thus, Plaintiff and the Subclass conferred a benefit on FCA.

238.   It is inequitable for FCA to retain these benefits.

239.   Plaintiff and the Subclass were not aware of the true facts about the Class Vehicles and did not benefit from FCA's conduct.

240.   FCA knowingly accepted the benefits of its unjust conduct.

241.   As a result of FCA's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

**C.   Florida**

**COUNT X**
**VIOLATION OF FLORIDA'S UNFAIR &**
**DECEPTIVE TRADE PRACTICES ACT**
**(Fla. Stat. § 501.201, *et seq.*)**
**(Alleged by Plaintiff Vasquez on behalf of the Florida Subclass)**

242.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

243.   Plaintiff Vasquez ("Plaintiff," for purposes of the Florida claims) brings this claim on behalf of himself and the Florida Subclass ("Subclass," for purposes of the Florida claims).

244.   Plaintiff and the Subclass are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), Florida Statute § 501.203(7).

245.   FCA engaged in "trade or commerce" within the meaning of Florida Statute § 501.203(8).

246.   The FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce .…" Fla. Stat. § 501.204(1). By concealing the Fire Defect in the Class Vehicles, FCA participated in unfair and deceptive trade practices that violated the FUDTPA as described herein.

247.   FCA's actions, as set forth above, occurred in the conduct of trade or commerce.

248.   In the course of its business, FCA concealed and/or failed to disclose the Fire Defect in the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

249.   By failing to disclose and/or actively concealing the Fire Defect in the Class Vehicles, which it marketed as safe, reliable, of high quality, and fit for use as plug-in hybrid electric vehicles, FCA engaged in unfair and deceptive business practices in violation of the FUDTPA.

250.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Class Vehicles.

251.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Subclass members, about the true safety and reliability of their vehicles.

252.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead Plaintiff and the Subclass.

253.   FCA knew or should have known that its conduct violated the FUDTPA.

254.   As alleged above, FCA made material statements about the safety and reliability of the Class Vehicles when operating as plug-in hybrid electric vehicles that were either false or misleading.

255.   FCA owed Plaintiff and the Subclass a duty to disclose the true safety and reliability of the Class Vehicles because FCA:

    a.   Possessed exclusive knowledge about the Fire Defect;

    b.   Intentionally concealed the foregoing from Plaintiff and the Subclass;

> c.      Made incomplete representations about the safety and
>         reliability of the Class Vehicles, while purposefully
>         withholding material facts from Plaintiff and the Subclass
>         that contradicted these representations; and/or
>
> d.      Had duties under the TREAD Act and related regulations
>         to disclose and remedy the defect.

256.   Because FCA fraudulently concealed the Fire Defect, as well as the true nature of the Class Vehicles, Plaintiff and Class Members were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Had Plaintiff and the other Subclass members been aware of the defect in their Class Vehicles, they would not have bought or leased the Class Vehicles or would have paid less for them.

257.   FCA's concealment of the defects in the Class Vehicles was material to Plaintiff and the Subclass.

258.   Plaintiff and the Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose Fire Defect. Plaintiff and Subclass members either would have paid less for the Class Vehicles or would not have purchased or leased them at all.

259.   FCA's violations present a continuing risk to Plaintiff and the Subclass as well as to the general public. In particular and as alleged herein, FCA has yet to offer any fix for the Class Vehicles. FCA's unlawful acts and practices complained of herein affect the public interest.

260.   As a direct and proximate result of FCA's violations of the FUDTPA, Plaintiff and the Subclass have suffered injury-in-fact and/or actual damage as alleged above.

261.   Plaintiff and the Subclass are entitled to recover their actual damages under Florida Statute § 501.211(2) and attorneys' fees under Florida Statute § 501.2105(1).

262.   Plaintiff also seeks an order enjoining FCA's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FUDTPA.

## COUNT XI
## BREACH OF IMPLIED WARRANTY OF
## MERCHANTABILITY UNDER FLORIDA LAW
### (Fla. Stat. § 672.314)
### (Alleged by Plaintiff Vasquez on behalf of the Florida Subclass)

263.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

264.   Plaintiff Vasquez ("Plaintiff," for purposes of the Florida claims) brings this claim on behalf of himself and the Florida Subclass ("Subclass," for purposes of the Florida claims).

265.   FCA is a "merchant" within the meaning of Florida Statute § 672.104, and a "seller" of motor vehicles within the meaning of Florida Statute § 672.103(d).

266.    Under Florida law, an implied warranty of merchantability attaches to the Class Vehicles. Fla. Stat. § 672.314.

267.    The Class Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to spontaneous combustion and pose an unreasonable risk of fires due to the Fire Defect as described herein. Without limitation, the Class Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm, and/or property damage to lessees and owners of the Class Vehicles as well as their homes, passengers, and bystanders. This defect renders the Class Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Class Vehicles in electric mode.

268.    Plaintiff and Subclass members were and are third-party beneficiaries of FCA's contracts with FCA-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiffs and Subclass members. See Fla. Stat. § 672.318.

269.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and Subclass members have been damaged in an amount to be determined at trial.

## COUNT XII
## UNJUST ENRICHMENT
## (COMMON LAW)
### (Alleged by Plaintiff Vasquez on behalf of the Florida Subclass)

270.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

271.   Plaintiff Vasquez ("Plaintiff," for purposes of the Florida claims) brings this claim on behalf of himself and the Florida Subclass ("Subclass," for purposes of the Florida claims).

272.   FCA has received and retained a benefit from Plaintiff and Subclass members and inequity has resulted.

273.   FCA has benefitted from selling, leasing, and distributing the Class Vehicles for more than they were worth as a result of FCA's conduct, and Plaintiff and Subclass members have overpaid for the Class Vehicles and been forced to pay other costs.

274.   Thus, Plaintiff and the Subclass conferred a benefit on FCA.

275.   It is inequitable for FCA to retain these benefits.

276.   Plaintiff and the Subclass were not aware of the true facts about the Class Vehicles and did not benefit from FCA's conduct.

277.   FCA knowingly accepted the benefits of its unjust conduct.

278.   As a result of FCA's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

**D.    New Jersey**

**COUNT XIII**
**VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT**
**(N.J. Stat. Ann. § 56:8-1,** *et seq.***)**
**(Alleged by Plaintiffs Jade and Christopher Wadleigh on behalf of the New**
**Jersey Subclass)**

279.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

280.   Plaintiffs Jade and Christopher Wadleigh ("Plaintiffs," for purposes of the New Jersey claims) brings this claim on behalf of themselves and the New Jersey Subclass ("Subclass," for purposes of the New Jersey claims).

281.   FCA and Plaintiffs are and were "persons" within the meaning of New Jersey Statutes Annotated § 56:8-1(d).

282.   FCA engaged in "sales" of "merchandise" within the meaning of New Jersey Statutes Annotated § 56:8-1(c), (d).

283.   FCA's actions, as set forth above, occurred in the conduct of trade or commerce.

284.   The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression,

or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. Ann. § 56:8-2. FCA engaged in unconscionable or deceptive acts or practices that violated the New Jersey CFA as described above and below and did so with the intent that Plaintiffs and the Subclass rely upon their acts, concealment, suppression or omissions.

285.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Class Vehicles.

286.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Subclass, about the true safety and reliability of their vehicles.

287.   FCA misrepresented material facts regarding the Class Vehicles with the intent to mislead Plaintiffs and the Subclass.

288.   FCA knew or should have known that its conduct violated the New Jersey CFA.

289.   As alleged above, FCA made material statements about the safety and reliability of the Class Vehicles and their ability to operate as plug-in hybrid vehicles that were either false or misleading.

290.    FCA owed Plaintiffs and the Subclass a duty to disclose the true

safety and reliability of the Class Vehicles because FCA:

        a.      Possessed exclusive knowledge about the Fire Defect in
                    the Class Vehicles;

        b.      Intentionally concealed the foregoing from Plaintiffs and
                    the Subclass;

        c.      Made incomplete representations about the safety and
                    reliability of the Class Vehicles, while purposefully
                    withholding material facts from Plaintiffs and the Subclass
                    that contradicted these representations; and/or

        d.      Had duties under the TREAD Act and related regulations
                    to disclose and remedy the defects well prior to the issue
                    of its confounding recall notice in 2023.

291.    Because FCA fraudulently concealed the Fire Defect, as well as the

true nature of the Class Vehicles, Plaintiffs and the Subclass were deprived of the

benefit of their bargain since the vehicles they purchased were worth less than they

would have been if they were free from the known serious safety defect. Had Class

Vehicle owners been aware of the defects in their vehicles, they would not have

bought their vehicles or would have paid less for them.

292.    FCA's concealment of the defect in the Class Vehicles was material to

Plaintiffs and the Subclass.

293.    Plaintiffs and the Subclass suffered ascertainable losses caused by

FCA's misrepresentations and/or its concealment of and failure to disclose the Fire

Defect.

294.   FCA's violations present a continuing risk to Plaintiffs and the Subclass as well as to the general public. In particular and as alleged herein, FCA's failure to provide a recall remedy leaves Class Vehicle owners facing three choices: follow FCA's instructions, if possible, at the great inconvenience of parking far from home and the expense and environmental impact of additional consumption of gasoline; ignore FCA's instructions and risk calamity; or sell the vehicles at a substantial loss as a result of FCA's conduct. FCA's unlawful acts and practices complained of herein affect the public interest.

295.   As a direct and proximate result of FCA's violations of the New Jersey CFA, Plaintiffs and the Subclass have suffered injury-in-fact and/or actual damage, as alleged above.

296.   Plaintiffs are entitled to recover legal and/or equitable relief including an order enjoining FCA's unlawful conduct, treble damages, costs and reasonable attorneys' fees pursuant to New Jersey Statutes Annotated § 56:8-19, and any other just and appropriate relief.

**COUNT XIV**
**BREACH OF IMPLIED WARRANTY OF**
**MERCHANTABILITY UNDER NEW JERSEY LAW**
**(N.J. Stat. Ann. § 12A:2-314)**
**(Alleged by Plaintiffs Jade and Christopher Wadleigh on behalf of the New Jersey Subclass)**

297.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

298.   Plaintiffs Jade and Christopher Wadleigh ("Plaintiffs," for purposes of the New Jersey claims) bring this claim on behalf of themselves and the New Jersey Subclass ("Subclass," for purposes of the New Jersey claims).

299.   FCA is a "merchant" and "seller" of motor vehicles and the Class Vehicles are "goods" under New Jersey law. N.J. Stat. Ann. § 12A:2-104(1).

300.   Under New Jersey law, an implied warranty of merchantability attaches to the Class Vehicles under New Jersey Statutes Annotated § 12A:2-104(1).

301.   The Class Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to spontaneous combustion and pose an unreasonable risk of fires due to the Fire Defect as described herein. Without limitation, the Class Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Class Vehicles as well as their homes, passengers and bystanders. This defect renders the Class Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Class Vehicles in electric mode.

302.   It was reasonable to expect that Plaintiffs and the Subclass members would use, consume, or be affected by the Class Vehicles.

303.   Plaintiffs and the other Subclass members were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiffs and Subclass members.

304.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and the other Subclass members have been damaged in an amount to be determined at trial.

## COUNT XV
## UNJUST ENRICHMENT
## (COMMON LAW)
**(Alleged by Plaintiffs Jade and Christopher Wadleigh on behalf of the New Jersey Subclass)**

305.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

306.   Plaintiffs Jade and Christopher Wadleigh ("Plaintiffs," for purposes of the New Jersey claims) brings this claim on behalf of themselves and the New Jersey Subclass ("Subclass," for purposes of the New Jersey claims).

307.   FCA has received and retained a benefit from Plaintiffs and Subclass members and inequity has resulted.

308.   FCA has benefitted from selling, leasing, and distributing the Class Vehicles for more than they were worth as a result of FCA's conduct, and

Plaintiffs and Subclass members have overpaid for the Class Vehicles and been forced to pay other costs.

309.    Thus, Plaintiffs and the Subclass conferred a benefit on FCA.

310.    It is inequitable for FCA to retain these benefits.

311.    Plaintiffs and the Subclass were not aware of the true facts about the Class Vehicles and did not benefit from FCA's conduct.

312.    FCA knowingly accepted the benefits of its unjust conduct.

313.    As a result of FCA's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

**E.    North Carolina**

**COUNT XVI**
**VIOLATION OF NORTH CAROLINA UNFAIR AND**
**DECEPTIVE ACTS AND PRACTICES ACT**
**(N.C. Gen. State §§ 75-1.1, *et seq.*)**
**(Alleged by Plaintiff Perrera on behalf of the North Carolina Subclass)**

314.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

315.    Plaintiff David Perrera ("Plaintiff," for purposes of the North Carolina claims) brings this claim on behalf of himself and the North Carolina Subclass ("Subclass," for the purposes of the North Carolina claims).

316.    FCA engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

317. The North Carolina UDTPA broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). In the course of FCA's business, it willfully failed to disclose and actively concealed the Fire Defect. Accordingly, FCA engaged in unfair and deceptive trade practices because its practices (1) have the capacity or tendency to deceive, (2) offend public policy, (3) are immoral, unethical, oppressive or unscrupulous, or (4) cause substantial injury to consumers.

318. In purchasing or leasing the Class Vehicles, Plaintiff and the Subclass were deceived by FCA's failure to disclose the Fire Defect.

319. Plaintiff and the Subclass reasonably relied upon FCA's material omissions and false misrepresentations. They had no way of knowing that FCA's representations were false and gravely misleading. As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiff and the Subclass did not, and could not, unravel FCA's deception on their own.

320. FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

321. FCA intentionally and knowingly failed to disclose and misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Subclass.

322.   FCA knew or should have known that its conduct violated the North

Carolina UDTPA.

323.   FCA owed Plaintiff and the Subclass a duty to disclose the truth about

its Class Vehicles because FCA:

  a.   Possessed exclusive knowledge of the Fire Defect;

  b.   Intentionally concealed the foregoing from Plaintiff; and/or

  c.   Made incomplete representations while purposefully withholding material facts from Plaintiff that contradicted these representations; and/or

  d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defects well prior to the issue of its confounding recall notice in 2022.

324.   FCA had a duty to disclose the Fire Defect, because, having

volunteered to provide information to Plaintiff, FCA had the duty to disclose not

just the partial truth, but the entire truth. Further, Plaintiff and the Subclass relied

on FCA's material omissions and representations that the Class Vehicles they were

purchasing were safe and free from defects.

325.   Plaintiff and the Subclass were unaware of the omitted material facts

referenced herein, and they would not have acted as they did if they had known of

the concealed and/or suppressed facts, in that they would not have purchased the

Class Vehicles manufactured by FCA, would have paid less, and/or would have

taken other affirmative steps in light of the information concealed from them.

Plaintiff and the Subclass's actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiff.

326.   FCA's conduct proximately caused injuries to Plaintiff and the Subclass.

327.   Plaintiff and the Subclass were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiff and the Subclass overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

328.   FCA's violations present a continuing risk to Plaintiff and the Subclass as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

329.   Plaintiff and the Subclass seek an order for treble their actual damages, costs of Court, attorneys' fees, and any other just and proper relief available under the North Carolina Act, N.C. Gen. Stat. § 75-16.

330.   Plaintiff and the Subclass also seek punitive damages against FCA because FCA's conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith.

## COUNT XVII
## BREACH OF IMPLIED WARRANTY OF
## MERCHANTABILITY UNDER NORTH CAROLINA LAW
## (N.C. Gen. Stat. § 25-2-314)
## (Alleged by Plaintiff Perrera on Behalf of the North Carolina Subclass)

331.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

332.   Plaintiff David Perrera ("Plaintiff," for purposes of the North Carolina claims) brings this claim on behalf of himself and the North Carolina Subclass ("Subclass," for the purposes of the North Carolina claims).

333.   FCA is a "merchant" of the Class Vehicles within the meaning of N.C. Gen. Stat. § 25-2-314, and the Class Vehicles are "goods" under the statute.

334.   Under North Carolina law, an implied warranty of merchantability attaches to the Class Vehicles.

335.   The Class Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to spontaneous combustion, and pose an unreasonable risk of fires due to the Fire Defect as described herein. Without limitation, the Class Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Class Vehicles as well as their homes, passengers and bystanders. This defect renders the Class

Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Class Vehicles in electric mode.

336.   Plaintiff and the Subclass were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiffs.

337.   It was reasonable to expect that Plaintiff and the Subclass would use, consume or be affected by the Class Vehicles, and they are therefore entitled to the protections of the implied warranty of merchantability under N.C. Gen. Stat. § 25-2-314.

338.   FCA was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Class Vehicles by the filing of this Complaint, by letters from Plaintiff's counsel to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

339.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the Subclass have been damaged in an amount to be determined at trial.

## COUNT XVIII
## UNJUST ENRICHMENT
## (COMMON LAW)
**(Alleged by Plaintiff Perrera on behalf of the North Carolina Subclass)**

340.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

341.    Plaintiff David Perrera ("Plaintiff," for purposes of the North Carolina claims) brings this claim on behalf of himself and the North Carolina Subclass ("Subclass," for the purposes of the North Carolina claims).

342.    FCA has received and retained a benefit from Plaintiff and Subclass members and inequity has resulted.

343.    FCA has benefitted from selling, leasing, and distributing the Class Vehicles for more than they were worth as a result of FCA's conduct, and Plaintiff and Subclass members have overpaid for the Class Vehicles and been forced to pay other costs.

344.    Thus, Plaintiff and the Subclass conferred a benefit on FCA.

345.    It is inequitable for FCA to retain these benefits.

346.    Plaintiff and the Subclass were not aware of the true facts about the Class Vehicles and did not benefit from FCA's conduct.

347.    FCA knowingly accepted the benefits of its unjust conduct.

348.    As a result of FCA's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

F.    **Pennsylvania**

## COUNT XIX
## VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### (73 Pa. Cons. Stat. § 201-1, *et seq*.)
### (Alleged by Plaintiff Berns on behalf of the Pennsylvania Subclass)

349.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

350.    Plaintiff Berns ("Plaintiff," for purposes of the Pennsylvania claims) brings this claim on behalf of himself and the Pennsylvania Subclass ("Subclass," for the purposes of Pennsylvania claims).

351.    Plaintiff purchased or leased his Class Vehicle primarily for personal, family, or household purposes within the meaning of 73 P.S. § 201-9.2.

352.    All of the acts complained of herein were perpetrated by FCA in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

353.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have … characteristics, …. Benefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another;" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv)

"Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

354.   FCA engaged in unlawful trade practices, including representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard and quality when they are not; advertising Class Vehicles with the intent not to sell them as advertised; and engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

355.   In purchasing or leasing the Class Vehicles, Plaintiff and the Subclass were deceived by FCA's failure to disclose the Fire Defect.

356.   Plaintiff and the Subclass reasonably relied upon FCA's material omissions and false misrepresentations. They had no way of knowing that FCA's representations were false and gravely misleading. Plaintiff and the Subclass did not, and could not, unravel FCA's deception on their own.

357.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

358.   FCA intentionally and knowingly failed to disclose and misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Subclass.

359. FCA knew or should have known that its conduct violated the Pennsylvania CPL.

360. FCA owed Plaintiff and the Subclass a duty to disclose the truth about its Class Vehicles because FCA:

       a.    Possessed exclusive knowledge of the Fire Defect;

       b.    Intentionally concealed the foregoing from Plaintiff and the Subclass;

       c.    Made incomplete representations while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations; and/or

       d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

361. FCA had a duty to disclose the Fire Defect, because, having volunteered to provide information to Plaintiff and the Subclass, FCA had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiff and the Subclass relied on FCA's material omissions and representations that the Class Vehicles they were purchasing were safe and free from serious safety defects.

362. Plaintiff and the Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Class Vehicles manufactured by FCA, would have paid less, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and the Subclass members' actions were justified. FCA was in exclusive

control of the material facts, and such facts were not generally known to the public, or to Plaintiff and the Subclass.

363. FCA's conduct proximately caused injuries to Plaintiff and the Subclass.

364. Plaintiff and the Subclass were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiff and the Subclass overpaid for their Class Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

365. FCA is liable to Plaintiff and the Subclass for treble their actual damages or $100 each, whichever is greater, and attorneys' fees and costs. 73 P.S. § 201-9.2(a). Plaintiff is also entitled to an award of punitive damages given that FCA's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

**COUNT XX**
**BREACH OF IMPLIED WARRANTY OF**
**MERCHANTABILITY UNDER PENNSYLVANIA LAW**
**(13 Pa. Cons. Stat. Ann. § 2314)**
**(Alleged by Plaintiff Berns on behalf of the Pennsylvania Subclass)**

366. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

367.   Plaintiff Berns ("Plaintiff," for purposes of the Pennsylvania claims) brings this claim on behalf of himself and the Pennsylvania Subclass ("Subclass," for the purposes of Pennsylvania claims).

368.   FCA is a "merchant" with respect to motor vehicles.

369.   Under Pennsylvania law, an implied warranty of merchantability attaches to the Class Vehicles.

370.   The Class Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to spontaneous combustion and pose an unreasonable risk of fires due to the Fire Defect as described herein. Without limitation, the Class Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm, and/or property damage to lessees and owners of the Class Vehicles as well as their homes, passengers, and bystanders. This defect renders the Class Vehicles when sold/leased and at all times thereafter, unmerchantable, and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Class Vehicles in electric mode.

371.   Plaintiff has had sufficient direct dealings with either FCA or its agents (dealerships) to establish privity of contract between FCA and Plaintiff.

Nonetheless, privity is not required here because Plaintiff and the Subclass are the intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of FCA's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the aforementioned defect, as spontaneous fires present an unreasonable risk of death, serious bodily harm, and/or property damage to lessees and owners of the Class Vehicles as well as their homes, other nearby structures and vehicles, passengers, and bystanders.

372.   It was reasonable to expect that Plaintiff and the Subclass would use, consume, or be affected by the Class Vehicles.

373.   FCA was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Class Vehicles by the filing of this Complaint, by correspondence from Plaintiff's counsel to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

374.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the Subclass have been damaged in an amount to be determined at trial.

**COUNT XXI**
**UNJUST ENRICHMENT**
**(COMMON LAW)**
**(Alleged by Plaintiff Berns on behalf of the Pennsylvania Subclass)**

375.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

376.    Plaintiff Berns ("Plaintiff," for purposes of the Pennsylvania claims) brings this claim on behalf of himself and the Pennsylvania Subclass ("Subclass," for the purposes of Pennsylvania claims).

377.    FCA has received and retained a benefit from Plaintiff and Subclass members and inequity has resulted.

378.    FCA has benefitted from selling, leasing, and distributing the Class Vehicles for more than they were worth as a result of FCA's conduct, and Plaintiff and Subclass members have overpaid for the Class Vehicles and been forced to pay other costs.

379.    Thus, Plaintiff and the Subclass conferred benefits on FCA.

380.    It is inequitable for FCA to retain these benefits.

381.    Plaintiff and the Subclass were not aware of the true facts about the Class Vehicles and did not benefit from FCA's conduct.

382.   FCA knowingly accepted the benefits of its unjust conduct.

383.   As a result of FCA's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

**G.   Texas**

**COUNT XXII**
**BREACH OF THE IMPLIED WARRANTY OF**
**MERCHANTABILITY UNDER TEXAS LAW**
**(Tex. Bus. & Com. Code § 2.314)**
**(Alleged by Plaintiff Liscano on behalf of the Texas Subclass)**

384.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

385.   Plaintiff Liscano ("Plaintiff," for purposes of the Texas claims) brings this claim on behalf of himself and the Texas Subclass ("Subclass" for the purposes of the Texas claims).

386.   FCA was and is a merchant with respect to motor vehicles under Texas Business and Commerce Code § 2.104.

387.   Under Texas Business and Commerce Code § 2.314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and the Subclass purchased or leased their Class Vehicles.

388.   The Class Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to spontaneous combustion and

pose an unreasonable risk of fires due to the Fire Defect as described herein. Without limitation, the Class Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Class Vehicles as well as their homes, passengers and bystanders. This defect renders the Class Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Class Vehicles in electric mode.

389.   Plaintiff and the Subclass were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiff and the Subclass.

390.   It was reasonable to expect that Plaintiff and the Subclass would use, consume, or be affected by the Class Vehicles.

391.   FCA was provided notice of these issues within a reasonable time of Plaintiff's and the Subclass members' knowledge of the non-conforming or defective nature of the Class Vehicles by the filing of this Complaint, by correspondence from Plaintiff's counsel to FCA, consumer complaints to NHTSA

regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

392. As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the Subclass have been damaged in an amount to be determined at trial.

**COUNT XXIII**
**UNJUST ENRICHMENT**
**(COMMON LAW)**
**(Alleged by Plaintiff Liscano on behalf of the Texas Subclass)**

393. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

394. Plaintiff Liscano ("Plaintiff," for purposes of the Texas claims) brings this claim on behalf of himself and the Texas Subclass ("Subclass" for the purposes of the Texas claims).

395. FCA has received and retained a benefit from Plaintiff and Subclass members and inequity has resulted.

396. FCA has benefitted from selling, leasing, and distributing the Class Vehicles for more than they were worth as a result of FCA's conduct, and Plaintiff and Subclass members have overpaid for the Class Vehicles and been forced to pay other costs.

397. Thus, Plaintiff and the Subclass conferred a benefit on FCA.

398. It is inequitable for FCA to retain these benefits.

399.   Plaintiff and the Subclass were not aware of the true facts about the Class Vehicles and did not benefit from FCA's conduct.

400.   FCA knowingly accepted the benefits of its unjust conduct.

401.   As a result of FCA's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

## X.   <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class and Subclasses, respectfully request that the Court enter judgment in their favor and against FCA, as follows:

A.   Certification of the proposed Nationwide and State Subclasses, including appointment of Plaintiffs' counsel as Class Counsel;

B.   Restitution, including at the election of Class and Subclass members, recovery of the purchase price of their Class Vehicles, or the overpayment for their vehicles;

C.   Damages, including punitive damages, costs, and disgorgement in an amount to be determined at trial;

D.   An order requiring FCA to pay both pre- and post-judgment interest on any amounts awarded;

E.   An award of costs and attorneys' fees; and

F.   Such other or further relief as may be appropriate.

## XI.   DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: March 4, 2024                    Respectfully submitted,

                                        /s/ E. Powell Miller
                                        E. Powell Miller (P39487)
                                        Dennis A. Lienhardt (P81118)
                                        Dana E. Fraser (P82873)
                                        **THE MILLER LAW FIRM PC**
                                        950 W. University Drive, Suite 300
                                        Rochester, MI 48307
                                        Telephone: (248) 841-2200
                                        epm@millerlawpc.com
                                        dal@millerlawpc.com
                                        def@millerlawpc.com

                                        Roger N. Heller
                                        Phong-Chau G. Nguyen
                                        Nicholas W. Lee
                                        **LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
                                        275 Battery Street, 29th Floor
                                        San Francisco, CA 94111
                                        Telephone: (415) 956-1000
                                        rheller@lchb.com
                                        pgnguyen@lchb.com
                                        nlee@lchb.com

                                        John R. Davis
                                        Michael L. Slack
                                        **SLACK DAVIS SANGER, LLP**
                                        6001 Bold Ruler Way, Suite 100
                                        Austin, TX 78746
                                        Telephone: (512) 795-8686
                                        jdavis@slackdavis.com
                                        mslack@slackdavis.com

                                        Robert K. Shelquist

Rebecca A. Peterson
Craig S. Davis
Krista K. Freier
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Ave., Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
rkshelquist@locklaw.com
rapeterson@locklaw.com
csdavis@locklaw.com
kkfreier@locklaw.com

*Attorneys for Plaintiffs and the Proposed
Classes*