## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| GARY FRISCH, TAMMY OTTO, BRIAN KREB, EVE PARK, HARRY VASQUEZ, RICHARD PERKAL, NATALIIA LIAKHOVA, JADE AND CHRISTOPHER WADLEIGH, DAVID PERRERA, ERIN MAY, DENNIS BERNS, JONATHAN LISCANO, and ROBERT STUEVE on behalf of themselves and all those similarly situated, | Case No. 2:24-cv-10546<br><br>Hon. Brandy R. McMillion |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| FCA US, LLC, | |
| Defendant. | |

## FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................ 1

II. JURISDICTION .............................................................. 8

III. VENUE .......................................................................... 9

IV. PARTIES ....................................................................... 9

    A. Plaintiffs .................................................................. 9

        Gary Frisch (Arizona) ............................................ 9

        Tammy Otto (Arizona) .......................................... 11

        Robert Stueve (Arizona) ........................................ 14

        Brian Kreb (California) .......................................... 17

        Eve Park (Colorado) .............................................. 19

        Harry Vasquez (Florida) ........................................ 22

        Richard Perkal (Florida) ........................................ 24

        Nataliia Liakhova (Illinois) .................................... 27

        Jade and Christopher Wadleigh (New Jersey) ................... 29

        David Perrera (North Carolina) ................................ 32

        Erin May (Oklahoma) ............................................ 34

        Dennis Berns (Pennsylvania) .................................. 37

        Jonathan Liscano (Texas) ...................................... 39

    B. Defendant ............................................................... 41

V. FACTUAL ALLEGATIONS ............................................... 42

A.   FCA marketed the Jeep Wrangler 4xe as a safe, dependable, rugged, high-performing, and emissions-friendly hybrid-electric vehicle. .......................................... 42

B.   The Fire Defect is likely the result of defective high-voltage lithium-ion battery systems. ................................... 62

C.   FCA knew or should have known of the Fire Defect long before it disclosed the problem to Plaintiffs. ..................................... 67

    i.   Lithium-ion batteries are dangerous without appropriate safeguards.................................................................... 68

    ii.   NHTSA issued warnings about lithium-ion battery safety and the dangerous risk of thermal runaway. ........................... 74

    iii.   FCA launches the Class Vehicles, and fires result. ................ 81

    iv.   FCA had notice of the Fire Defect before the Class Vehicles were sold because of its accumulated knowledge regarding the Samsung Manufactured HV Battery in Class Vehicles and similar defects in the Chrysler Pacifica plug-in. ......................................... 89

    v.   FCA was slow to recall the Class Vehicles and does not have sufficient stock of HV batteries to actually repair all the Class Vehicles that require replacement. ........................... 97

    vi.   FCA's recall appears to be underinclusive because it does not include unrecalled vehicles that nevertheless combusted while charging. ................................... 104

    vii.   FCA's recall procedure leaves Plaintiffs and Class Members with vehicles that continue to pose an unreasonable fire risk. ........................................... 105

VI.   FRAUDULENT CONCEALMENT ........................................ 108

VII.   DISCOVERY RULE TOLLING OF THE STATUTE OF LIMITATIONS........................................................... 111

VIII.   CLASS ALLEGATIONS ................................................ 112

A.   Numerosity ........................................................ 114

B.   Commonality and Predominance ................................... 114

C. Typicality ........................................................................... 115

D. Adequacy .......................................................................... 115

E. Superiority ......................................................................... 116

IX. NATIONWIDE CLAIMS ............................................................. 116

    COUNT I VIOLATION OF THE MAGNUSON-MOSS
    WARRANTY ACT (15 U.S.C. § 2301, *et seq.*) (Alleged
    by all Plaintiffs on behalf of the Nationwide Class or, in
    the alternative, the State Subclasses) ..................................... 116

X. STATE-SPECIFIC CLAIMS ....................................................... 121

A. Arizona ............................................................................. 121

    COUNT II BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY UNDER ARIZONA LAW
    (Ariz. Rev. Stat. § 47-2314)  (Alleged by Plaintiffs
    Frisch, Otto, and Stueve on behalf of the Arizona
    Subclass) ................................................................................ 121

    COUNT III VIOLATIONS OF THE ARIZONA CONSUMER
    FRAUD ACT (Ariz. Rev. Stat. § 44-1521, *et seq.*)
    (Alleged by Plaintiffs Frisch, Otto, and Stueve on behalf
    of the Arizona Subclass) ......................................................... 124

    COUNT IV UNJUST ENRICHMENT (COMMON LAW)
    (Alleged by Plaintiffs Frisch, Otto, and Stueve on behalf
    of the Arizona Subclass) ......................................................... 128

B. California ........................................................................... 131

    COUNT V VIOLATION OF THE CALIFORNIA
    CONSUMER LEGAL REMEDIES ACT (Cal. Civ. Code
    § 1750, *et seq.*) (Alleged by Plaintiffs Carter and Kreb on
    behalf of the California Subclass) ........................................... 131

    COUNT VI VIOLATIONS OF THE CALIFORNIA UNFAIR
    COMPETITION LAW (Cal. Bus. & Prof. Code § 17200)
    (Alleged by Plaintiffs Carter and Kreb on behalf of the
    California Subclass) ................................................................ 136

COUNT VII VIOLATIONS OF CALIFORNIA FALSE
ADVERTISING LAW (Cal. Bus. & Prof. Code § 17500,
*et seq.*) (Alleged by Plaintiffs Carter and Kreb on behalf
of the California Subclass) ...................................................... 140

COUNT VIII VIOLATION OF SONG-BEVERLY
CONSUMER WARRANTY ACT FOR BREACH OF
IMPLIED WARRANTY OF MERCHANTABILITY
UNDER CALIFORNIA LAW (Cal. Civ. Code §§ 1791.1
& 1792) (Alleged by Plaintiffs Carter and Kreb on behalf
of the California Subclass) ...................................................... 143

COUNT IX UNJUST ENRICHMENT (COMMON LAW)
(Alleged by Plaintiffs Carter and Kreb on behalf of the
California Subclass) ................................................................ 147

C.     Colorado ......................................................................................... 150

COUNT X BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER COLORADO LAW
(Colo. Rev. Stat. Ann. § 4-2-314) (Alleged by Plaintiff
Park on behalf of the Colorado Subclass) .............................. 150

COUNT XI VIOLATIONS OF THE COLORADO
CONSUMER PROTECTION ACT (C.R.S. § 6-1-101 *et
seq.*) (Alleged by Plaintiff Park on behalf of the Colorado
Subclass) ................................................................................ 153

COUNT XII UNJUST ENRICHMENT  (COMMON LAW)
(Alleged by Plaintiff Park on behalf of the Colorado
Subclass) ................................................................................ 158

D.     Florida............................................................................................. 161

COUNT XIII VIOLATION OF FLORIDA'S UNFAIR &
DECEPTIVE TRADE PRACTICES ACT (Fla. Stat.
§ 501.201, *et seq.*) (Alleged by Plaintiffs Vasquez and
Perkal on behalf of the Florida Subclass) .............................. 161

COUNT XIV BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER FLORIDA LAW (Fla.
Stat. § 672.314)  (Alleged by Plaintiffs Vasquez and
Perkal on behalf of the Florida Subclass) .............................. 165

COUNT XV UNJUST ENRICHMENT (COMMON LAW)
(Alleged by Plaintiff Vasquez and Perkal on behalf of the
Florida Subclass) ................................................................... 168

E.      Illinois ............................................................................................. 170

COUNT XVI BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER ILLINOIS LAW (810
ILCS 5/2-314 and 5/2A-212) (Alleged by Plaintiff
Liakhova on behalf of the Illinois Subclass) ......................... 170

COUNT XVII VIOLATION OF THE ILLINOIS CONSUMER
FRAUD ACT (815 ILCS § 505/1 *et seq.*) (Alleged by
Plaintiff Liakhova on behalf of the Illinois Subclass) .......... 173

COUNT XVIII UNJUST ENRICHMENT (COMMON LAW)
(Alleged by Plaintiff Liakhova on behalf of the Illinois
Subclass) ................................................................................ 177

F.      New Jersey ...................................................................................... 180

COUNT XIX VIOLATION OF NEW JERSEY CONSUMER
FRAUD ACT (N.J. Stat. Ann. § 56:8-1, *et seq.*) (Alleged
by Plaintiffs Jade and Christopher Wadleigh on behalf of
the New Jersey Subclass) ....................................................... 180

COUNT XX BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER NEW JERSEY LAW
(N.J. Stat. Ann. § 12A:2-314) (Alleged by Plaintiffs Jade
and Christopher Wadleigh on behalf of the New Jersey
Subclass) ................................................................................ 184

COUNT XXI UNJUST ENRICHMENT (COMMON LAW)
(Alleged by Plaintiffs Jade and Christopher Wadleigh on
behalf of the New Jersey Subclass) ....................................... 187

G.      North Carolina ................................................................................ 189

COUNT XXII VIOLATION OF NORTH CAROLINA
UNFAIR AND DECEPTIVE ACTS AND PRACTICES
ACT (N.C. Gen. State §§ 75-1.1, *et seq.*) (Alleged by
Plaintiff Perrera on behalf of the North Carolina
Subclass) ................................................................................ 189

COUNT XXIII BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER NORTH CAROLINA

LAW (N.C. Gen. Stat. §§ 25-2-314 and 25-2A-212)
(Alleged by Plaintiff Perrera on Behalf of the North
Carolina Subclass)..................................................................... 193

COUNT XXIV UNJUST ENRICHMENT (COMMON LAW)
(Alleged by Plaintiff Perrera on behalf of the North
Carolina Subclass)..................................................................... 196

H.   Oklahoma ......................................................................................... 198

COUNT XXV BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER OKLAHOMA LAW
(Okla. Stat. Ann. tit. 12A, §§ 2-314 and 2A-212)
(Alleged by Plaintiff May on behalf of the Oklahoma
Subclass) .................................................................................... 198

COUNT XXVI VIOLATION OF THE OKLAHOMA
CONSUMER PROTECTION ACT (Okla. Stat. Ann. Tit.
15 § 751 *et seq*.) (Alleged by Plaintiff May on behalf of
the Oklahoma Subclass)............................................................ 201

COUNT XXVII UNJUST ENRICHMENT (Common Law)
(Alleged by Plaintiff May on behalf of the Oklahoma
Subclass) .................................................................................... 205

I.   Pennsylvania..................................................................................... 208

COUNT XXVIII VIOLATION OF THE PENNSYLVANIA
UNFAIR TRADE PRACTICES AND CONSUMER
PROTECTION LAW (73 Pa. Cons. Stat. § 201-1,
*et seq*.) (Alleged by Plaintiff Berns on behalf of the
Pennsylvania Subclass) ............................................................. 208

COUNT XXIX BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER PENNSYLVANIA
LAW (13 Pa. Cons. Stat. Ann. §§ 2314 and 2A212)
(Alleged by Plaintiff Berns on behalf of the Pennsylvania
Subclass) .................................................................................... 212

COUNT XXX UNJUST ENRICHMENT (COMMON LAW)
(Alleged by Plaintiff Berns on behalf of the Pennsylvania
Subclass) .................................................................................... 215

J.   Texas................................................................................................. 217

COUNT XXXI BREACH OF THE IMPLIED WARRANTY
OF MERCHANTABILITY UNDER TEXAS LAW
(Tex. Bus. & Com. Code § 2.314) (Alleged by Plaintiff
Liscano on behalf of the Texas Subclass)............................... 217

COUNT XXXII Violations of the Texas Deceptive Trade
Practices Act Tex. Bus. & Com. Code §§ 17.41, *et seq*.
(Alleged by Plainitff Liscano on behalf of the Texas
Subclass) ................................................................................. 220

COUNT XXXIII UNJUST ENRICHMENT (COMMON LAW)
(Alleged by Plaintiff Liscano on behalf of the Texas
Subclass) ................................................................................. 225

XI.   REQUEST FOR RELIEF ............................................................. 228

XII.   DEMAND FOR JURY TRIAL ................................................... 228

Plaintiffs Gary Frisch, Tammy Otto, Brian Kreb, Eve Park, Harry Vasquez, Richard Perkal, Nataliia Liakhova, Jade and Christopher Wadleigh, David Perrera, Erin May, Dennis Berns, Jonathan Liscano, and Robert Stueve ("Plaintiffs") file this lawsuit individually and on behalf of a proposed nationwide class and statewide classes. Plaintiffs allege the following based on personal knowledge as to their own acts and experiences and, as to all other matters, based on the investigation of counsel:

## I.    INTRODUCTION

1.    This case concerns a concealed, dangerous defect in over 32,000 Model Year 2021-2023 Jeep Wrangler 4xe plug-in hybrid electric vehicles (the "Class Vehicles") that were designed, manufactured, marketed, and sold by Defendant FCA US, LLC ("FCA"). FCA marketed these plug-in hybrid Class Vehicles as safe, reliable, and high performing vehicles that remained true to the rugged Jeep image and performance, while avoiding the gas guzzling propensities of other SUVs before it.  Plaintiffs and the putative Class paid a substantial premium for the Class Vehicles, compared to similar models that were not plug-in hybrids.

2.    What FCA failed to disclose, however, is that the Class Vehicles have a dangerous and defective high-voltage hybrid battery system ("HV Battery") that can cause, and has in fact caused, vehicle fires and explosions (the "Fire Defect").

The Fire Defect has not only put Plaintiffs and putative Class Members in danger, as detailed herein, it has also deprived these consumers of the use of their vehicles and of the very fuel efficiency and other benefits FCA touted.

3.    Despite knowing of the safety risks from the Fire Defect, FCA sold and leased the Class Vehicles to Plaintiffs and putative Class Members without disclosing the defect, and it still has not yet addressed the root cause of the defect.

4.    Plaintiffs bring this class action on behalf of themselves and a proposed Class of all owners or lessees of a Class Vehicle to hold FCA accountable for its defective product and the damages these consumers have incurred as a result.

5.    The Fire Defect exposes Plaintiffs and putative Class Members, as well as the public at large, to an unreasonable risk of accident, injury, death, or property damage from Class Vehicles that can catch fire while driving or, more commonly, while parked and charging.

6.    The serious and ongoing danger from the Fire Defect is real. Plaintiff Nataliia Liakhova's Class Vehicle, for example, caught on fire during a routine evening charge outside of her apartment in April 2024. Firefighters on the scene traced the fire to a hot spot underneath the backseats where the HV Battery was located.



*Plaintiff Liakhova's Class Vehicle shortly after being extinguished.*

7.     Plaintiff Liakhova's Jeep was not the first Class Vehicle to ignite while turned off and charging. A year before in April 2023, a Jeep Wrangler 4xe Class Vehicle caught fire and exploded in a garage located in Erie, Colorado. Like the fire in Plaintiff Liakhova's vehicle, the flames clearly originated in the back seat of the car. The resulting explosion was so powerful that it sent the garage door flying some thirty feet through the air, striking a responding firefighter in the helmet.[1]

---

[1] Ex. 1, YouTube, StacheD Training, Close Call: Jeep 4xe Hybrid Explosion Nearly Hits Fire Captain in Erie, Colorado! (Aug. 4, 2023), https://www.youtube.com/watch?v=en3PuyWQ_7g.



*Video footage of the Jeep Wrangler 4xe fire and explosion in Erie, Coloardo.*

8.     Following at least eight reports of similar fires caused by the HV Battery installed in the Class Vehicles, FCA issued a safety recall notice in November 2023 and acknowledged that the Class Vehicles' "high voltage battery may fail internally and lead to a vehicle fire while parked or driving." Yet, despite issuing this recall, FCA had no fix available to address the issue, and admitted that it still did not identify of the root cause of the fires. Instead, it advised Plaintiffs and putative Class Members "to refrain from recharging these vehicles and not to park them inside of buildings or structures, or near other vehicles until the vehicle has the final repair completed."

9.     FCA never explained to Class Vehicle owners and lessees what constitutes a "safe" distance from an exploding vehicle. Nor has it explained what

owners and lessees should do with their vehicles if they have no such place to park and charge their vehicles. As such, FCA put Plaintiffs and putative Class Members in an untenable situation where they could not realistically follow FCA's directive to park their Class Vehicles a "safe" distance from structures or other vehicles, and could not use the plug-in hybrid electric features for which they paid a hefty premium.

10. Without the ability to safely recharge their Class Vehicles, Plaintiffs and putative Class Members were stuck with a plug-in hybrid electric vehicle that could only be driven as a gasoline-powered vehicle. This lack of battery charging actually renders the hybrid propulsion system in the Class Vehicles worse than useless—it becomes dead weight. The hybrid propulsion system adds significant weight to the Class Vehicles, leading them to consume more fuel when the hybrid electric features are underutilized. For example, according to FCA's specifications, a 2021 Class Vehicle operating outside of electric mode actually consumes *more* fuel than an equivalent 2021 Jeep Wrangler with a gasoline engine. A plug-in electric hybrid vehicle that cannot be operated in all-electric mode and is less efficient than its gas-powered equivalent is not fit for its ordinary purpose.

11. Owners and lessees of Class Vehicles have been injured in fact, incurred damages, and suffered ascertainable losses in money and property because of the Fire Defect. They paid thousands of dollars for a plug-in hybrid electric

propulsion system that they cannot use, and will continue to incur damages until the Fire Defect is actually fixed. Had Plaintiffs and putative Class Members known of the Fire Defect, they would not have purchased or leased those vehicles; paid substantially less for them; or purchased non-hybrid versions of the vehicles, which are significantly less expensive.

12.     The injuries and damages to Plaintiffs and putative Class Members persist even with the recall "procedure" that FCA announced following the filing of Plaintiffs' original Complaint (ECF No. 1). This procedure—which came several months after a notice advising Plaintiffs and Class Members to refrain from charging their Class Vehicles—consists of only a software update to the HV Battery control system, and explicitly instructs dealerships to "not replace the High Voltage battery unless the BPCM Integrity Procedure DTCs indicates a new battery is required." Thus, rather than offering a safer redesign of the Class Vehicle's HV Battery system, FCA's "recall" discourages battery replacement and continues to take a "wait and see" approach.

13.     FCA's delayed recall procedure has neither addressed the root cause of the Fire Defect (which FCA still has not identified) nor remediated the harm to Plaintiffs and the putative Class Members. Instead, the limited scope, poor implementation, and lack of effectiveness of FCA's recall have merely contributed to the damages that Plaintiffs and putative Class Members suffered by lengthening

their loss of use of the Class Vehicles. Indeed, it appears that FCA does not even have the capacity to effectuate the recall. FCA has reported that only twenty percent of its "suspect population" has received recall service, which takes hours to complete and requires that the Class Vehicle be left with an FCA dealership for days at a time. Unsurprisingly, Class Members have reported waiting months to obtain the recall procedure.

14.     FCA had all the knowledge it needed to anticipate, test for, and prevent the Fire Defect before the Class Vehicles went to market. This knowledge came from, among other things, industry and scientific studies on the fire risks of lithium-ion battery packs;[2] rigorous pre-launch testing of the HV Battery and hybrid propulsion system that any responsible manufacturer would have conducted; industry insights on the appropriate specifications and control systems for lithium-ion batteries; and known fire issues arising in other vehicles with lithium-ion battery packs, including FCA's Chrysler Pacifica PHEV. Despite this wealth of knowledge, FCA chose profits over safety, and sold and leased the Class Vehicles to Plaintiffs and the putative Class Members without disclosing or rectifying the serious risk of the Fire Defect.

---

[2] *See generally* Ex. 2, *Lithium-Ion Battery Safety Issues for Electric and Plug-in Hybrid Vehicles*, NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION (Oct. 2017) ("2017 NHTSA Report").

15.    Plaintiffs bring this class action to redress FCA's misconduct. Plaintiffs seek damages and a repair under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301-2312, for FCA's violations of state consumer protection acts, breaches of implied warranties, and unjust enrichment.

## II.    JURISDICTION

16.    This Court has original jurisdiction over this lawsuit under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) and (6), because Plaintiffs and Defendant are citizens of different states; there are more than 100 members of the Class and each Subclass (as defined herein); the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest, and costs; and Class Members reside across the United States. The citizenship of each party is described further below in the "Parties" section.

17.    This Court has personal jurisdiction over the Defendant by virtue of its transactions and business conducted in this judicial district, and because Defendant is headquartered in Michigan. Defendant has transacted and done business, and violated statutory and common law, in the State of Michigan and in this judicial district.

### III.   VENUE

18.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendant transacts substantial business and is headquartered in this district.

### IV.   PARTIES

**A.   Plaintiffs**

**Gary Frisch (Arizona)**

19.     Plaintiff and proposed class representative Gary B. Frisch is a citizen of Arizona, residing in Phoenix, Arizona. Plaintiff Frisch leased a 2021 Jeep Wrangler 4xe on May 18, 2021, from an authorized FCA dealer in Phoenix, Arizona. Mr. Frisch leased the vehicle for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or operating under ordinary use.

20.     Before acquiring the Class Vehicle, Plaintiff Frisch conducted extensive research, which included reading literature on the FCA website, reviewing a set of buyback disclosure notices from FCA regarding the vehicle, discussions with the dealer sales representative, and reading other materials regarding the vehicle. Based on this research, Plaintiff Frisch believed FCA's representations (including implicit representations) regarding the dependability and safety of the Class Vehicle, as well as FCA's representations regarding the fuel economy savings and benefits of it being a hybrid vehicle with the ability to be

driven in full electric mode. Plaintiff also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors or at home. These were material reasons why Plaintiff leased the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicle and the benefits of using the vehicle in its electric mode, at no point did FCA or its agents, dealers, or other representatives disclose to Plaintiff the Fire Defect. Had FCA not concealed and instead properly disclosed the Fire Defect, Plaintiff would have known about the Fire Defect.

21.     After learning of FCA's recall for the Fire Defect, Plaintiff Frisch limited his use of the Class Vehicle and was unable to park the car in his garage or charge the vehicle due to the risk of fire. Plaintiff was unable to use the vehicle charger that was installed in his home to charge the Class Vehicle, and he was also unable to use the vehicle's fully electric drive mode for short excursions due to charging restrictions from the recall. Moreover, because Plaintiff could no longer charge the plug-in hybrid vehicle as he ordinarily would, Plaintiff had to pay for additional gas that he otherwise would not have needed if the hybrid propulsion system was able to operate as intended. FCA has not compensated Plaintiff for the lost use of the Class Vehicle and other associated damages he sustained due to the Fire Defect.

22.     FCA did not have a recall procedure available when it announced the recall for the Fire Defect. As a result, the lease term for Plaintiff Frisch's Class Vehicle ended before the recall procedure could be completed on the vehicle.

23.     Plaintiff lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and he returned the vehicle to the dealer rather than exercising the purchase option, which he intended to exercise when he entered the lease agreement. Due to restrictions brought on by the Fire Defect and FCA's recall notice, Plaintiff drove the vehicle only approximately 30,000 miles out of the 36,000 allowed by his lease agreement by the time he turned the car into the dealer, and thereby lost the value of the mileage included in the lease.

24.     Had Plaintiff Frisch known of the Fire Defect, he would not have leased the Jeep Wrangler 4xe, but would have instead chosen a safer vehicle or leased a vehicle which would allow him to exercise the purchase option as he intended to do with this vehicle.

**Tammy Otto (Arizona)**

25.     Plaintiff and proposed class representative Tammy Otto is a citizen of Arizona, residing in Sedona, Arizona. Plaintiff Otto purchased a 2021 Jeep Wrangler 4xe on October 8, 2021, from an authorized FCA dealer in Flagstaff, Arizona. Ms. Otto purchased the vehicle for personal, family, and household use,

and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or otherwise operating under ordinary use.

26.     Before acquiring the Class Vehicle, Plaintiff Otto conducted extensive research, including reviewing the vehicle's features on the Jeep website. Based on this research, Plaintiff Otto believed FCA's representations (including implicit representations) regarding the dependability and safety of the Class Vehicle, as well as FCA's representations regarding the fuel economy savings and benefits of it being a hybrid vehicle with the ability to be driven in full electric mode. Plaintiff also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors or at home. These were material reasons why Plaintiff purchased the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles and the benefits of using the vehicle in its electric mode, at no point did FCA or its agents, dealers, or other representatives disclose to Plaintiff the Fire Defect. Had FCA not concealed and instead properly disclosed the Fire Defect, Plaintiff would have known about the Fire Defect.

27.     After learning of FCA's recall for the Fire Defect, Plaintiff Otto limited her use and charging of the Class Vehicle, and she was unable to park it freely because of the dangerous fire risk it posed to the wooded area around her home. Moreover, because Plaintiff was unable to charge the plug-in hybrid vehicle

as she ordinarily would, Plaintiff had to pay for additional gas that she otherwise would not have needed if the hybrid propulsion system was able to operate as intended. FCA has not compensated Plaintiff for the lost use of the Class Vehicle and other associated damages she sustained due to the Fire Defect.

28.     FCA did not have a recall procedure available when it announced the recall for the Fire Defect. As a result, Plaintiff Otto had to wait for several months before an FCA dealer was actually able to perform the recall servicing on her Class Vehicle. When Plaintiff was finally able to get the recall performed, she was forced to leave the vehicle with the dealership overnight and did not receive a loaner vehicle.

29.     Several weeks after the recall was performed, Plaintiff Otto's Class Vehicle experienced a battery failure and had to be towed back to the dealership. Plaintiff Otto was unable to start the vehicle, and the dashboard warning light illuminated for the battery charger, which indicated that there was a problem with the battery. The dealership informed Plaintiff Otto that the battery in her Class Vehicle needed to be replaced, and the vehicle would need to be kept at the dealership for several weeks for the work to be performed.

30.     Plaintiff Otto remains concerned about driving, charging, and parking the Class Vehicle due to the ongoing dangers resulting from the Fire Defect. FCA still has not identified the root cause of the Fire Defect, and its supposed recall

"fix" involved a software update to the Class Vehicle's battery pack control module and a battery integrity test. FCA has not redesigned the defective high voltage battery system at issue in Plaintiff's Class Vehicle, which means that any replacement battery that will be installed in the vehicle will still have the same Fire Defect.

31.     Had Plaintiff Otto known of the Fire Defect, she would not have purchased the Jeep Wrangler 4xe, but would have instead chosen a safer vehicle. Plaintiff has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiff cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiff in the untenable position of having to drive an unsafe vehicle and has not provided any effective repair to address the actual cause of the Fire Defect.

### Robert Stueve (Arizona)

32.     Plaintiff and proposed class representative Robert Stueve is a citizen of Texas, residing in Dallas, Texas. Plaintiff Stueve purchased a 2021 Jeep Wrangler 4xe on or about November 24, 2023, from an authorized FCA dealer in Phoenix, Arizona. Mr. Stueve purchased the car for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or operating under ordinary use.

33.     Before acquiring the Class Vehicle, Plaintiff Stueve conducted
extensive research, which included reading literature on the FCA website,
reviewing a set of buyback disclosure notices from FCA regarding the vehicle,
discussions with the dealer sales representative, and reading other materials
regarding the vehicle. Based on this research, Plaintiff Stueve believed FCA's
representations (including implicit representations) regarding the dependability and
safety of the Class Vehicle, as well as FCA's representations regarding the fuel
economy savings and benefits of it being a hybrid vehicle with the ability to be
driven in full electric mode. Plaintiff also believed that the Class Vehicle's plug-in
functionality could be used to safely recharge the Class Vehicle's electric battery
indoors or at home. These were material reasons why Plaintiff purchased the Class
Vehicle. However, despite touting the safety and dependability of the Class
Vehicle and the benefits of using the vehicle in its electric mode, at no point did
FCA or its agents, dealers, or other representatives disclose to Plaintiff the Fire
Defect. Had FCA not concealed and instead properly disclosed the Fire Defect,
Plaintiff would have known about the Fire Defect.

34.     After learning of FCA's recall for the Fire Defect, Plaintiff Stueve has
reasonably followed the recall instructions, including limiting his use of the Class
Vehicle when possible and not charging the plug-in hybrid vehicle as he ordinarily
would. Plaintiff had to pay for additional gas that he otherwise would not have

needed if the hybrid propulsion system was able to operate as intended. FCA has not compensated Plaintiff for the lost use of the Class Vehicle and other associated damages sustained due to the Fire Defect.

35.     FCA did not have a recall procedure available when it announced the recall for the Fire Defect. As a result, Plaintiff Stueve had to wait for several months before an FCA dealer was actually able to perform the recall servicing on his Class Vehicle. When Plaintiff was finally able to get the recall performed, he was forced to leave the vehicle with the dealership for several days.

36.     Even with the recall servicing performed, Plaintiff Stueve remains concerned about driving, charging, and parking the Class Vehicle due to the ongoing dangers resulting from the Fire Defect. FCA still has not identified the root cause of the Fire Defect, and its supposed recall "fix" involved a software update to the Class Vehicle's battery pack control module and a battery integrity test. FCA has not redesigned or replaced the dangerous and defective high voltage battery system at issue in Plaintiff's Class Vehicle.

37.     Had Plaintiff Stueve known of the Fire Defect, he would not have purchased the Jeep Wrangler 4xe, but would have instead chosen a safer vehicle. Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiff cannot operate the vehicle in a manner in which it was intended to be used. FCA has put

Plaintiff in the untenable position of having to drive an unsafe vehicle and has not provided any effective repair to address the actual cause of the Fire Defect.

### Brian Kreb (California)

38.     Plaintiff and proposed class representative Brian Kreb is a citizen of California, residing in Chico, California. Plaintiff Kreb purchased a 2021 Jeep Wrangler 4xe on September 8, 2021, from an authorized FCA dealer in San Jose, California. Mr. Kreb purchased the vehicle for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or otherwise operating under ordinary use.

39.     Before acquiring the Class Vehicle, Plaintiff Kreb conducted extensive research, including going on the Jeep website and building out his individual vehicle for purchase, looking at the reported mileage and the specifics of the hybrid engine, and test driving the car itself. Based on this research, Plaintiff Kreb believed FCA's representations (including implicit representations) regarding the dependability and safety of the Class Vehicle, as well as FCA's representations regarding the fuel economy savings and benefits of it being a hybrid vehicle with the ability to be driven in full electric mode. Plaintiff also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors and at home. These were material reasons why Plaintiff purchased the Class Vehicle. However, despite touting the safety and dependability

of the Class Vehicles and the benefits of using the vehicle in its all electric mode, at no point did FCA or its agents, dealers, or other representatives disclose to Plaintiff the Fire Defect. Had FCA not concealed and instead properly disclosed the Fire Defect, Plaintiff would have known about the Fire Defect.

40.     After learning of FCA's recall for the Fire Defect, Plaintiff Kreb refrained from using the electric mode of the Class Vehicle and avoided parking it inside his garage at home or near other cars he owned. Moreover, because Plaintiff could no longer charge the battery on the plug-in hybrid vehicle as he ordinarily would, Plaintiff had to pay for additional gasoline that he otherwise would not have needed if the hybrid propulsion system was able to operate as intended. FCA has not compensated Plaintiff for the lost use of the Class Vehicle and other associated damages he sustained due to the Fire Defect.

41.     FCA did not have a recall procedure available when it announced the recall for the Fire Defect. As a result, Plaintiff Kreb had to wait for several months before an FCA dealer was actually able to perform the recall servicing on his Class Vehicle. When Plaintiff was finally able to get the recall performed, he was forced to leave the vehicle with the dealership for several days and did not receive a loaner vehicle.

42.     Even with the recall servicing performed, Plaintiff Kreb remains concerned about driving, charging, and parking the Class Vehicle due to the

ongoing dangers resulting from the Fire Defect. FCA still has not identified the root cause of the Fire Defect, and its supposed recall "fix" involved a software update to the Class Vehicle's battery pack control module and a battery integrity test. FCA has not redesigned or replaced the dangerous and defective high voltage battery system at issue in Plaintiff's Class Vehicle.

43.     Had Plaintiff Kreb known of the Fire Defect, he would not have purchased the Jeep Wrangler 4xe, but would have instead chosen a safer vehicle. Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiff cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiff in the untenable position of having to drive an unsafe vehicle and has not provided any effective repair to address the actual cause of the Fire Defect.

**Eve Park (Colorado)**

44.     Plaintiff and proposed class representative Eve Park is a citizen of Colorado, residing in Littleton, Colorado. Plaintiff Park purchased a 2021 Jeep Wrangler 4xe on or about May 7, 2021, from an authorized FCA dealer in Littleton, Colorado. Plaintiff Park purchased the car for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or operating under ordinary use.

45.     Before acquiring the Class Vehicle, Plaintiff Park conducted extensive research, which included reading literature on the FCA website, reviewing the official Jeep YouTube videos of the 4xe reveal, speaking with the FCA dealer sales representative, and reading other materials regarding the vehicle. Based on this research, Plaintiff Park believed FCA's representations (including implicit representations) regarding the dependability and safety of the Class Vehicle, as well as FCA's representations regarding the fuel economy savings and benefits of it being a hybrid vehicle with the ability to be driven in full electric mode. Plaintiff Park also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors or at home. These were material reasons why Plaintiff Park purchased the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicle and the benefits of using the vehicle in its electric mode, at no point did FCA or its agents, dealers, or other representatives disclose to Plaintiff Park the Fire Defect. Had FCA not concealed and instead properly disclosed the Fire Defect, Plaintiff would have known about the Fire Defect.

46.     After learning of FCA's recall for the Fire Defect, Plaintiff Park limited her use of the Class Vehicle and was unable to park the car in her driveway or charge the vehicle due to the risk of fire. Plaintiff Park was also unable to use the Class Vehicle's fully electric drive mode for short excursions due to charging

restrictions from the recall. In addition, it was impossible for Plaintiff Park to park the Class Vehicle away from structures and other vehicles as FCA instructed. Moreover, because Plaintiff Park could no longer charge the plug-in hybrid vehicle as she ordinarily would, she had to pay for additional gas that she otherwise would not have needed if the hybrid propulsion system was able to operate as intended. FCA has not compensated Plaintiff for the lost use of the Class Vehicle and other associated damages she sustained due to the Fire Defect.

47.     FCA did not have a recall procedure available when it announced the recall for the Fire Defect. As a result, Plaintiff Park had to wait for several months before an FCA dealer was actually able to perform the recall servicing on her Class Vehicle. When Plaintiff Park was finally able to get the recall performed, Plaintiff Park was forced to leave the vehicle with the dealership for over a week without receiving a loaner vehicle.

48.     Even with the recall servicing performed, Plaintiff Park remains concerned about driving, charging, and parking the Class Vehicle due to the ongoing dangers resulting from the Fire Defect. FCA still has not identified the root cause of the Fire Defect, and its supposed recall "fix" involved a software update to the Class Vehicle's battery pack control module and a battery integrity test. FCA has not redesigned or replaced the dangerous and defective high voltage battery system at issue in Plaintiff Park's Class Vehicle.

49.     Had Plaintiff Park known of the Fire Defect, she would not have purchased the Jeep Wrangler Unlimited Rubicon 4xe but would have instead chosen a safer vehicle. Plaintiff Park has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiff Park cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiff Park in the untenable position of having to drive an unsafe vehicle and has not provided any effective repair to address the actual cause of the Fire Defect.

### **Harry Vasquez (Florida)**

50.     Plaintiff and proposed class representative Harry Vasquez is a citizen of Florida, residing in New Port Richey, Florida. Plaintiff Vasquez purchased a 2021 Jeep Wrangler 4xe on September 15, 2023, from a dealer in Tampa, Florida. Mr. Vasquez purchased the vehicle for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or otherwise operating under ordinary use.

51.     Before acquiring the Class Vehicle, Plaintiff Vasquez conducted extensive research, including reviewing the vehicle's features on the Jeep website. Based on this research, Plaintiff Vasquez believed FCA's representations (including implicit representations) regarding the dependability and safety of the Class Vehicle, as well as FCA's representations regarding the fuel economy

savings and benefits of it being a hybrid vehicle with the ability to be driven in full electric mode. Plaintiff also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors or at home. These were material reasons why Plaintiff purchased the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles and the benefits of using the vehicle in its electric mode, at no point did FCA or its agents, dealers, or other representatives disclose to Plaintiff the Fire Defect. Had FCA not concealed and instead properly disclosed the Fire Defect, Plaintiff would have known about the Fire Defect.

52. After learning of FCA's recall for the Fire Defect, Plaintiff Vasquez has reasonably followed the recall instructions, including limiting his use of the Class Vehicle when possible and not charging the plug-in hybrid vehicle as he ordinarily would. Plaintiff had to pay for additional gas that he otherwise would not have needed if the hybrid propulsion system was able to operate as intended. FCA has not compensated Plaintiff for the lost use of the Class Vehicle and other associated damages sustained due to the Fire Defect.

53. FCA did not have a recall procedure available when it announced the recall for the Fire Defect. As a result, Plaintiff Vasquez had to wait for several months before an FCA dealer was actually able to perform the recall servicing on his Class Vehicle. Indeed, Plaintiff Vasquez attempted multiple communications

with his authorized FCA dealer before they responded to him. He has since been communicating with an authorized FCA dealer regarding scheduling the recall procedure and intends to submit his Class Vehicle for the recall procedure.

54.     Plaintiff Vasquez remains concerned about driving, charging, and parking the Class Vehicle due to the ongoing dangers resulting from the Fire Defect. Even if the FCA dealer is able to complete the recall servicing on his vehicle (which appears dubious given FCA's "Parts Unavailable" messaging related to this recall) FCA still has not identified the root cause of the Fire Defect, and its supposed recall "fix" involved a software update to the Class Vehicle's battery pack control module and a battery integrity test.

55.     Had Plaintiff Vasquez known of the Fire Defect, he would not have purchased the Jeep Wrangler 4xe, but would have instead chosen a safer vehicle. Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiff cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiff in the untenable position of having to drive an unsafe vehicle and has not provided any effective repair to address the actual cause of the Fire Defect.

**Richard Perkal (Florida)**

56.     Plaintiff and proposed class representative Richard Perkal is a citizen of Florida, residing in Fort Lauderdale, Florida. Plaintiff Perkal purchased a 2021

Jeep Wrangler 4xe on May 28, 2021, from an authorized FCA dealer in Jacksonville, Florida. Mr. Perkal purchased the vehicle for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or otherwise operating under ordinary use.

57.    Before acquiring the Class Vehicle, Plaintiff Perkal conducted extensive research, including reviewing the vehicle's features on the Jeep website and speaking with the salesperson at the FCA dealership about the vehicle. Based on this research, Plaintiff Perkal believed FCA's representations (including implicit representations) regarding the dependability and safety of the Class Vehicle, as well as FCA's representations regarding the fuel economy savings and benefits of it being a hybrid vehicle with the ability to be driven in full electric mode. Plaintiff also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors or at home. These were material reasons why Plaintiff purchased the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles and the benefits of using the vehicle in its electric mode, at no point did FCA or its agents, dealers, or other representatives disclose to Plaintiff the Fire Defect. Had FCA not concealed and instead properly disclosed the Fire Defect, Plaintiff would have known about the Fire Defect.

58.     After learning of FCA's recall for the Fire Defect, Plaintiff Perkal limited his use of the Class Vehicle and refrained from parking it indoors or near other vehicles. Moreover, because Plaintiff Perkal could no longer charge the plug-in hybrid vehicle as he ordinarily would, Plaintiff Perkal had to pay for additional gas that he otherwise would not have needed if the hybrid propulsion system was able to operate as intended. FCA has not compensated Plaintiff Perkal for the lost use of the Class Vehicle and other associated damages he sustained due to the Fire Defect.

59.     FCA did not have a recall procedure available when it announced the recall for the Fire Defect. As a result, Plaintiff had to wait for several months before an FCA dealer was actually able to perform the recall servicing on his Class Vehicle. But even then, the FCA dealer had difficulty installing the software update for the recall, and Plaintiff was forced to leave the vehicle with the dealership overnight without receiving a loaner vehicle.

60.     Even with the recall servicing performed, Plaintiff Perkal remains concerned about driving, charging, and parking the Class Vehicle due to the ongoing dangers resulting from the Fire Defect. FCA still has not identified the root cause of the Fire Defect, and its supposed recall "fix" involved a software update to the Class Vehicle's battery pack control module and a battery integrity

test. FCA has not redesigned or replaced the dangerous and defective high voltage battery system at issue in Plaintiff's Class Vehicle.

61.     Had Plaintiff Perkal known of the Fire Defect, he would not have purchased the Jeep Wrangler 4xe, but would have instead chosen a safer vehicle. Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiff cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiff in the untenable position of having to drive an unsafe vehicle and has not provided any effective repair to address the actual cause of the Fire Defect.

### Nataliia Liakhova (Illinois)

62.     Plaintiff and proposed class representative Nataliia Liakhova is a citizen of Illinois, residing in Buffalo Grove, Illinois. Plaintiff leased a 2023 Jeep Sahara Wrangler 4xe on or about September 17, 2022, from an authorized FCA dealer. Plaintiffs leased the vehicle for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or otherwise operating under ordinary use.

63.     Before acquiring the Class Vehicle, Plaintiff conducted extensive research, including reviewing and building the specifications and features of her Class Vehicle on FCA's website. Based on this research, Plaintiff believed FCA's representations (including implicit representations) regarding the dependability and

safety of the Class Vehicle, as well as FCA's representations regarding the fuel economy savings and benefits of it being a hybrid vehicle with the ability to be driven in full-electric mode. Plaintiff also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery at the charging station in her apartment complex. These were material reasons why Plaintiff leased the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles and the benefits of using the vehicle in its electric mode, at no point did FCA or its agents, dealers, or other representatives disclose to Plaintiff the Fire Defect. Had FCA not concealed and instead properly disclosed the Fire Defect, Plaintiff would have known about the Fire Defect.

64.     As discussed in detail *infra* section V.C.ii, Plaintiff Liakhova's vehicle caught fire while plugged into an EV Charger outside of her apartment complex. Upon arrival, the Buffalo Grove Fire Department concentrated its efforts to extinguish on a spot with increased temperature located in the back seat of Plaintiff Liakhova's vehicle. The HV Battery is located underneath the back seat in the Class Vehicles.

65.     Plaintiff Liakhova can no longer drive, charge, or park the Class Vehicle because her vehicle was totaled by the Fire Defect.

66.     Had Plaintiff known of the Fire Defect, she would not have leased the Jeep Wrangler 4xe, but would have instead chosen a safer vehicle. Plaintiff's Class

Vehicle cannot provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiff cannot operate the vehicle in the manner in which it was intended to be used. FCA has left Plaintiff without a vehicle as a result of its failure to address the Fire Defect.

### Jade and Christopher Wadleigh (New Jersey)

67.     Plaintiffs and proposed class representatives Jade and Christopher Wadleigh are a married couple and citizens of New Jersey, residing in Sussex, New Jersey. Plaintiffs purchased a 2021 Jeep Wrangler 4xe on or about July 5, 2021, from an authorized FCA dealer. Plaintiffs purchased the vehicle for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or otherwise operating under ordinary use.

68.     Before acquiring the Class Vehicle, Plaintiffs conducted extensive research, including reviewing the vehicle's features on the Jeep website. Based on this research, Plaintiffs believed FCA's representations (including implicit representations) regarding the dependability and safety of the Class Vehicle, as well as FCA's representations regarding fuel economy savings and benefits of it being a hybrid vehicle with the ability to be driven in full electric mode. Plaintiffs also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors or at home. These were material reasons why Plaintiffs purchased the Class Vehicle. However, despite

touting the safety and dependability of the Class Vehicles and the benefits of using the vehicle in its electric mode, at no point did FCA or its agents, dealers, or other representatives disclose to Plaintiffs the Fire Defect. Had FCA not concealed and instead properly disclosed the Fire Defect, Plaintiffs would have known about the Fire Defect.

69.     After learning of FCA's recall for the Fire Defect, Plaintiffs have reasonably followed the recall instructions, including limiting their use of the Class Vehicle when possible and not charging the plug-in hybrid vehicle as they ordinarily would. Plaintiffs had to pay for additional gas that they otherwise would not have needed if the hybrid propulsion system was able to operate as intended. FCA has not compensated Plaintiffs for the lost use of the Class Vehicle and other associated damages sustained due to the Fire Defect.

70.     FCA did not have a recall procedure available when it announced the recall for the Fire Defect. As a result, Plaintiffs had to wait for several months before an FCA dealer was even potentially able to perform the recall servicing on his Class Vehicle. When FCA did announce the recall procedure, Plaintiff Jade Wadleigh contacted her local authorized FCA dealer to submit her Class Vehicle for the recall procedure. But instead of providing the recall work, the dealership indicated that the replacement HV Battery Systems are so far backordered that they had no idea if or when they might receive any. Additionally, the FCA dealership

advised Plaintiff Wadleigh that if her Class Vehicle failed the recall procedure, the dealer would keep the vehicle and offer her a loaner, but only for up to two weeks. After that point, Plaintiff Wadleigh would have to pay any rental car costs out of pocket. Given this reality (namely, a recall procedure FCA is not even able to complete and FCA's attempt to push costs onto Class Members) Plaintiff Wadleigh is justifiably hesitant to submit her Class Vehicle for the recall procedure at this time.

71.    Plaintiffs remain concerned about driving, charging, and parking the Class Vehicle due to the ongoing dangers resulting from the Fire Defect. Even if the FCA dealer is able to complete the recall servicing on their vehicle, FCA still has not identified the root cause of the Fire Defect, and its supposed recall "fix" involved a software update to the Class Vehicle's battery pack control module and a battery integrity test.

72.    Had Plaintiffs known of the Fire Defect, they would not have purchased the Jeep Wrangler 4xe, but would have instead chosen a safer vehicle. Plaintiffs have lost confidence in the ability of their Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiffs cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiffs in the untenable position of having to drive an unsafe vehicle and has not provided any effective repair to address the cause of the Fire Defect.

**David Perrera (North Carolina)**

73.     Plaintiff and proposed class representative David Perrera is a citizen of North Carolina, residing in Charlotte, North Carolina. Plaintiff Perrera leased a 2021 Jeep Wrangler 4xe on December 4, 2021, from an authorized FCA dealer. Plaintiff Perrera leased the vehicle for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or otherwise operating under ordinary use.

74.     Before acquiring the Class Vehicle, Plaintiff Perrera conducted extensive research, including reviewing the vehicle's features on the Jeep website. Based on this research, Plaintiff Perrera believed FCA's representations (including implicit representations) regarding the dependability and safety of the Class Vehicle, as well as FCA's representations regarding the fuel economy savings and benefits of it being a hybrid vehicle with the ability to be driven in full electric mode. Plaintiff also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors or at home. These were material reasons why Plaintiff leased the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles and the benefits of using the vehicle in its electric mode, at no point did FCA or its agents, dealers, or other representatives disclose to Plaintiff the Fire Defect. Had FCA not

concealed and instead properly disclosed the Fire Defect, Plaintiff would have known about the Fire Defect.

75.     After learning of FCA's recall for the Fire Defect, Plaintiff Perrera has reasonably followed the recall instructions, including limiting his use of the Class Vehicle when possible and not charging the plug-in hybrid vehicle as he ordinarily would. Plaintiff had to pay for additional gas that he otherwise would not have needed if the hybrid propulsion system was able to operate as intended. FCA has not compensated Plaintiff for the lost use of the Class Vehicle and other associated damages sustained due to the Fire Defect.

76.     FCA did not have a procedure available when it announced the recall for the Fire Defect. As a result, Plaintiff Perrera had to wait for several months before an FCA dealer was actually able to perform the recall servicing on his Class Vehicle. Plaintiff was forced to leave his vehicle with the dealer overnight to have the recall procedure done.

77.     Even with the recall servicing performed, Plaintiff Perrera remains concerned about driving, charging, and parking the Class Vehicle due to the ongoing dangers resulting from the Fire Defect. FCA still has not identified the root cause of the Fire Defect, and its supposed recall "fix" involved a software update to the Class Vehicle's battery pack control module and a battery integrity

test. FCA has not redesigned or replaced the dangerous and defective high voltage battery system at issue in Plaintiff's Class Vehicle.

78.     Had Plaintiff Perrera known of the Fire Defect, he would not have leased the Jeep Wrangler 4xe, but would have instead chosen a safer vehicle. Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiff cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiff in the untenable position of having to drive an unsafe vehicle and has not provided any effective repair to address the actual cause of the Fire Defect.

### Erin May (Oklahoma)

79.     Plaintiff and proposed class representative Erin May is a citizen of Oklahoma, residing in Bixby, Oklahoma. Plaintiff May purchased a 2021 Jeep Wrangler 4xe on or about October 29, 2021, from an authorized Jeep dealer in Owasso, Oklahoma. Plaintiff May purchased the vehicle for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or otherwise operating under ordinary use.

80.     Before acquiring the Class Vehicle, Plaintiff May conducted extensive research, including but not limited to reviewing the vehicle's features on the Jeep website. Based on this research, Plaintiff May believed FCA's representations (including implicit representations) regarding the dependability and safety of the

Class Vehicle, as well as FCA's representations regarding the fuel economy savings and benefits of it being a hybrid vehicle with the ability to be driven in full electric mode. Plaintiff also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors or at home. These were material reasons why Plaintiff purchased the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles and the benefits of using the vehicle in its electric mode, at no point did FCA or its agents, dealers, or other representatives disclose to Plaintiff the Fire Defect. Had FCA not concealed and instead properly disclosed the Fire Defect, Plaintiff would have known about the Fire Defect.

81.    After learning of FCA's recall for the Fire Defect, Plaintiff May has reasonably followed the recall instructions, including limiting her use of the Class Vehicle when possible and not charging the plug-in hybrid vehicle as she ordinarily would. Plaintiff had to pay for additional gas that she otherwise would not have needed if the hybrid propulsion system was able to operate as intended. FCA has not compensated Plaintiff for the lost use of the Class Vehicle and other associated damages sustained due to the Fire Defect.

82.    FCA did not have a procedure available when it announced the recall for the Fire Defect. As a result, Plaintiff May had to wait for several months before an FCA dealer was actually able to perform the recall servicing on her Class

Vehicle. But even then, the FCA dealer improperly ran the recall procedure on Plaintiff May's vehicle. Upon return of her Class Vehicle, Plaintiff May found a "check engine" light, at which point she returned the vehicle to the authorized FCA dealer. Plaintiff May's vehicle remained at the dealer for approximately twenty-nine (29) days at which point her HV battery was replaced as it "failed" the software flash recall procedure upon re-run.

83.     Even with the recall servicing performed and finally being returned her vehicle, Plaintiff May remains concerned about driving, charging, and parking the Class Vehicle due to the ongoing dangers resulting from the Fire Defect. FCA still has not identified the root cause of the Fire Defect, and it has simply replaced Ms. May's battery with another identical battery without any explanation why the replacement battery is not expected to degrade and become a fire risk itself.

84.     Had Plaintiff May known of the Fire Defect, she would not have purchased the Jeep Wrangler 4xe, but would have instead chosen a safer vehicle. Plaintiff has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiff cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiff in the untenable position of having to drive an unsafe vehicle and has not provided any effective repair to address the actual cause of the Fire Defect.

**Dennis Berns (Pennsylvania)**

85.     Plaintiff and proposed class representative Dennis Berns is a citizen of Pennsylvania, residing in Milford, Pennsylvania. Plaintiff Berns purchased a 2021 Jeep Wrangler 4xe on or about December 30, 2022, from an authorized FCA dealer. Mr. Berns purchased the vehicle for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or otherwise operating under ordinary use.

86.     Before acquiring the Class Vehicle, Plaintiff Berns conducted extensive research, including reviewing the vehicle's features on the Jeep website. Based on this research, Plaintiff Berns believed FCA's representations (including implicit representations) regarding the dependability and safety of the Class Vehicle, as well as FCA's representations regarding the fuel economy savings and benefits of it being a hybrid vehicle with the ability to be driven in full electric mode. Plaintiff also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors or at home. These were material reasons why Plaintiff purchased the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles and the benefits of using the vehicle in its electric mode, at no point did FCA or its agents, dealers, or other representatives disclose to Plaintiff the Fire Defect. Had FCA not

concealed and instead properly disclosed the Fire Defect, Plaintiff would have known about the Fire Defect.

87.     After learning of FCA's recall for the Fire Defect, Plaintiff Berns has reasonably followed the recall instructions, including limiting his use of the Class Vehicle when possible and not charging the plug-in hybrid vehicle as he ordinarily would. Plaintiff had to pay for additional gas that he otherwise would not have needed if the hybrid propulsion system was able to operate as intended. FCA has not compensated Plaintiff for the lost use of the Class Vehicle and other associated damages sustained due to the Fire Defect.

88.     FCA did not have a recall procedure available when it announced the recall for the Fire Defect. As a result, Plaintiff Berns had to wait for several months before an FCA dealer was actually able to perform the recall servicing on his Class Vehicle. Plaintiff Berns had to leave the Class Vehicle with the FCA dealer for several days to get the recall service done and did not receive a loaner vehicle.

89.     Even with the recall servicing performed, Plaintiff Berns remains concerned about driving, charging, and parking the Class Vehicle due to the ongoing dangers resulting from the Fire Defect. FCA still has not identified the root cause of the Fire Defect, and its supposed recall "fix" involved a software update to the Class Vehicle's battery pack control module and a battery integrity

test. FCA has not redesigned or replaced the dangerous and defective high voltage battery system at issue in Plaintiff's Class Vehicle.

90.    Had Plaintiff Berns known of the Fire Defect, he would not have purchased the Jeep Wrangler 4xe, but would have instead chosen a safer vehicle. Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiff cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiff in the untenable position of having to drive an unsafe vehicle and has not provided any effective repair to address the actual cause of the Fire Defect.

**Jonathan Liscano (Texas)**

91.    Plaintiff and proposed class representative Jonathan Liscano is a citizen of Texas, residing in McAllen, Texas. Plaintiff Liscano leased a 2023 Jeep Wrangler 4xe on or about April 19, 2023, from a dealer in McAllen, Texas. Mr. Liscano leased the vehicle for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or otherwise operating under ordinary use.

92.    Before acquiring the Class Vehicle, Plaintiff Liscano conducted extensive research, including but not limited to reviewing the vehicle's features on the Jeep website. Based on this research, Plaintiff Liscano believed FCA's representations regarding the dependability and safety of the Class Vehicle, as well

as FCA's representations regarding the fuel economy savings and benefits of it being a hybrid vehicle with the ability to be driven in full electric mode. Plaintiff also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors or at home. These were material reasons why Plaintiff leased the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles and the benefits of using the vehicle in its electric mode, at no point did FCA or its agents, dealers, or other representatives disclose to Plaintiff the Fire Defect. Had FCA not concealed and instead properly disclosed the Fire Defect, Plaintiff would have known about the Fire Defect.

93.     After learning of FCA's recall for the Fire Defect, Plaintiff Liscano has reasonably followed the recall instructions, including limiting his use of the Class Vehicle when possible and not charging the plug-in hybrid vehicle as he ordinarily would. Plaintiff had to pay for additional gas that he otherwise would not have needed if the hybrid propulsion system was able to operate as intended. FCA has not compensated Plaintiff for the lost use of the Class Vehicle and other associated damages sustained due to the Fire Defect.

94.     FCA did not have a recall procedure available when it announced the recall for the Fire Defect. As a result, Plaintiff Liscano had to wait for several months before an FCA dealer was actually able to perform the recall servicing on

his Class Vehicle. Plaintiff Liscano had to leave the Class Vehicle with the FCA dealer for several days to get the recall procedure done.

95.     Even with the recall servicing performed, Plaintiff Liscano remains concerned about driving, charging, and parking the Class Vehicle due to the ongoing dangers resulting from the Fire Defect. FCA still has not identified the root cause of the Fire Defect, and its supposed recall "fix" involved a software update to the Class Vehicle's battery pack control module and a battery integrity test. FCA has not redesigned or replaced the dangerous and defective high voltage battery system at issue in Plaintiff's Class Vehicle.

96.     Had Plaintiff Liscano known of the Fire Defect, he would not have leased the Jeep Wrangler 4xe, but would have instead chosen a safer vehicle. Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiff cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiff in the untenable position of having to drive an unsafe vehicle and has not provided any effective repair to address the actual cause of the Fire Defect.

**B.     Defendant**

97.     Defendant FCA US, LLC ("FCA"), formerly known as Chrysler Group, is a Delaware limited liability company organized and existing under the laws of the State of Delaware, and is wholly owned by Stellantis N.V., a Dutch

corporation headquartered in Amsterdam, Netherlands. FCA's principal place of business and headquarters is at 1000 Chrysler Drive, Auburn Hills, Michigan 48326.

98.     FCA is a motor vehicle manufacturer and a licensed distributor of new, previously untitled Chrysler, Dodge, Jeep, and Ram brand motor vehicles. FCA's Chrysler brand is one of the "Big Three" American automobile brands. FCA engages in commerce by distributing and selling new and used passenger cars and motor vehicles under its Chrysler, Dodge, Jeep, and Ram brands.

99.     FCA, through its various entities, designs, manufactures, markets, distributes, and sells automobiles throughout the United States and worldwide. FCA and/or its agents designed and manufactured the Class Vehicles. FCA also developed and disseminated the owner's manuals and warranty booklets, advertisements, brochures, and other promotional materials relating to the Class Vehicles, with the intent that such documents be purposely distributed throughout all fifty states. FCA is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

## V.     FACTUAL ALLEGATIONS

**A.     FCA marketed the Jeep Wrangler 4xe as a safe, dependable, rugged, high-performing, and emissions-friendly hybrid-electric vehicle.**

100.    The Jeep Wrangler is a popular sport utility vehicle that FCA designs, manufactures, and sells under the Jeep brand. The Jeep brand traces its lineage to

the original U.S. military Jeeps that were produced during World War II. According to the description on Jeep's website, "Born in the heat of battle, the . . . Jeep® Brand 4x4 emerged a hero to thousands of Allied soldiers around the world."[3]



101.    These original military Jeeps were "4x4" or "four-by-four" because they had a four-wheel drivetrain. A 4x4 drivetrain sends torque to all four of its wheels simultaneously, as opposed to two-wheel drive vehicles which are front or rear wheel drive. This increases the performance and capability off-road and on rough terrain like mud, snow, or rocks, where two-wheel drive vehicles might become stuck.

102.    The iconic styling of the Jeep Wrangler as a tough and capable 4x4 proved successful at marketing to civilians. In subsequent decades, the brand

---

[3] Ex. 3, Jeep.com, *History: 1940-1949*, https://www.jeep.com/history/1940s.html (last visited June 13, 2024).

continued to introduce vehicles that met consumer desires for "sporty" and "capable" sport utility vehicles (SUVs), including the "super-capable Wrangler (TJ) with its new coil suspension that was introduced in 1997." They followed the success of the original Wrangler with "[t]he radical 2003 Jeep® Wrangler Rubicon," which FCA represents "was the most capable vehicle ever produced by the Jeep Brand."[4]



*A recent tweet by the Jeep Brand using the "go anywhere, do anything" slogan.*

103.  In the past two decades, sensitivity to higher fuel prices and increased concern about the negative effects of gas-powered vehicle emissions on the

---

[4] Ex. 4, Jeep.com, *The Jeep Brand: The Story of the Legend*, https://www.jeep.com/history.html (last visited June 13, 2024).

environment have resulted in a trend away from the gas-guzzling, SUV-heavy vehicle lineups that dominated the end of the 20th century. In response, manufacturers have also shifted towards electrification and hybrid-electric vehicles, which offer greater gas mileage and less emissions.

104.    In 2020, FCA announced the 2021 Jeep plug-in hybrid Wrangler 4xe in response to these trends and in an effort to mitigate the poor gas mileage caused in part by the Wrangler's design. The 4xe (or "four-by-e") name is a play on Jeep's 4x4 reputation that highlights both the vehicle's rugged four-wheel drive and modern electric capabilities.

105.    FCA pervasively advertised the Jeep Wrangler 4xe as offering the same performance and capability as the gas-powered Jeep Wrangler, but with all the environmental and mileage benefits of a plug-in hybrid electric battery.

106.    FCA also pervasively represented that plug-in hybrid-electric vehicles like the Class Vehicles have significant environmental advantages over conventional vehicles with internal combustion engines. While operating in electric mode, the Class Vehicles do not produce any of the noxious tailpipe emissions—such as nitrogen oxides and other smog-forming pollutants that are harmful to human health, and greenhouse gases, such as carbon dioxide and methane—that vehicles with internal combustion engines produce.

107.    FCA knew that one of its largest customer bases were outdoor enthusiasts, who are often invested in issues such as environmental protection and climate change. It explicitly sought to exploit this customer base in marketing the vehicle. As explained by an FCA marketing executive: "With Jeep, you have the DNA of adventure and freedom, meaning that our customer already is in a relationship with the planet. . . . But some are maybe 'cheating' in the sense that they don't want to think about the fact that internal-combustion vehicles pollute. Some are in an open relationship with the planet but like combustion cars. And some are in true love with the planet and nature, and these are the consumers we want to start with" in promoting the Wrangler 4xe.[5]

108.    FCA also announced the 4xe with a broadly disseminated ad narrated by Carl Sagan, a noted science educator and climate change activist. It concluded by showing the 4xe climbing a mountain and describing it as "the first-ever electric Wrangler."[6]

---

[5] Ex. 5, Dale Buss, Forbes, *Jeep's Wrangler 4xe Proves Worthy Of Sagan's Seminal 'Pale Blue Dot'* (Sept. 15, 2020 12:00 PM EDT), https://www.forbes.com/sites/dalebuss/2020/09/15/jeeps-4xe-hybrid-proves-worthy-of-sagans-seminal-pale-blue-dot/.

[6] Ex. 6, Twitter, @Jeep, *To explore and cherish the only home we've ever known. The first-ever Wrangler 4xe* (Sept. 4, 2020 10:42 AM), https://x.com/Jeep/status/1301938665044750337.



109.   In addition to embracing the environmental benefits of reduced gas consumption, Jeep also pervasively advertised the plug-in hybrid-electric design as a performance enhancer. When working together, the hybrid and electric power sources are supposed to provide more power and torque than Jeep Wranglers with traditional internal combustion engines, giving the Class Vehicles better acceleration and performance.

110.   For instance, the 2021 Jeep Wrangler 4xe total powertrain output was advertised as capable of 470 pound-feet (lb.-ft.) of torque at 3,000 revolutions per minute (rpm) and 375 horsepower (hp) at 5,250 revolutions per minute, all while achieving 49 MPGe.[7] Meanwhile, the lower-cost, gas-powered 2021 Jeep Wrangler

---

[7] Ex. 7, Stellantis Media, 2021 Jeep Wrangler 4xe Specifications, https://s3.amazonaws.com/chryslermedia.iconicweb.com/mediasite/specs/2021_JP _Wrangler_4xe_SP3oj78skon97eivshempg1eg8in.pdf (last visited June 23, 2024).

a 2.0 liter turbocharged four-cylinder gas engine could only put out a relatively

meager 295 lb.-ft. of torque and 270 hp, with a combined city and highway gas

mileage of 21 mpg.[8]



111.   FCA also repeatedly emphasized in its marketing and other pervasive

statements the performance capabilities of the Jeep in all-electric mode, including

by appealing directly to outdoors and off-road enthusiasts. In 2021, FCA

announced plans to install Jeep-branded EV charging stations at popular off-road

trailheads, including in Moab, Utah; Big Bear, California; and the Rubicon Trail in

Pollock Pines—the namesake of one of the 4xe trim levels. Alongside this

announcement, FCA touted that, "[w]ith 49 MPGe and 21 miles of all-electric

---

[8] Ex. 8, Stellantis Media, 2021 Jeep Wrangler Specifications,
https://s3.amazonaws.com/chryslermedia.iconicweb.com/mediasite/specs/2021_JP
_Wrangler_SPpr9cq0ipusqbj1krgeoq0pu45s.pdf (last visited June 23, 2024).

range, the Jeep Wrangler 4xe can conquer even the toughest trails with zero emissions."[9]

112.   As another example, FCA aired a commercial featuring the Jeep 4xe during Super Bowl LVII, the most-watched US telecast in history with 115.1 million viewers.[10] The all-electric driving mode and charging were front and center in this ad. After conspicuously switching to all-electric mode, the Wrangler raced around dirt trails before stopping to re-charge in the shadow of mountain tops. It concluded with a new tagline: "Jeep: Freedom is Electric."[11]



---

[9] Ex. 9, Press Release, Stellantis, *Jeep® Brand Creates Jeep 4xe Charging Network, Works With Electrify America to Provide EV Charging at Off-road Trailheads Throughout the United States* (March 26, 2021), https://media.stellantisnorthamerica.com/newsrelease.do?id=22622&mid=1535.

[10] Ex. 10, Ben Morse, *Super Bowl LVII most-watched US telecast ever after updated figures*, CNN (May 3, 2023 11:28 EDT), https://www.cnn.com/2023/05/03/sport/super-bowl-lvii-most-watched-us-telecast-ever-spt-intl/index.html.

[11] Ex. 11, AdAge, Jeep: "Electric Boogie" (Oct. 22, 2023), https://adage.com/video/jeep-electric-boogie.

113.   In introducing the Class Vehicles, Christian Meunier, the then-Global President of the Jeep Brand, stated: "Our Jeep 4xe vehicles will be the most efficient, responsible and capable that the brand has ever created."[12] FCA's pervasive marketing for the Class Vehicles conveyed to consumers that they could have the best of all worlds—an adventurous 4x4 vehicle that was also emissions friendly and technology driven.

114.   The general idea that the Class vehicles represented the best of all worlds was repeated in literature directed at potential buyers. For example, the vehicle brochure for the 2021 Jeep Wrangler 4xe touts that the vehicle includes a "17-kwh Battery" and "is a shining example of hybrid innovation, handing you tomorrow's progressive technology, today," while also providing "the rugged, open-air freedom and legendary capability that Jeep Wrangler is revered for, the world over":

---

[12] Ex. 12, Press Release, Stellantis North America, New Jeep® Wrangler 4xe Joins Renegade and Compass 4xe Models in Brand's Global Electric Vehicle Lineup (Sept. 3, 2020), https://media.stellantisnorthamerica.com/newsrelease.do?id=22016&mid=1535.



115.   The brochure also boasted that the vehicle was "strong," "quick," "expansive," and "easy on the planet":



116.   FCA also touted the array of safety features in the Class Vehicles. For example, the vehicle brochure for the 2022 Jeep 4xe highlighted its "advanced safety & security systems" and represented that, "when it comes to your

well-being on the road Jeep Wrangler is ready and willing to stand as a constant

guardian." [13]



117.   FCA also used the moniker "4xFortress" to describe the Class

Vehicles' safe design. According to FCA, the 4xe's "high-strength superstructure

helps protect every occupant and is filled with features that add peace of mind."[14]

---

[13] Ex. 13, FCA, 2022 Wrangler Buying Guide at 7,( https://www.auto-brochures.com/makes/Jeep/Wrangler/Jeep_US%20Wrangler_2022.pdf last visited June 27, 2024)

    [14] *Id.* at 27.



118.    But as FCA consistently and pervasively promoted the Class

Vehicles' many road safety features, it also conspicuously omitted any disclosure

of the Fire Defect or that risk that the vehicles' battery might explode unexpectedly

while plugged in at home. This glaring omission would naturally lead a potential

buyer or lessee to believe that their Class Vehicle was a safe "4xFortress" that was

more than capable of withstanding day-to-day charging at home.

119.    In addition to highlighting the off-road capabilities of the Jeep

Wrangler 4xe, FCA also pervasively marketed the vehicle as fit for city driving.

For example, the vehicle brochure for the 2021 Jeep Wrangler 4xe highlighted how

the driver could choose between different modes of the hybrid drivetrain under the

banner of "POWER x2," including an electric-only mode and an "E-SAVE" mode

for "low-emission zones in cities."



120.   FCA's more technical consumer-facing literature also projected a

similar "no compromise" image for the Class Vehicles. According to the Manual

for the 2023 Wrangler 4xe Hybrid, "Wrangler 4xe plug-in hybrid electric vehicle

technology enhances the fun, freedom, and adventure Wrangler is known for,

while providing unprecedented performance, fuel economy, and environmental

friendliness. Wrangler 4xe makes it more capable off-road and on-road with no

compromise to the top down and doors off fun and freedom customers expect from the Jeep® icon."[15]

121.   The all-electric mode and convenience of charging at home were central to the value proposition of the Class Vehicles. Notably, the advertised 49 eMPG was only achievable in all-electric mode. Without the ability to charge the vehicle, the 2023 Jeep Wrangler 4xe can achieve only 20 MPG in hybrid mode.

122.   To that end, FCA highlighted the convenience of charging inside or near the home. FCA included a 25-foot 110v charger in the purchase of every 4xe vehicle. The relatively limited range of the cord implied that the vehicle was safe to charge within or near the owner's home. FCA also impliedly represented to each consumer that frequent charging was safe to do again and again, by stating in the manual that "[l]ithium-ion batteries can be recharged and discharged thousands of times."

123.   FCA also sold additional products to owners and lessees of Class Vehicles to facilitate charging at home. In 2022, FCA's subsidiary Mopar, the parts supplier for Jeep vehicles, also began sales of its own "at-home" chargers. According to a Mopar North America spokesperson, FCA's "new, factory-backed, at-home, Level 2, plug-in charging units offer a quick, seamless charging solution

---

[15] Ex. 14, Jeep, 2023 Wrangler 4xe Hybrid Supplement, https://cdn.dealereprocess.org/cdn/servicemanuals/jeep/ca/2023-wrangler4xe.pdf (last visited Jun. 13, 2024).

for Jeep 4xe and Chrysler Pacifica Hybrid owners." The new chargers were touted

as "[p]ortable, lightweight, lockable and weatherproof for indoor/outdoor

charging."[16] Press photos featured a Jeep 4xe charging indoors with FCA's new

Jeep branded charger.[17]



124.    The purported benefits of the plug-in hybrid-electric design came at a

hefty premium to consumers: the Jeep Wrangler 4xe models cost thousands of

dollars more than similarly equipped Jeep Wranglers with conventional, non-

hybrid internal combustion engines. And while FCA highlighted the electric

---

[16] Ex. 15, Press Release, Stellantis North America, Mopar Introduces New At-home Plug-in Wall Chargers for Jeep® 4xe Models and Chrysler Pacifica (Jan. 18, 2022), https://media.stellantisnorthamerica.com/newsrelease.do?id=23467&mid=1.

[17] Ex. 16, Stellantis North America, Images for Mopar Introduces New At-home Plug-in Wall Chargers for Jeep® 4xe Models and Chrysler Pacifica, https://s3.amazonaws.com/chryslermedia.iconicweb.com/mediasite/libraryImages/MP022_002JPbhqi9bn8hav39bfcvidndje59s__mid.jpg (last visited June 13, 2024).

- 57 -

battery features to justify this premium cost, FCA's marketing never disclosed to consumers that the Class Vehicles were equipped with dangerous batteries susceptible to fire, even when the vehicle is turned off.

125.   Nor did FCA's marketing disclose to consumers that they would not be able to park or charge their vehicles indoors due to battery fire risk.  Instead, FCA advertised the high-tech and convenient at-home charging features of the Class Vehicles. Ironically, it described the vehicle interiors as "a place to recharge."



126.   Instead of being a "place to recharge," Plaintiffs and Class Members are justifiably afraid to be anywhere near their Jeep Wrangler 4xe, much less inside of it.

127.   Further, by depriving Plaintiffs and members of the Class of their ability to charge their vehicles frequently and conveniently, FCA deprived them of a major value-proposition for the Class Vehicles: less fuel consumption.

128.   Without the ability to charge, the Class Vehicles could not make use of the much-advertised "all-electric" and "e-save" modes. The only practically available mode without plug-in charging capability is "hybrid," which was actually less fuel efficient than the gas-powered 4xe.



*A screenshot of the three powertrain settings of Jeep Wrangler 4xe from FCA's "Electric Boogie" Super Bowl commercial.*[18]

---

[18] Ex. 10.

129.   As noted in *Car and Driver*, "[t]o get the full fuel-economy benefit [of the 2021 Wrangler 4xe], you'll have to stay close to home and plug in often. . . . Once the battery has been depleted, the 4xe actually gets worse fuel economy than a Wrangler powered by the turbo four with none of the plug-in-hybrid hardware (20 versus 22 mpg combined). Blame the extra 800 pounds that the 4xe carries wherever it goes."[19]

130.   Ironically, after extensively advertising the Class Vehicle as a fuel-efficient, environmentally-friendly alternative since launch, the 4xe—weighed down by its underutilized electric motors and battery—was actually slightly less fuel efficient than its lighter, gas-powered cousin. The promise of FCA's various advertisements was unrealized. Certainly, FCA never disclosed in these numerous commercials or on its website that the Class Vehicles would consume more fuel than its gas-powered equivalent if the Class Vehicles' hybrid and electric features were not in use.

131.   FCA's marketing described herein was pervasive throughout the United States during the time the Class Vehicles were purchased and leased. Such pervasive marketing—including online advertising, television ads, including

---

[19] Ex. 17, Eric Tingwall, Car & Driver, *Tested: 2021 Jeep Wrangler 4xe Complicates a Simple Machine* (Jul. 1, 2021), https://www.caranddriver.com/reviews/a36906094/2021-jeep-wrangler-unlimited-rubicon-4xe-by-the-numbers/.

during the Super Bowl, vehicle brochures, manuals in every Class Vehicle, and broadly disseminated press releases and other public statements by FCA—repeatedly represented and/or implied that the Class Vehicles could be charged safely and were more powerful, more capable, and more fuel-efficient than gas-alternatives.

132. Furthermore, FCA represented on the doorjamb of every single Class Vehicle that it "CONFORMS TO ALL APPLICABLE U.S.A. FEDERAL MOTOR VEHICLE SAFETY STANDARDS IN EFFECT ON THE DATE OF MANUFACTURE." This likewise conveys that the Class Vehicles are safe to operate, including for charging at home.

133. FCA's extensive marketing regarding the ruggedness and enhanced performance of the Class Vehicles, including their ability to traverse in difficult terrain and extreme conditions, also conveyed, or at least implicitly represented that it would be safe for normal driving. Certainly, it was implied in all of FCA's marketing that the Class Vehicles would be safe inside of a garage.

134. Yet, despite its extensive marketing efforts and representations to Plaintiffs and consumers, FCA failed to disclose the potential danger and loss of use caused by the Fire Defect.

**B.**    **The Fire Defect is likely the result of defective high-voltage lithium-ion battery systems.**

135.   FCA failed to adequately research, design, test, and manufacture the Class Vehicles before warranting, advertising, promoting, marketing, and selling the Class Vehicles as suitable and safe for use in an intended and reasonably foreseeable manner.

136.   As FCA now admits in a November 22, 2023, notification of a safety recall sent to the National Highway Traffic Safety Administration ("NHTSA") (of which consumers were apprised later in 2023)[20] the Class Vehicles contain a "high voltage ('HV') battery which may fail internally" and could "lead to a vehicle fire with the ignition on or off."

137.   Despite announcing the recall procedure, FCA admits that the "root cause" of the Fire Defect is unknown, but the nature of the fires and the fact they can occur even while the vehicle is not running—together with FCA's direction to refrain from charging the vehicle—strongly suggests that the defect is connected to the high-voltage lithium-ion battery system that powers the electric propulsion of the Class Vehicles.

138.   One of the fire risks posed by the use of lithium-ion batteries stems from a phenomenon known as "thermal runaway." A lithium-ion cell can heat up

---

[20] Ex. 18, November 22, 2023 Part 573 Safety Recall Report for NHTSA Recall No. 23V-787.

and catastrophically fail under one of several scenarios: a manufacturing defect in

a cell; improper electrical charging and/or discharging; mechanical damage

associated with significant bending or puncturing of a cell; or thermal abuse,

wherein the cell is subjected to high temperatures. All of these scenarios generate

local heating in the cell. The local heating induces locally high temperatures,

which accelerate additional chemical reactions that can promote the degradation of

the organic liquid electrolytes in the cell. Those electrolytes and their

decomposition products are volatile and flammable at high temperatures.[21]

139.   Catastrophic failure occurs when multiple cells become engaged in

thermal runaway. Thermal runaway has been estimated to cause as many as 80%

of lithium-ion battery fires.[22]

140.   One of the most significant thermal runaway fire risks posed by the

use of lithium-ion batteries stems from a dangerous phenomenon known as

---

[21] Ex. 19, Heekyon Yang, *Explainer: Are lithium-ion batteries in EVs a fire hazard?*, REUTERS (Aug. 23, 2021), https://www.reuters.com/business/autos-transportation/are-lithium-ion-batteries-evs-fire-hazard-2021-08-23/#:~:text=Lithium%2Dion%20batteries%2C%20whether%20they,battery%20is%20not%20designed%20correctly (last visited March 3, 2024).

[22] *See* Ex. 20, Adreesh Ghoshal, *How Lithium Ion Batteries in EVs Catch Fire*, MEDIUM (Aug. 16, 2020), https://medium.com/the-innovation/how-lithium-ion-batteries-in-evs-catch-fire-9d166c5b3af1 (last visited March 3, 2024); *see also* Ex. 21, Ryan Fogelman, *April 2020 Fire Report: How & Why Do Lithium-Ion Batteries Fail, Insight from the Jedi Master of Lithium Power!*, WASTE360 (May 5, 2020), https://www.waste360.com/safety/april-2020-fire-report-how-why-do-lithium-ion-batteries-fail-insight-jedi-master-lithium (last visited March 3, 2024).

"lithium plating." Lithium plating occurs when metallic lithium deposits on the anode surface form tree-like structures called dendrites. Those tree-like structures can then penetrate the separator into the cathode and cause short circuiting, which in turn sparks a battery fire.



*An illustration of tree-like dendrite formations piercing the separator in a lithium-ion battery.*[23]

141.   Dendrite formation—a form of internal physical damage to the battery—can occur as a result of repeated use and/or charging of the battery or its cells outside of manufacturer specifications. The risk of short-circuit leading to

---

[23] Ex. 22, Julian Long, *Guide to Lithium Plating in Lithium-Ion Batteries* (Dec. 7, 2022), https://www.accure.net/battery-knowledge/blog-guide-to-lithium-plating-in-lithium-ion-batteries.

thermal runaway and fire is therefore cumulative; it increases as the battery or its cells are repeatedly subjected to improper use and/or charging conditions.

142.   Significantly, the documented fires in the Class Vehicles do not appear to be the result of external damage or misuse by the consumer. Upon information and belief, all reported fires to date have resulted from internal battery failure while the cars are parked and turned off, which points to either improper programming or internal issues within the battery, such as dendrite formation.[24]

143.   Reports also suggest that this type of combustion is caused by internally initiated thermal runaway process. Given that a single cell failure could result in a catastrophic thermal runaway event, a safe hybrid vehicle design should limit the thermal runaway propagation to adjacent cells.

144.   Thermal runaway risk can be mitigated by implementing appropriate battery system controls and safety monitoring features. For example, setting low and high-end state of charge buffers prevents overcharging and/or over-discharging of batteries. In addition, appropriate controls to prevent individual cells from exceeding their maximum voltage can mitigate thermal runaway risk. These safety margins and criteria are even more important with nickel manganese cobalt

---

[24] *See* Ex. 23, Guillaume Rivard, *Jeep Wrangler 4xe Recalled Following Eight Fires*, The Car Guide (Nov. 22, 2023), https://www.guideautoweb.com/en/articles/72779/jeep-wrangler-4xe-recalled-following-eight-fires/ (last visited March 3, 2024).

("NMC") batteries, the specific type of lithium-ion battery used in Class Vehicles,[25] which are uniquely susceptible to lithium plating.

145.   The high-voltage batteries in the Class Vehicles are 400-volt, 17-kwh, 96-cell lithium-ion NMC batteries made by Samsung that have an MSRP of $16,910.00 each.[26] FCA and Samsung have recently promoted their $2.5 billion joint venture in manufacturing these battery packs in Kokomo, Indiana.[27]

146.   Samsung also manufactured the cells contained in batteries that allegedly caused fires in certain BMW and Ford models that have been recalled and subject to litigation.[28] Those Ford and BMW recalls occurred in 2020, and upon information and belief, were caused by similar defective attributes as present here. According to BMW, the fires that led to recall of their PHEVs were caused

---

[25] Ex. 24, Stellantis Media, New Jeep® Wrangler 4xe Joins Renegade and Compass 4xe Models in Brand's Global Electric Vehicle Lineup (Sept. 3, 2020), https://media.stellantisnorthamerica.com/newsrelease.do?id=22016 (notes "400-volt, 17-kWh, 96-cell lithium-ion, nickel manganese cobalt battery pack").

[26] Ex. 25, Mild Hybrid Motor Generator Unit Battery Pack, MYMOPARPARTS, https://www.mymoparparts.com/oem-parts/mopar-mild-hybrid-motor-generator-unit-mgu-battery-pack-68488244aa (last visited March 3, 2024).

[27] Ex. 26, *Stellantis and Samsung SDI to Invest Over $2.5 Billion in Joint Venture for Lithium-Ion Battery Production Plant in United States*, STELLANTIS PRESS RELEASE (May 24, 2022), https://www.stellantis.com/en/news/press-releases/2022/may/stellantis-and-samsung-announce-battery-plant-in-kokomo?adobe_mc_ref=. (last visited March 3, 2024).

[28] Ex. 27, Gustavo Henrique Ruffo, *Samsung SDI Might Be The Root of Ford And BMW PHEV Recalls*, INSIDEEVS (Oct. 16, 2020), https://insideevs.com/news/449322/samsung-sdi-root-ford-bmw-phev-recalls/ (last visited March 3, 2024).

by "thermal events" in the Samsung batteries.[29] These facts make it overwhelmingly likely that the Fire Defect is in fact the result of defectively designed, manufactured, installed, and/or controlled HV battery or battery systems.

147.   So far, FCA has recalled only the 2021-2023 Jeep Wrangler 4xe. However, FCA has continuously sold Jeep Wrangler 4xe vehicles that continue to use Samsung's 400v lithium-ion batteries and battery systems. Troublingly, NHTSA reports have emerged that even 2024 Jeep Wrangler 4xe vehicles are catching fire while plugged in, as discussed *infra*, Section V.C.iii.

148.   Plaintiffs' counsel continue to investigate whether additional model years of the Jeep Wrangler 4xe are also affected by the Fire Defect.

**C.   FCA knew or should have known of the Fire Defect long before it disclosed the problem to Plaintiffs.**

149.   As set forth below, FCA knew of the risk of the Fire Defect through various sources, including: the well-documented risks of runaway propagation in lithium-ion batteries; NHTSA warnings of safety risks for lithium-ion batteries; the rigorous pre-launch testing FCA must have done on the Class Vehicle's HV Battery and hybrid propulsion system; consumer complaints lodged with NHTSA, FCA, and publicized online; and similar battery fire issues in other hybrid electric vehicles, including FCA's Chrysler Pacifica PHEVs, and BMW and Ford-

---

[29] Ex. 28, *Burbank et al. v. BMW of N. Am.*, No. 2:21-cv-01711 (D.N.J.) (Dkt. No. 1, at ¶ 15) (Dec. 3, 2020).

manufactured vehicles that use Samsung batteries for electric propulsion. Through this accumulated knowledge, FCA would have been aware of the serious danger of the Fire Defect by the time it released the Class Vehicles into the market, and certainly well before it issued its November 2023 recall.

> ### i.   Lithium-ion batteries are dangerous without appropriate safeguards.

150.   Most electric and hybrid-electric vehicles, like the Class Vehicles, use lithium-ion batteries because of their "high power-to-weight ratios, high energy efficiency, good high-temperature performance, and low self-discharge."[30]

151.   However, lithium-ion batteries carry well-documented risks of combustion if they are improperly used by an auto manufacturer or placed in vehicles that are defectively designed or manufactured. Safety concerns related to unexpected fires connected with lithium-ion batteries are well-documented and were known to FCA at the time it designed, manufactured, and sold the Class Vehicles.[31] Even before NHTSA released its comprehensive report on lithium-ion battery safety issues in 2017, many scientific and engineering articles discussed the

---

[30] Ex. 29, *Batteries for Hybrid and Plug-In Electric Vehicles*, U.S. DEP'T OF ENERGY, https://afdc.energy.gov/vehicles/electric_batteries.html (last visited March 3, 2024).

[31] *See* Ex. 2, 2017 NHTSA Report at 2-24 through 2-27, 3-9-3 through 3-11 (discussing fire risks of high-voltage lithium-ion batteries in vehicles).

thermal-runaway-related safety concerns of lithium-ion cells and battery packs and proposed solutions.[32]

152. Like other batteries, lithium-ion batteries are made up of multiple power-generating compartments called "cells."[33] Each cell contains the basic functional components of a simple battery: a positive electrode, a negative electrode, and an electrolyte.[34] In addition, each cell contains a separator designed to keep the positive electrode from contacting and discharging into the negative electrode.[35]

153. A battery cell discharges energy in the form of electricity when lithium ions flow from the negative electrode, or anode, to the positive electrode, or cathode.[36] The active materials (either cathode or anode) store the lithium, and

---

[32] Ex. 30, Wen, Jianwu, *et al.*, *A Review on Lithium-Ion Batteries Safety Issues: Existing Problems and Possible Solutions*, AMERICAN SCIENTIFIC PUBLISHERS (2012); Ex. 31, Feng, Xuning, *et al.*, *Thermal runaway mechanism of lithium ion battery for electric vehicles: A review*, SCIENCEDIRECT, 2015, https://www.sciencedirect.com/science/article/abs/pii/S2405829716303464, (last visited March 3, 2024)

[33] Ex. 32, Chris Woodford, *Lithium-ion batteries*, EXPLAINTHATSTUFF! (Nov. 23, 2020), https://www.explainthatstuff.com/how-lithium-ion-batteries-work.html (last visited March 3, 2024).

[34] *Id.*

[35] *Id.*

[36] *Id.*

the electrolyte carries lithium ions between electrodes.[37] When the cell is charging, those ions flow in the opposite direction, or from cathode to anode.[38]

154.   Of course, a single cell cannot store nearly enough energy to power an automobile, so cells are grouped into modules and packs. Those modules and packs, together with control systems, constitute the complete battery.[39]

155.   A module ordinarily contains an array of cells, sensors, controls, mounts, communications capabilities, protective safety devices, and cooling elements or cooling provisions.[40]

156.   Beyond this, there are various methods of: (i) arranging the cells into arrays within the module; (ii) managing the flow of electrical current to and from the module or arrays within the module; and (iii) monitoring and managing the temperature of the cells within the module. Finally, there are various other necessary safety features, and integration with the vehicle also plays an important role in the safety of the lithium-ion battery system.[41]

157.   Importantly, it is well-established that lithium-ion batteries (and individual cells) should not be subjected to improper electrical charge and/or discharge conditions, as doing so can cause rapid battery degradation and fire risk.

---

[37] *Id.*
[38] *Id.*
[39] Ex. 2, 2017 NHTSA Report, § 4.
[40] *Id.* § 4.1.1.
[41] *Id.*, Ch. 4.

158.    The Class Vehicles include an extremely powerful 32-amp onboard charger that can accept up to 7.7 kw of electrical current, in contrast to most PHEVs which only include 16-amp 3.7kw onboard chargers.[42] Jeep boasts in its marketing materials and vehicle manuals that the Jeep Wrangler 4xe can fully charge in approximately two (2) hours:[43]



159.    Indeed, for these very batteries at issue, the U.S. Department of Transportation ("DOT") considers them so inherently dangerous that FCA had to obtain a special permit from the DOT to transport them.[44] Notably, those special

---

[42] Ex. 33, https://insideevs.com/news/523845/how-to-charge-jeep-4xe/ (last visited June 25, 2024).

[43] Ex. 34, https://www.jeep.com/ev/technology.html#:~:text=turn%20it%20off.-,RECHARGE,of%20fully%20electric%20daily%20commutes (last visited June 25, 2024); Ex. 17 at 22.

[44] Ex. 35, https://www.phmsa.dot.gov/hazmat/documents/offer/SP21084.pdf/2022094501/SP21084 (last visited June 25, 2024).

permits require FCA to keep them at a state of charge of no more than thirty percent during transport.

160. FCA confirmed the danger associated with the batteries in Class vehicles in an August 10, 2022 Technical Service Bulletin, which states: "Beginning April 1, 2022, a $5,000 penalty will be assessed to dealers who return any visually damaged battery to the supplier. Improper handling of damaged lithium ion batteries can cause[] ***property damage, serious injury or even death***."[45]

161. It is critical, especially in automotive applications, to have sophisticated control modules and safety monitoring features regarding lithium-ion battery systems. These include parameters that place limits on the state-of-charge, battery and individual cell voltage, current, and cell temperature, among other things to protect battery integrity.

162. The HV Battery Systems used in the Class Vehicles by FCA are nickel-manganese-cobalt compositions. Importantly, "Ni[ckel]-rich NMC cathode materials are known to be susceptible to certain safety issues, such as thermal runaway and the risk of triggering battery fires."[46] Thus, especially for NMC

---

[45] Ex. 36, Technical Service Bulletin, GPOP - Issue Review System, Part Number: 68488244A$ ,68488244G$ (Aug. 10, 2022), https://static.nhtsa.gov/odi/tsbs/2022/MC-10225305-9999.pdf (emphasis added).

[46] Ex. 37, Farish I. Saaid et al., Ni-rich lithium nickel manganese cobalt oxide cathode materials, 10 Heliyon e23968 (Jan. 2024), https://www.sciencedirect.com/science/article/pii/S2405844023111765.

battery systems, it is imperative to set appropriate controls regarding maximum and minimum state of charge, maximum and minimum cell and/or overall voltage, appropriate current limitations, as well as robust cell temperature monitoring features.

163.   Despite the known fire risk of these HV Batteries, FCA's design of the Jeep Wrangler 4xe placed them directly inside the passenger compartment of the vehicle, which at least one firefighting expert has described as a "terrible idea in my mind."[47]

164.   The safe operation of an HV battery requires battery control systems to set careful parameters that regulate the battery's voltage, current, and temperature ranges, among other things.[48] While an HV battery itself may be manufactured separately by a third-party supplier like Samsung, the programming of the battery control system is made by the vehicle manufacturer. The

---

[47] Ex. 62, YouTube, StacheD Training, Electric Car Explosions Worldwide (Nov. 16, 2023), https://www.youtube.com/watch?v=aLtkTp4GVuE (see 4:20 of the video onward for quotation).

[48] *See* Ex. 2, 2017 NHTSA Report at 6-5–6-6 ("While the failure phenomena have been discussed extensively in previous chapters, here we summarize these phenomena in terms related to the [battery] control systems and their actions. . . . Several approaches [in battery control systems] are used to overcome this problem. The first is empirically setting the allowable voltage, current, and temperature ranges to maintain a sufficient margin with respect to undesired behavior. The second is to use a model, combined with data, to infer the operating margin more carefully. Models may be simple or complex; the various types are discussed briefly in this chapter.").

programmed safety margins or modules that FCA implemented in its design of the

HV Battery system in Class Vehicles were inadequate to protect against premature

battery degradation, lithium plating, and thermal runaway in the Class Vehicles.

165.   Just as important as the design and safety features used in a lithium-

ion battery pack is rigorous pre-launch testing.[49] The use of better safety systems

and more rigorous testing would have prevented the reported battery fire incidents

in the Class Vehicles and the significant cost and inconvenience now visited upon

Plaintiffs and Class Members.

>   **ii.   NHTSA issued warnings about lithium-ion battery safety and the dangerous risk of thermal runaway.**

166.   In 2017, NHTSA released a report on lithium-ion battery safety

issues, which documented well-known battery fire risks, cited to the vast body of

academic and engineering studies on those risks, and recommended rigorous

design and testing protocols to protect against those risks. All of this would have

been known to FCA at the time it launched the Class Vehicles.

167.   NHTSA reiterated that all car manufacturers have a duty "to conduct

their own due diligence safety testing and analysis, while the industry is working to

develop a consensus."[50] Unfortunately for Plaintiffs and the putative Classes

---

[49] *Id.*, Ch. 8.
[50] *Id.* at xx.

Members, FCA recklessly or intentionally breached this duty to better pad its profits.

168.   A central focus of the NHTSA Report is the fire risk associated with the use of lithium-ion batteries, and recommended protection methods and rigorous testing required to mitigate that risk.[51] The major cause of these fires is the propagation of thermal runaway, including but not limited to lithium plating-caused thermal runaway.

169.   According to the NHTSA Report, thermal runaway "is a phenomenon in which the lithium-ion cell enters an uncontrollable, self-heating state."[52] If a cell short-circuits (*e.g.*, from reaching an inappropriately high maximum voltage) the cell electrolyte can combust as pressure in the cell rapidly increases until the cell bursts and releases the flammable electrolyte and other flammable and toxic gases. These flammable and toxic gases include hydrogen gas and carbon monoxide. The temperature of the ruptured cell can increase to above 1,832 degrees Fahrenheit.[53]

---

[51] *See id.* at xvi; *see also id.* at Ch. 6 (management and control systems), 8-10 (testing, "gap assessments," and "hazards, risks and risk mitigation strategies").

[52] Ex. 38, *What is Thermal Runaway?*, UNDERWRITERS LABORATORIES (Aug. 24, 2021), https://ul.org/what-we-do/electrochemical-safety/getting-started-electrochemical-safety/what-thermal-runaway#:~:text= (last visited March 3, 2024).

[53] Ex. 39, Alysha Liebscher and Gary Gayman, *Preventing Thermal Runaway in Electric Vehicle Batteries*, MACHINE DESIGN (Dec. 26, 2018), https://www.machinedesign.com/materials/article/21837402/preventing-thermal-runaway-in-electric-vehicle-batteries (last visited March 3, 2024).

170.   As the NHTSA Report stresses:

> [T]hermal runaway of a Lithium-ion cell is one of the
> fundamental failure mechanisms leading to safety hazards
> from Lithium-ion batteries. Cell heating is normal, but
> temperatures must be maintained within a predetermined
> safe operating level. Thermal runaway is most likely to be
> realized when an event occurs that results in rapid heating
> of the cell that outpaces the rate of heat dissipation by the
> cell. Rapid heating may be caused by internal or external
> short circuits, overcharging, and general use [among other
> things.] [54]

As the Report further notes, "[t]he thermal and mechanical design of a cell strongly influences its ability to control and dissipate heat, thereby influencing its safety performance."[55]

171.   When thermal runaway spreads from one cell to adjacent cells in the module, the result is what appears to be happening in the Class Vehicles—thermal runaway propagation, causing combustion even when the cars are parked. In other words, "the rapid and extreme rise in temperature (thermal runaway) can easily propagate to nearby cells in a domino effect that has been dubbed thermal runaway propagation."[56] Fires and explosions then result.

---

[54] Ex. 2, 2017 NHTSA Report at 3.2.
[55] *Id.*
[56] Ex. 39.

172.   Given the extreme hazards of runaway propagation in high-voltage lithium-ion batteries such as those used in the Class Vehicles, it is incumbent upon manufacturers to incorporate strong safety measures and rigorous testing.

173.   As the 2017 NHTSA report noted in a statement that has been prophetic for Plaintiffs and all other owners and lessees of the Class Vehicles, as of 2017, car manufacturers were not adequately designing and testing electric and plug-in-hybrid electric systems powered by highly volatile lithium-ion batteries— indeed, the "safety standards" employed by car manufactures such as FCA appeared "to trail—rather than lead—technology development."[57]

174.   As of 2017, there were a good number of standards and testing protocols designed to guide manufacturers in constructing lithium-ion battery systems to be safely used in electric and plug-in hybrid electric vehicles, and many safety technologies and testing protocols existed at the time of the launch of the Class Vehicles.[58]

175.   Appropriate safety measures to prevent thermal runaway at the cellular level included a range of "electrical components and subsystems to prevent heating and overpressure to the cell by opening the circuit, increasing resistance, or changing the chemical composition of the cell."[59]

---

[57] Ex. 2, 2017 NHTSA Report at 1-3.
[58] *See id.* at 3-9 through 3-11, Ch. 8.
[59] *Id.* at 3-10.

176.   Protection technology at the module level also existed, including technologies for "charge and discharge management," designed to limit the electric current to and from the battery module or cellular arrays within a module. Such technologies also protect against the potential for abnormal discharge caused by failures such as short circuiting, which can trigger thermal runaway and ultimately runaway propagation.[60]

177.   Also at the module level, manufacturers must ensure adequate thermal management to monitor and prevent the spikes in temperature associated with thermal runaway. "Thermal management functions at the module level include, first monitoring, then cooling," and various available technologies serve this function.[61] Thermal management must also occur at the battery pack level in order to maintain "an average temperature within the battery's specifications, and with even temperature distribution throughout the pack."[62] Cooling and thermal barrier separation between cells can reduce the rate of thermal runaway propagation and can stop cell-to-cell propagation for properly sized cells and cooling systems.

178.   Safety features at the module level include "interlock circuits, pressure sensors, and communication architecture that allows the battery status to

---

[60] *Id.* at 4-6.
[61] *Id.* at 4-10 through 4-15.
[62] *Id.* at 4-24.

be monitored by the automobile electronic control unit."[63] Other available safety measures operate at the battery pack level, including (but not limited to) thermal management; an array of communication, control, and reporting functions;[64] and the appropriate integration of the battery pack with the vehicle.[65]

179.   On information and belief, any number of combinations of the above-referenced safety protocols, in combination with effective safety testing, would have rendered the Class Vehicles safe and fit for their intended purpose of operating as plug-in hybrid electric vehicles.

180.   The dilemma facing electric and plug-in hybrid electric vehicles is that incorporating adequate safety measures is not only expensive, but also "is likely to reduce the vehicle's range because any protective materials means less space for the electricity-storing cells."[66] On information and belief, FCA skimped on available protection measures in order to promote the high electric mode range and overall range, speed of charging, and other desirable features, of the Class Vehicles—all to the benefit of FCA's bottom line and to the detriment of owners and lessees of the Class Vehicles.

---

[63] *Id.* at 4-16 through 4-19.
[64] *Id.* at 4-28.
[65] *Id.* at 4-34.
[66] Ex. 39.

181.   Regardless of the safety measures incorporated in the battery and related components designed to prevent runaway propagation, before launching an electric or plug-in hybrid electric vehicle, propagation testing is of the utmost importance.[67]

182.   In addition to the 2017 NHTSA report, at the time of the launch of the Class Vehicles, there were a wide array of standards and safety testing procedures for lithium-ion batteries and vehicles that use them, including those promulgated by the Society for Automotive Engineers (SAE), the International Organization for Standardization, Underwriters Laboratories, the Institute for Electrical and Electronics Engineers, the United Nations Economic Commission for Europe, and Sandia National Laboratories for the FreedomCAR program.[68]

183.   Many of these standards and testing protocols protect against runaway propagation and the resulting catastrophe for vehicle owners and anyone or anything in their vicinity.[69]

184.   These standards and testing protocols provided FCA with a wide range of guidelines on design and laboratory testing considerations to ensure the safety of lithium-ion batteries in the Class Vehicles.

---

[67] Ex. 2, 2017 NHTSA Report at 3-9 (discussing propagation testing *circa* 2014).

[68] *Id.* at 8-1.

[69] *See id.* at Ch. 8.

185.   On information and belief, any adequate testing of the Class Vehicle would have revealed the lithium-ion batteries' propensity to combust as the result of runaway propagation. Either FCA followed these standards and testing protocols and discovered the risk, or it failed to follow these protocols.

### iii.   FCA launches the Class Vehicles, and fires result.

186.   Once FCA released the Class Vehicles into the market, owners and lessees began complaining that their Class Vehicles suddenly caught fire. According to FCA, between at least April and November 2023, at least eight Jeep 4xe's caught fire all while parked and turned off.

187.   Battery fires in the Jeep 4xes tend to be catastrophic. One such fire occurred in Erie, Colorado on the morning of April 11, 2023, and was caught on camera. The owner reported that he awoke to blaring fire alarms and smoke emanating from his Jeep 4xe, which was parked in the garage and plugged into a charger. As fire crews attempted to put out the fire, the Jeep exploded sending a garage door flying 30 feet.[70]

---

[70] Ex. 40, YouTube, FOX31 Denver, Electric Jeep explosion in Erie (Apr. 13, 2023), https://www.youtube.com/watch?v=CpfYtTPzEmU.



*Body camera footage of the Jeep 4xe explosion in Erie, Colorado.*

188.   In the Jeep 4xe, the HV Battery is situated below the passenger row of seats. After-action photos of the Jeep 4xe involved in the Erie explosion appear to show the most severe charring in that area of the vehicle, which suggests it was the point of origin of the fire.



*The charred backseats of the Jeep that exploded in Erie, Colorado.*[71]

189.   FCA, as a leading auto manufacturer, certainly would have been aware of the Erie, Colorado 4xe explosion. This story was reported on by local news and was viewed 11,000 times on YouTube.[72] Another YouTube video shared by a fire training instruction was viewed over 100,000 times as well.[73]

190.   This was not the only reported Jeep 4xe fire in 2023 either. On December 11, 2023, a Reddit user from Upstate New York reported that his 2021 Jeep 4xe, "[s]tarted on fire in my driveway a little over a week ago, so that is the

---

[71] Ex. 1.
[72] Ex. 40.
[73] Ex. 1.

end of my 4XE experiment."[74] It was connected to a 220V charger at the time.[75] According to the user, after the fire FCA "had an independent firm come out and inspect," but "[c]ommunication from Jeep/Stellantis has been basically nonexistent."[76] On February 17, 2024, the user reported that FCA "is buying [their Class Vehicle] back, after some negotiation. The poor thing was totaled. Torched interior, glass smashed from the fire co, plastics burned through by the rear passenger tire which blew the tire."[77]

191. Plaintiff Nataliia Liakhova encountered a similar fire with her Class Vehicle. At approximately 1:30 AM on April 17, 2024, Ms. Liakhova's 2023 Jeep 4xe Wrangler caught on fire while it was plugged into a 220V charger at her apartment complex in Buffalo Grove, Illinois.

---

[74] Ex. 41, Reddit, r/4xe, u/dtorgue, "Lurking subs and cross shopping our next leased vehicle, specifically a Hybird…" (Dec. 11, 2023 4:01 a.m. PT), https://www.reddit.com/r/4xe/comments/18f6460/comment/kcw5689/.

[75] Ex. 42, Reddit, r/4xe, u/dtorgue, "My 4XE is affected by the battery recall." (Dec. 2, 2023 3:45 p.m. PT), https://www.reddit.com/r/4xe/comments/188weg2/comment/kbqlwxj/.

[76] Ex. 41.

[77] Ex. 42.



*Ms. Liakhova's vehicle immediately after being extinguished.*

192.   According to the fire department, upon arrival firefighters "found a Hybrid vehicle (Jeep) plugged into a charging station with smoke billowing out from inside the vehicle. Smoke could be seen through all the windows of the vehicle with singe marks noted around the base of the window posts." Firefighters removed the charger and then broke the back windshield to direct water through it and extinguish the fire.

193.   As with the Erie fire, the cause of Plaintiff Liakhova's fire was likely the HV Battery System based on the likely point of origin. According to the

Buffalo Grove Fire Department's report, "During extinguishment, personnel found a spot in the vehicle with an increased temperature. The spot was found under the middle seat, just behind the front passenger. The middle seat was pried up and crews focused extinguishment on the area below the seat that was just pried up (believed to be a location of the electric battery for the vehicle)."

194.   Firefighters towed Ms. Liakhova's vehicle away as a fire risk and it was thereafter declared a total loss. Plaintiff Liakhova never received a recall notice for the Fire Defect before or after the fire. FCA sent its own fire cause investigator to examine Ms. Liakhova's burned vehicle but did not provide her with a copy of the investigation report, even after multiple requests.

195.   FCA is also likely aware of international HV battery fire incident(s) involving the Jeep Wrangler 4xe, which vehicles, upon information and belief, are materially the same as the Class Vehicles sold in the U.S. For instance, a Jeep Wrangler 4xe Sahara exploded in Belgium on or about October 30, 2023, as captured in a video posted by a firefighting expert to YouTube.[78] The following still images show the powerful explosion and the battery post-explosion:

---

[78] Ex. 62.



*October 30, 2023 Explosion of Jeep Wrangler 4xe in Belgium*



*Image of the HV Battery After October 30, 2023 Explosion of Jeep Wrangler 4xe in Belgium*

196.   In addition to these incidents, FCA also had notice of the Fire Defect through its buyback acquisition of Class Vehicles and subsequent investigation. According to its Part 573 Safety Recall Report, FCA requested buybacks of seven vehicles and received buybacks of two of those vehicles and disassembled the HV battery packs.

197.   All vehicle manufacturers, including FCA, routinely monitor and analyze NHTSA complaints to determine whether vehicles or components should be recalled due to safety concerns. Thus, on information and belief, FCA has knowledge of all NHTSA complaints filed concerning the vehicles it manufactures, including the Class Vehicles. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

198.   It is unknown whether FCA reported Plaintiff Liakhova's recent vehicle fire, or all other Class Vehicle fire incidents to NHTSA. What is known is that fires continue to be reported, even after the recall. Analysis of the NHTSA database reveals at least two other vehicle fire complaints, one made on June 5, 2024, where a 2021 4xe Wrangler owner reports: "Vehicle exploded while parked in the middle of night catching fire causing major damage to the vehicle and a total loss." The second fire complaint involved a non-recalled 2024 Jeep Wrangler 4xe, which is outside the scope of FCA's recall and suggests the problem may extend to model year 2024 vehicles. Upon information and belief, further examination of

complaints submitted to FCA and to NHTSA via Vehicle Owner Questionnaires ("VOQ") will reveal further instances of Class Vehicles catching on fire.

199.   Other NHTSA complaints reveal continued issues experienced by Class Members, even after the recall procedure was performed. For instance, a complaint made on June 10, 2024 by a 2021 Wrangler 4xe owner stated: "The vehicle was running and suddenly shut down due to a hybrid battery warning right in the middle of traffic, rendering the vehicle undriveable and leaving me in a dangerous position.  Vehicle had to be towed to a dealership.  Code P0B24 $07EF Hybrid Battery A Voltage Unstable."

>                   **iv.    FCA had notice of the Fire Defect before the Class Vehicles were sold because of its accumulated knowledge regarding the Samsung Manufactured HV Battery in Class Vehicles and similar defects in the Chrysler Pacifica plug-in.**

200.   FCA accumulated knowledge of the automotive industry's issues with the HV Battery packs it put in the Class Vehicles. The 17 kwh high-voltage lithium-ion battery packs in the Class Vehicles (the "Battery Pack") were made by Samsung SDI America Inc. ("Samsung"). Samsung has a history of issues with its high-voltage EV batteries, of which FCA has had notice of since at least 2020. In August 2020, for instance, Ford recalled its Kuga PHEV due to fire defect and, in a familiar refrain, owners were told not to charge the battery. The battery

manufacturer was Samsung.[79] Similarly, BMW recalled over 26,000 of its vehicles due to fire defect because "the battery production process allowed impurities to enter the cells."[80] Around 2022, Samsung recalled more than 1,000 of its EV batteries (including in FCA vehicles) because of poor manufacturing quality.[81]

201.   FCA was also on notice of the Fire Defect because it accumulated knowledge of a similar defect in another FCA plug-in hybrid vehicle—the 2017-2018 Chrysler Pacifica plug-in hybrid minivan. Similar to the launch of the Class Vehicles, FCA introduced its Chrysler Pacifica plug-in hybrid in 2016 as "truly a no-compromises minivan, giving customers everything they need or want." The Chrysler Pacifica Plug-in Hybrid was touted as "symboliz[ing] the brand's electrification evolution," which could "deliver an estimated range of 33 miles solely on zero-emissions electric power from a 16-kWh lithium-ion (Li-ion) battery."[82]

202.   The next step in FCA's electrification evolution was the Jeep 4xe, which was first available in early 2021. But even before the first Class Vehicle

---

[79] Ex. 27.

[80] *Id.*

[81] Ex. 43, Jung Min-Hee, *Samsung SDI Voluntarily Recalls EV Batteries in the U.S.*, BUSINESSKOREA (Feb. 7, 2022), https://www.businesskorea.co.kr/news/articleView.html?idxno=87120 (last visited March 3, 2024).

[82] Ex. 44, Stellantis North America, Press Kit: 2017 Chrysler Pacifica (Jan. 11, 2016), https://media.stellantisnorthamerica.com/newsrelease.do?id=17216&mid=722.

rolled off the lot, FCA began receiving reports of fires related to the HV battery system in Chrysler Pacifica Plug-in Hybrid, including a vehicle fire on April 23, 2019.[83] Another occurred on June 15, 2019, where a Chrysler Pacifica exploded in front of a house while plugged in, as pictured below.[84]



---

[83] Ex. 45, NHTSA, Part 573 Safety Recall Report 22V-077 (Feb. 11, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V077-3486.PDF ("As of February 4, 2022, FCA US has identified five customer records, zero warranty claims, and 12 field reports potentially relating to this issue for all markets with dates of receipt ranging from April 23, 2019, to December 14, 2021.").

[84] Ex. 46, Pacifica Forums, Bsmith, A second Pacifica PHEV fire (June 15, 2019), https://www.pacificaforums.com/threads/a-second-pacifica-phev-fire.43545/ (last visited June 21, 2024).

203.   The above photo shows flames that appear to originate in the mid-section of the vehicle, where the Chrysler Pacifica's 16-kWh HV battery powers two electric motors and is located below the rear seats as pictured below.[85]



204.   The design of the particular parts of the Chrysler Pacifica hybrid that are related to the HV battery are similar to the analogue components in the Class Vehicles. Like the Pacifica, the Class Vehicle's 17 kWh HV battery powers two electric motors and is of a similar size and capacity and is placed in a similar location beneath the rear seats as well, as pictured below.[86]

---

[85] Ex. 47, Stellantis, 2017-2021 Chrysler Pacifica Hybrid Emergency Response Guide (Oct. 21, 2021), https://www.mopar.com/content/dam/mopar/images/first-responders/pdf/2021_RU_PHEV_ERG_2017-2021_Final.pdf.

[86] Ex. 48, Stellantis, 2021-2022 Jeep Wrangler 4xe Hybrid Emergency Response Guide (Jan. 10, 2022),



205.  Much like its response to the Fire Defect in the Class Vehicles, FCA's response to the Chrysler Pacifica fires was slow. On August 31, 2021, more than two years after these fires occurred, FCA opened an internal investigation into those fires in response to what it described as "a potential trend in fires in certain Chrysler Pacifica PHEV."[87]

206.  On February 11, 2022, FCA finally issued a recall for more than 16,700 of its 2017-2018 Chrysler Pacifica plug-in hybrids due to rising reports of fires in those vehicles. It stated that, "A vehicle may experience a fire, even with

---

https://www.mopar.com/content/dam/mopar/images/first-responders/pdf/JL_ERG_2022.pdf.

[87] Ex. 49, NHTSA, Part 573 Safety Recall Report 22V-077 (Feb. 11, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V077-3486.PDF.

the ignition in the 'OFF' mode," much like the Class Vehicles. FCA offered a software fix that it said would resolve the fire risk.[88]

207.  FCA's knowledge of the 2019 Chrysler Pacifica fires, and the associated battery issues in those vehicles, predated its release of the Class Vehicles announced in 2020, let alone sold. FCA manufactured both of these plug-in hybrid systems and was therefore on notice that these similar HV Battery parts were likely to cause fires, especially if they were programmed to be used inconsistently with industry standard safety guidelines.

208.  At the same time that FCA was investigating and recalling Chrysler Pacificas for HV battery fires, it was also fulfilling orders for Jeep 4xes, which it advertised as a no compromise, high-mileage-efficiency SUV. Indeed, as discussed above, FCA designed and released a Level 2 charger that was advertised as a "quick, seamless charging solution for Jeep 4xe and Chrysler Pacifica Hybrid owners." The simultaneously issued press photos featured a Jeep 4xe charging inside a garage, but the Chrysler Pacifica was shown charging just outside of a garage.[89]

---

[88] *Id.*

[89] Ex. 50, Stellantis North America, Images for Mopar Introduces New At-home Plug-in Wall Chargers for Jeep® 4xe Models and Chrysler Pacifica, https://media.stellantisnorthamerica.com/image-gallery.do?method=adhoc&mid=1&imageIds=,61956,61954,61955,61953,61951,61950,61952&title=Mopar%20Introduces%20New%20At-home%20Plug-



209.   Even after FCA's recall procedure was applied to the Chrysler

Pacifica hybrid (a software update of the Battery Pack Control Module, same as

with the Class Vehicles), fires related to the hybrid battery not only persisted, but

increased as time went on. In one such case, a Missouri family's Chrysler Pacifica

combusted while plugged into a Mopar-branded charger installed in the family's

garage.[90]

210.   On January 16, 2024, NHTSA announced that its Office of Defects

Investigation would open an investigation to "to review the effectiveness of the

original recall procedure, understand the root cause of the battery fires, investigate

additional reports of Pacifica PHEV HV battery fires, and to increase monitoring

of the manufacturer root cause investigation." NHTSA decided to review the

effectiveness of FCA's recall based on "a recent increase in HV battery thermal

---

in%20Wall%20Chargers%20for%20Jeep%C2%AE%204xe%20Models%20and%
20Chrysler%20Pacifica (last visited June 13, 2024).

[90] Ex. 51, Betty Lin-Fisher, USA Today, *More EV problems: This time Chrysler
Pacifica under recall investigation after fires* (Jan. 24, 2024),
https://www.usatoday.com/story/money/cars/2024/01/24/recall-investigation-
chrysler-pacifica-plugin-fires/72153451007/.

events," and noted that "a review of NHTSA complaint data indicated the post-recall HV battery thermal event complaint rate now exceeds pre-recall levels."[91]

211.   FCA's delayed recall experience with the Chrysler Pacifica hybrid would have put it on notice that a similar Fire Defect could emerge in the Class Vehicles. The timing is oddly prescient; for both vehicles, the timing between the initial vehicle and the release of the vehicle and the first reported fire is about three years.

212.   This extended timing for the battery failures to manifest could be related to the fact that, as stated in 2017 NHTSA Report,  "[l]i-ion failure processes are time-dependent process." For instance, dendrite formation occurs over time and the risk caused by it is cumulative. As further stated in the NHTSA report, "While failure can sometimes occur very rapidly after a cell is damaged, damage may also sometimes grow over many years and many duty cycles, causing delayed failure long after damage is initiated."[92]

213.   In other words, the likelihood of failure continues to increase as the HV battery is subjected to more and more duty cycles based on inappropriate use parameters programmed by FCA.

---

[91] Ex. 52, NHTSA, ODI Resume, Investigation RQ24001
[92] Ex. 2, 2017 NHTSA Report at 11-1.

> **v.** **FCA was slow to recall the Class Vehicles and does not have sufficient stock of HV batteries to actually repair all the Class Vehicles that require replacement.**

214.   Despite FCA's actual and/or constructive knowledge of the serious risk of explosion and fire in the Class Vehicles, it did nothing to remedy the problem or even warn consumers until many months later.

215.   According to a Part 573 Recall Report that FCA sent to NHTSA on November 22, 2023, FCA's Technical Safety and Regulatory Compliance organization began investigating fire risk from the HV battery pack after receiving numerous reports of fires.

216.   By October 2023, FCA had conducted "two vehicle buybacks and . . . disassembled the HV battery packs. The modules and cells are undergoing additional analysis." FCA has not disclosed the results of any such analysis.

217.   Finally, on November 22, 2023, FCA's Vehicle Regulations Committee decided "to conduct a voluntary safety recall" of the Class Vehicles.

218.   FCA's November 2023 recall announcement, however, did not provide any fix for the Fire Defect. It took another four months before FCA began to roll out a recall procedure in March 2024. But even after those months of delay, FCA admitted that it still had not identified the root cause of the Fire Defect.

219.   Further, the recall itself, while inherently insufficient to address the Fire Defect, is also being deficiently executed by FCA. To start, FCA self-

servingly predicted in its communications with dealers that, "Very few vehicles [an estimated one percent] are expected to require HV battery replacement."[93]

220.   FCA's rosy prediction was off the mark. Class Vehicles have failed the recall procedure in unexpectedly high numbers. One online poll on a Jeep 4xe forum found that nearly half of respondents needed a replacement HV battery, with all but one still waiting on their battery at the time they responded to the poll.[94]

221.   According to FCA's Quarterly Report to NHTSA, as of April 23, 2024, only 6,715 vehicles have received service out of a "recall population of 32,125." Indeed, Class Members have reported waiting for months on end for their replacement HV Battery on various Jeep forums. For instance, on April 5, 2024, one commenter posted that his Jeep 4xe was at the dealership for 76 days waiting for a replacement HV battery before being returned to him.[95] Another reported six weeks of "total silence" on when (s)he might expect a replacement HV Battery.[96]

---

[93] Ex. 53, NHTSA Safety Recall, https://static.nhtsa.gov/odi/rcl/2023/RCRIT-23V787-2021.pdf.

[94] Ex. 54, https://www.4xeforums.com/threads/poll-safety-recall-b9a-battery-replaced-or-not.6108/ (last visited June 22, 2024).

[95] Ex. 55, https://www.jlwranglerforums.com/forum/threads/4xe-in-shop-for-65-days-and-counting-battery-wont-charge-jeep-cant-figure-out-the-problem-cel-code-p0bbd-00.127362/page-3 (last visited June 22, 2024).

[96] Ex. 56, https://www.wranglerforum.com/threads/hybrid-battery-pack-what's-left-to-do.2470507/ (last visited June 22, 2024).

222.    Another Class Member submitted the following complaint to NHTSA on or about May 3, 2024 regarding their 2021 Jeep Wrangler 4xe that was included in the recall:

> The contract [sic] owns a 2021 Jeep Wrangler. The contact stated that the vehicle was included in NHTSA Campaign Number: 23V787000 (Electrical System), where the high voltage battery pack software and other updates were updated. The contact stated that after receiving the repair the vehicle started to run rough while driving at various speeds. The contact stated that the charging indicator was fluctuating, the RPM was fluctuating, and the check engine warning light was illuminated. The vehicle also ran rough while attempting to accelerate. The power would fail, and the vehicle would restart while driving at various speeds. The vehicle had been taken back to the dealer where it was diagnosed that the battery had failed. The dealer performed more software updates; however, the failure persisted. The dealer stated that the battery pack assembly needed to be replaced. The vehicle had not been repaired due to the dealer waiting for parts to be available. The manufacturer was made aware of the failure. The failure mileage was 34,000.

223.    More recently, on June 18, 2024, another class member submitted this complaint to NHTSA regarding their 2021 Jeep Wrangler 4xe:

> Jeep has failed to repair the outstanding recalls--one of which says my Jeep can spontaneously combust on/off, charging/not charging, driving/not driving.  Jeep offered to buy back my Jeep and now has put it into processing hell, essentially reneging its offer to buy back my Jeep, which I have in writing.

224.    Even when Class Members submit their Class Vehicles for the multi-day recall procedure, many authorized FCA dealers are not performing the misconceived Recall procedure correctly.

225.   As alleged in more detail below, Plaintiff Erin May's Class Vehicle initially passed FCA's recall procedure, but later experienced issues immediately upon being returned to her from the dealer. The test was re-run a second time and her Class Vehicle failed the test; her Class Vehicle then sat at the dealership for almost a month while she waited for a replacement HV Battery.

226.   FCA's own messaging in the Jeep App has contributed to confusion over the recall. Class Members are now simply being advised by FCA in their Jeep App that replacement HV Battery packs are simply not available in the event their Class Vehicle fails the recall procedure. The following is a June 23, 2024 screenshot from Plaintiff Eve Park's Jeep App, which lists the recall as being incomplete and "Parts Unavailable" even though Plaintiff Park already brought the vehicle to an FCA dealer to have the recall procedure performed:



227.   It is no wonder that FCA is struggling to get Class Members to submit their vehicles in for the recall procedure—only about 20% so far as reported by FCA, and some number of that pursuant to botched Recall procedures by FCA dealers. Class Members either leave with the same exact HV Battery being told, dubiously, that it is not in fact prone to catching fire, or their vehicle sits with the dealer for an indeterminate amount of time while waiting for a replacement HV Battery System and without being fully compensated for rental or loaner cars.

228.   While FCA flounders in getting Class Vehicles in for the recall procedure due to FCA's advisement that the "Parts [Are] Unavailable," it continues to advise the Class Vehicle owners and lessees "to refrain from recharging these vehicles and not to park them inside of buildings or structures, or near other vehicles until the vehicle has the final repair completed."

229.   FCA does not explain what could constitute a safe distance from an exploding car or what owners should do with their vehicles if they have no such place to park them. FCA is likewise not globally offering to buy back the vehicles or provide loaner or rental vehicles until it obtains a sufficient stock of HV Batteries to address the unexpectedly high number of Class Vehicles requiring replacement of the HV Battery pack.

230.   Indeed, the sheer number of Class Vehicles failing the recall procedure (combined with the multiple fire incidents in non-recalled vehicles)

strongly indicates that the Fire Defect is not an isolated manufacturing defect as FCA insists, but rather a design defect either in the battery system itself or regarding the battery controls implemented by FCA.

231.    In particular and as alleged herein, FCA's failure to provide an adequate or available recall remedy leaves Class Vehicle owners facing three choices: (i) follow FCA's instructions, if possible, at the great inconvenience of parking far from home and the expense and environmental impact of additional consumption of gasoline; (ii) ignore FCA's instructions and risk calamity; or (iii) sell the vehicles at a substantial loss as a result of FCA's conduct.

232.    Perhaps more commonly, many owners of Class Vehicles are simply unable to find a "safe" place to park their vehicles at home, work, and/or anywhere else they need to take their vehicles. This is especially true for owners who live in apartments or densely populated urban areas, but also rural wooded areas with high fire risk. Often, owners have no choice but to park them in unsafe locations. Others, faced with spiking fuel costs, simply cannot afford not to re-fuel them.

233.    All owners and lessees of the Class Vehicles have suffered ascertainable loss in the form of greatly diminished value of their vehicles which are not fit for their ordinary purposes, and excess fuel costs, among other things.

      **vi.**   **FCA's recall appears to be underinclusive because it does not include unrecalled vehicles that nevertheless combusted while charging.**

234.   There is substantial evidence emerging that FCA's recall remedy is both underinclusive and insufficient to address the issue.

235.   In addition, even among 2021-2023 model years, FCA did not recall all of the vehicles. According to FCA's Part 573 Recall Report "[t]he suspect population [subject to recall] was determined using supplier manufacturing records of HV batteries with cells manufactured from January 21, 2021, through October 2, 2021." But limitation to this "suspect range" does not appear to be warranted. By FCA's own admission the same document states that the "suspect period began on September 18, 2020" (before the batteries were manufactured) and "[t]he defect has not been identified and the root cause is still being investigated."[97]

236.   Indeed, Plaintiff Liahkova, whose vehicle recently combusted in Buffalo Grove, Illinois, owned one of the non-recalled vehicles. But based on an NHTSA recall search, Ms. Liakhova's vehicle was not included in the original recall, which allegedly covered the "suspect population," as "determined using supplier manufacturing records." Her vehicle catching fire should have made it

---

[97] Ex. 57, NHTSA, Part 573 Safety Recall Report 23V-797 (Feb. 22, 2024), https://static.nhtsa.gov/odi/rcl/2023/RCLRPT-23V787-9402.PDF.

obvious to FCA that its suspect population was underinclusive and particularly

after FCA sent a fire cause inspector to inspect her vehicle.

237.   Plaintiffs also have reason to believe that 2024 model year Jeep

Wrangler 4xe's should also be included in the recall. Recent NHTSA complaints

regarding 2024 Jeep Wrangler 4xe vehicles suggest as much. At least one 2024 4xe

has caught fire this year as reported on January 9, 2024:

> The contact owns a 2024 Jeep Wrangler 4x4E. The contact stated that
> his wife noticed a fire at the charger while the vehicle was plugged in
> and charging. The owners were able to extinguish the fire. There were
> no reported injuries. The vehicle had not been charged. The fire
> department was called to the scene. While his wife was driving the
> vehicle, it overheated. There were no warning lights illuminated. The
> contact called the local dealer, but the vehicle was not diagnosed or
> repaired. The manufacturer was not notified of the failure. The failure
> mileage was approximately 8,500.

238.   As alleged above, there are indications that the Fire Defect extends to

2024 Jeep Wrangler 4xe vehicles. This is logical since the 2024 Jeep Wrangler 4xe

utilizes the exact same HV Battery as previous model years and FCA has not

disclosed any adjustments to its operating parameters and/or software for the HV

Battery system.

### vii.   FCA's recall procedure leaves Plaintiffs and Class Members with vehicles that continue to pose an unreasonable fire risk.

239.   It is also apparent that that the recall procedure itself is insufficient to

address the Fire Defect.

240.   Per FCA's revised recall communication to dealers in March 2024, the following is the summary of the "Repair to Be Performed":

Perform the Battery Pack Control Module (BPCM) Software Update and BPCM Integrity Procedure.

Do not replace the High Voltage battery unless the BPCM Integrity Procedure DTCs indicates a new battery is required.[98]

241.   In other words, the recall procedure merely runs a battery integrity test rather than providing any safer redesign to Class Vehicle's HV Batteries. It is unclear how testing the battery without replacement will remedy the root cause of the Fire Defect, which FCA still has not identified.

242.   It is also unclear how a programming fix could remedy battery failure as internal damage caused by overcharging and undercharging the battery increases risk of battery failure, which may not emerge until long after the damage has already occurred.[99]  There is no software that can remedy physical changes within the battery.

243.   The fact that some Class Vehicles' HV Batteries have not yet degraded to a degree that FCA deems worthy of replacement does not mean that those HV Battery systems are safe from fire. As discussed above, HV Battery

---

[98] Ex. 58, https://static.nhtsa.gov/odi/rcl/2023/RCRIT-23V787-8736.pdf (last visited June 24, 2024).
[99] Ex. 2, 2017 NHTSA Report at 11-1.

degradation, and the risk of fire, increases over time as the battery is charged and discharged without appropriate safeguards.

244.   Indeed, the insufficient scope of the recall is evidenced by very real battery fires in vehicles for which FCA not issued a recall for the Fire Defect— *e.g.*, Plaintiff Liakhova's vehicle and the 2024 Jeep Wrangler 4xe fire complaint submitted to NHTSA. This indicates that FCA's interpretation of whether one of its HV Battery systems presents as subject to the Fire Defect is far too narrow.

245.   On the other hand, if the vehicle fails and the recall procedure indicates a new battery is required, FCA states that it will replace the HV Battery with an *identical* HV Battery (although as alleged above, FCA is not even able to make good on that given its current "Parts Unavailable" messaging to Class Members).

246.   This "remedy" does not appear to address core issues regarding internal physical damage to the HV battery system as a result of poor design or manufacture. FCA also has not publicly disclosed any of its modifications to the battery controls and systems to mitigate the Fire Defect going forward.

247.   Given what is known about the Fire Defect, it seems likely that these new *identical* HV batteries, if subjected to the same FCA-programmed usage and charging specifications, may develop a similar risk of combustion in the future. If anything, FCA's unwillingness to proactively replace and redesign the dangerous

HV Battery systems in the Class Vehicles shows that its recall "fix" is a cost cutting measure rather than an actual safety measure.

## VI.   FRAUDULENT CONCEALMENT

248.   Plaintiffs' claims arise out of FCA's fraudulent concealment of the Fire Defect and its representations or omissions about the quality, safety, and comfort of the Class Vehicles.

249.   Plaintiffs allege that at all relevant times, including specifically at the time they and other Class Members purchased or leased their Class Vehicles, FCA knew or should have known of the Fire Defect; FCA was under a duty to disclose the Fire Defect based upon its exclusive knowledge of it, and its concealment of it; and FCA never disclosed the Fire Defect to Plaintiffs, Class Members, or the public at any time or place or in any manner other than an inadequate and ineffective recall of a small subset of the Class Vehicles.

250.   Plaintiffs make the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to FCA:

a.   **Who:** FCA, as manufacturer and seller of the Class Vehicles.

b.   **What:** As described above, FCA knew, or was deliberately indifferent to knowledge of the Fire Defect because of the cumulative notice provided by each of the following sources: (1) general industry knowledge of fire

risk in plug-in hybrid vehicles, as described in the 2017 NHTSA Report; (2) FCA's accumulation of knowledge regarding similarly defective parts related to the HV Battery in the Chrysler Pacifica; (3) several Class Vehicles that FCA investigated or had the opportunity to investigate prior to FCA's insufficient and underinclusive recall; (4) subsequent Class Vehicle fires that have occurred after FCA's insufficient and underinclusive recall; and (5) that even a single incident of unexpected vehicle explosion can and should draw immediate and intense scrutiny.

c. ***When:*** FCA concealed material information regarding the Fire Defect at all times and made representations about the quality, safety, and comfort of the Class Vehicles, starting no later than 2019, when it accumulated requisite knowledge of the Fire Defect based on its extensive industry knowledge and fires in similarly defective parts of the HV Battery of the Chrysler Pacifica hybrid plug-in. This was prior to sale of a Class Vehicle to any member of the Class. FCA still has not disclosed the truth about the full scope of the Fire Defect in the Class Vehicles to anyone outside of FCA, through its insufficient and underinclusive recall or otherwise. FCA has never taken any action to inform consumers about the true nature of the Fire Defect in Class Vehicles. And when members of the Class brought their Class Vehicles to FCA complaining of fires related to the HV Battery, FCA denied and continues to deny any knowledge of or responsibility for the Fire Defect.

d.      ***Where:*** FCA concealed material information regarding the true

nature of the Fire Defect in every communication it had with Plaintiffs and Class

Members, including in the pervasive marketing described herein, and including by

making or omitting material representations about the quality, safety, comfort, and

features of the Class Vehicles. Plaintiffs are aware of no document,

communication, or other place or thing, in which FCA disclosed the truth about the

full scope of the Fire Defect in the Class Vehicles to anyone outside of FCA. Such

information is not adequately disclosed in any sales documents, displays, stickers,

advertisements, warranties, owner's manuals, on FCA's website, or by any

salesperson at an FCA dealership.

e.      ***How:*** By concealing the truth about about the existence, scope,

and nature of the Fire Defect from Plaintiffs and Class Members at all times, even

though it knew about the Fire Defect and knew that information about the Fire

Defect would be material to a reasonable consumer. Also, by promising and

implying in its marketing materials that the Class Vehicles were safe, dependable,

high performing, and had features and attributes they did not actually have.

f.      ***Why:*** FCA actively concealed material information about the

Fire Defect in the Class Vehicles, and made representations conveying and

implying that the Class Vehicles were safe, dependable, high performing, and had

attributes they did not actually have, for the purpose of inducing Plaintiffs and

Class Members to purchase and/or lease Class Vehicles, rather than purchasing and/or leasing competitors' vehicles. Had FCA disclosed the truth—for example, in its advertisements or other materials or communications—Plaintiffs and Class Members (all reasonable consumers) would have been aware of it, and would not have bought or leased the Class Vehicles or would have paid less for them.

## VII.   <u>DISCOVERY RULE TOLLING OF THE STATUTE OF LIMITATIONS</u>

251.   At the time that they purchased or leased their Class Vehicles, Plaintiffs and Class Members could not have discovered through the exercise of reasonable diligence the existence of the Fire Defect or FCA's conduct as complained of herein.

252.   FCA concealed its knowledge regarding the existence of the Fire Defect, and Class Members had no way of knowing about the Fire Defect until November 2023 at the earliest, when FCA issued a recall for the Fire Defect.

253.   Plaintiffs and the other Class Members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that FCA did not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that FCA had concealed information about the Fire Defect.

254.   For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Class Vehicles.

## VIII.  CLASS ALLEGATIONS

255.   Plaintiffs bring this action on behalf of themselves and as a class

action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of

Civil Procedure, on behalf of the following class and subclasses:

> **Nationwide Class**: All persons or entities who purchased or leased one or more model year 2021-2023 Jeep Wrangler 4xe vehicles (the "Class Vehicles").

> **Arizona Subclass:** All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Arizona.

> **California Subclass:** All persons or entities who purchased or leased one or more of the Class Vehicles in the State of California.

> **Colorado Subclass:** All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Colorado.

> **Florida Subclass:** All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Florida.

> **Illinois Subclass:** All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Illinois.

> **New Jersey Subclass:** All persons or entities who purchased or leased one or more of the Class Vehicles in the State of New Jersey.

> **North Carolina Subclass:** All persons or entities who purchased or leased one or more of the Class Vehicles in the State of North Carolina.

> **Oklahoma Subclass:** All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Oklahoma.

> **Pennsylvania Subclass:** All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Pennsylvania.
>
> **Texas Subclass:** All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Texas.

256.   Plaintiffs assert claims under the laws of each state set forth below.

257.   Excluded from the definitions of each Class and Subclass are any personal injury or property damages claims resulting from the fires or explosions caused by the Class Vehicles. Also excluded from the Class and Subclasses are FCA and its subsidiaries and affiliates; all persons who make a timely election to be excluded from this action; governmental entities; the Judge to whom this case is assigned and his/her immediate family; and Plaintiffs' Counsel. Plaintiffs reserve the right to revise the Class and Subclass definitions based upon information learned through discovery.

258.   Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

259.   This action has been brought and may be properly maintained on behalf of the Class and Subclasses proposed herein under Federal Rule of Civil Procedure 23.

A.      **Numerosity**

260.    Federal Rule of Civil Procedure 23(a)(1): The members of each Class and Subclass are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. For purposes of this complaint, Plaintiffs allege that there are estimated to be over 32,000 Class Vehicles in the Nationwide Class. The precise number of Class and Subclass Members is unknown to Plaintiffs but may be ascertained from FCA's books and records. Class and Subclass Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

B.      **Commonality and Predominance**

261.    Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class and Subclass Members, including, without limitation:

a.      Whether FCA engaged in the conduct alleged herein;

b.      Whether the Fire Defect creates an unreasonable risk of fires in the Class Vehicles;

c.      When FCA first knew about the Fire Defect;

d.      Whether FCA designed, manufactured, marketed, and distributed the Class Vehicles with defective high-voltage battery packs;

e.      Whether any future FCA purported recall "repair" is a *bona fide* repair of the faulty battery packs;

- 114 -

f.     Whether FCA's conduct renders it liable for breach of warranties;

g.     Whether FCA has been unjustly enriched at the expense of Plaintiffs and the Class and Subclasses;

h.     Whether Plaintiffs and the other Class and Subclass Members overpaid for their vehicles at the point of sale; and

i.     Whether Plaintiffs and the other Class and Subclass Members are entitled to damages and other monetary relief and, if so, in what amount.

## C.     Typicality

262.   Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class and Subclass Members' claims because, among other things, all Class and Subclass Members were comparably injured through FCA's wrongful conduct as described above.

## D.     Adequacy

263.   Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class and Subclass representatives because their interests do not conflict with the interests of the other members of the Class and Subclasses they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class and Subclasses' interests will be fairly and adequately protected by Plaintiffs and their counsel.

**E.    Superiority**

264.   Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class and Subclass Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against FCA, so it would be impracticable for the members of the Class and Subclasses to individually seek redress for FCA's wrongful conduct. Even if Class and Subclass Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**IX.    <u>NATIONWIDE CLAIMS</u>**

**COUNT I**
**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**
**(15 U.S.C. § 2301, *et seq.*)**
**(Alleged by all Plaintiffs on behalf of the Nationwide Class**
**or, in the alternative, the State Subclasses)**

265.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

- 116 -

266.   Plaintiffs bring this claim on behalf of the Nationwide Class.

267.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

268.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiffs and Nationwide Class Members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

269.   FCA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

270.   15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

271.   FCA provided Plaintiffs and Nationwide Class Members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As part of the implied warranty of merchantability, FCA warranted that the Class Vehicles engines were fit for their ordinary purpose as safe plug-in hybrid electric motor vehicles and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

272.   FCA breached its implied warranties, as alleged herein and in more detail above, and is therefore liable to Plaintiffs pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of combustion, causing an unreasonable risk of death, serious bodily harm, and/or property damage to lessees and owners of the Class Vehicles as well as their homes, passengers, and bystanders. This defect rendered the Class Vehicles, when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of hybrid driving. In fact, as a result of the defect, FCA specifically advised owners and lessees not to charge their batteries and not to drive the Class Vehicles in electric mode.

273.   As discussed above, on information and belief, FCA skimped on available safety technologies that would have precluded the Fire Defect, and, through the sort of testing that any responsible vehicle manufacturer would have done prior to launching the Class Vehicles, FCA knew or should have known of the defect. Yet, in order to pad its bottom line and launch the first-ever plug-in hybrid electric vehicle with the highest possible electric and overall range, FCA intentionally or recklessly foisted the outrageously dangerous Class Vehicles on unwitting Class Members.

274.   Any effort by FCA to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

275.   Any limitations FCA might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between FCA and Plaintiffs, as, at the time of purchase and lease, Plaintiffs had no other options for purchasing warranty coverage other than directly from FCA.

276.   Any limitations FCA might seek to impose on its warranties are substantively unconscionable. FCA knew that the Class Vehicles were defective and that the Class Vehicles could ignite when used as intended long before Plaintiffs and the Class. FCA failed to disclose this defect to Plaintiffs and the Class. Thus, enforcement of the durational limitations on the warranties is harsh and would shock the conscience.

277.   Plaintiffs have had sufficient direct dealings with FCA and its authorized dealerships to establish privity of contract between FCA and Plaintiffs. Nonetheless, privity is not required here because Plaintiffs are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of FCA's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended

to benefit consumers. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the aforementioned defect, as fires present an unreasonable risk of death, serious bodily harm, and/or property damage to lessees and owners of the Class Vehicles as well as their homes, other nearby structures and vehicles, passengers, and bystanders.

278.   Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give FCA notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

279.   Plaintiffs would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because FCA will not acknowledge any revocation of acceptance and immediately return any payments made, Plaintiffs have not re-accepted their Class Vehicles by retaining them.

280.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of all other Nationwide Class Members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In

addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the Nationwide Class Members in connection with the commencement and prosecution of this action.

281.   Plaintiffs also seek the establishment of an FCA-funded program for Plaintiffs and Nationwide Class Members to recover out-of-pocket costs incurred in attempting to rectify and/or mitigate the effects of the hybrid propulsion system defect in their Class Vehicles.

## X.   STATE-SPECIFIC CLAIMS

**A.   Arizona**

### COUNT II
### BREACH OF IMPLIED WARRANTY OF
### MERCHANTABILITY UNDER ARIZONA LAW
### (Ariz. Rev. Stat. § 47-2314)
### (Alleged by Plaintiffs Frisch, Otto, and Stueve on behalf of the Arizona
### Subclass)

282.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

283.   Plaintiffs Frisch, Otto, and Stueve ("Plaintiffs," for purposes of the Arizona claims) bring this claim on behalf of themselves and the Arizona Subclass ("Subclass," for purposes of the Arizona claims).

284.    FCA is and was at all relevant times a merchant with respect to motor vehicles under Ariz. Rev. Stat. § 47-2104.

285.    Under Arizona law, an implied warranty of merchantability attaches to the Class Vehicles. Ariz. Rev. Stat. § 47-2314.

286.    The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles are all afflicted by the Fire Defect, which, among other things, makes the vehicles susceptible to battery combustion and poses an unreasonable risk of death, serious bodily harm, and/or property damage to Plaintiffs and Subclass Members. This dangerous latent defect renders the Class Vehicles unmerchantable and unfit for their ordinary use of driving.

287.    As a result of the Fire Defect, and per FCA's instructions, Plaintiffs and Subclass Members had to limit their use and/or charging of the Class Vehicles, and they were unable to rely on their Class Vehicles to provide them with safe transportation. Notably, FCA's recall notice instructed Plaintiffs and Subclass Members to refrain from charging their Class Vehicles or parking inside of buildings or structures, which deprived Plaintiffs and Subclass Members of using

their vehicles' hybrid electric driving features, regardless of whether they experienced a battery fire.

288.   Plaintiffs have had sufficient direct dealings with FCA, its authorized dealers, or its agents to establish privity of contract with FCA. Nonetheless, privity is not required here because Plaintiffs and the Subclass are the intended third-party beneficiaries of agreements between FCA and its dealers regarding sales and leases of the Class Vehicles, including FCA's implied warranties. Furthermore, privity is also not required because the Class Vehicles are inherently dangerous and defective due to the Fire Defect, which presents a hidden and unreasonable risk of death, serious bodily harm, and/or property damage to Plaintiffs and Subclass Members.

289.   It was reasonable to expect that Plaintiffs and the Subclass would use, consume, or be affected by the Class Vehicles.

290.   FCA was provided notice of these issues within a reasonable time of Plaintiffs' knowledge of the non-conforming or defective nature of the Class Vehicles by correspondence from Plaintiffs' counsel to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, the filing of Plaintiffs' March 4, 2024 Complaint (ECF No. 1), and/or by the allegations contained in this Complaint.

291.   Alternatively, Plaintiffs and Subclass Members were excused from providing FCA with notice and an opportunity to cure the breach of warranty because it would have been futile. FCA did not have a repair available when it announced the recall for the Fire Defect, and it still has not identified the root cause of the Fire Defect or provided an effective recall remedy to address the actual cause of the defect. As a result, Plaintiffs and Subclass Members had no reason to believe that FCA would have repaired the Fire Defect if they presented their Class Vehicles to FCA for repair.

292.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and Subclass Members have been damaged in an amount to be determined at trial.

**COUNT III**
**VIOLATIONS OF THE ARIZONA CONSUMER FRAUD ACT**
**(Ariz. Rev. Stat. § 44-1521, *et seq.*)**
**(Alleged by Plaintiffs Frisch, Otto, and Stueve on behalf of the Arizona Subclass)**

293.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

294.   Plaintiffs Frisch, Otto, and Stueve ("Plaintiffs," for purposes of the Arizona claims) bring this claim on behalf of themselves and the Arizona Subclass ("Subclass," for purposes of the Arizona claims).

295.   FCA, Plaintiffs, and the Subclass are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), Ariz. Rev. Stat. § 44-1521(6).

296.   The Class Vehicles are "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

297.   FCA's actions, as set forth above, occurred in the conduct of trade or commerce.

298.   The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, … misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale … of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A).

299.   FCA's actions, as set forth above, occurred in the conduct of trade or commerce.

300.   In the course of its business, FCA concealed and/or failed to disclose the Fire Defect in the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, concealment, suppression, or omission of a material fact with

- 125 -

intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

301. By failing to disclose and actively concealing the Fire Defect in the Class Vehicles, which it marketed as safe, reliable, of high quality, and fit for use as plug-in hybrid electric vehicles, FCA engaged in unfair and deceptive business practices in violation of the Arizona CFA.

302. In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the defects in the Class Vehicles.

303. FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and Subclass Members, about the true safety and reliability of their vehicles.

304. FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead Plaintiffs and the Subclass.

305. FCA knew or should have known that its conduct violated the Arizona CFA.

306. As alleged above, FCA made material statements about the safety and reliability of the Class Vehicles when operating as plug-in hybrid electric vehicles that were either false or misleading.

307. FCA owed Plaintiffs and the Subclass a duty to disclose the true safety and reliability of the Class Vehicles because FCA:

a. Possessed exclusive knowledge about the Fire Defect;

b. Intentionally concealed the foregoing from Plaintiffs and the Subclass;

c. Made incomplete representations about the safety and reliability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations; and/or

d. Had duties under the TREAD Act and related regulations to disclose and fix the defect.

308. Because FCA fraudulently concealed the Fire Defect, as well as the true nature of the Class Vehicles, Plaintiffs were deprived of the benefit of their bargain because each vehicle they purchased was worth less than it would have been if it were free from defects. Had Plaintiffs been aware of the defects in the vehicle, they would not have bought or leased their Class Vehicles or would have paid less for it.

309. FCA's concealment and/or failure to disclose the defects in the Class Vehicles was material to Plaintiffs and the Subclass.

310. Plaintiffs and the Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose the Fire Defect. Plaintiffs and Subclass Members either would have paid less for their vehicles or would not have purchased or leased them at all.

311. FCA's violations present a continuing risk to Plaintiffs and the Subclass as well as to the general public. In particular and as alleged herein, FCA

has yet to offer any effective remedy for the Class Vehicles. FCA's unlawful acts and practices complained of herein affect the public interest.

312. As a direct and proximate result of FCA's violations of the Arizona CFA, Plaintiffs and the Subclass have suffered injury-in-fact and/or actual damage as alleged above.

313. Plaintiffs seek monetary relief against FCA in an amount to be determined at trial. Plaintiffs also seek punitive damages because FCA engaged in aggravated and outrageous conduct with an evil mind.

314. Plaintiffs also seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

**COUNT IV**
**UNJUST ENRICHMENT**
**(COMMON LAW)**
**(Alleged by Plaintiffs Frisch, Otto, and Stueve**
**on behalf of the Arizona Subclass)**

315. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

316. Plaintiffs Frisch, Otto, and Stueve ("Plaintiffs," for purposes of the Arizona claims) bring this claim on behalf of themselves and the Arizona Subclass ("Subclass," for purposes of the Arizona claims).

317.   Pursuant to Federal Rule of Civil Procedure 8(d)(2) and (3), Plaintiffs plead this claim separately and in the alternative to their claims for breach of implied warranty and violation of the Magnuson Moss Act because if Plaintiffs' claims for damages are dismissed or judgment is entered in favor of FCA, Plaintiffs and the Subclass will have no adequate legal remedy.

318.   FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the lithium-ion batteries that it installed in the Class Vehicles, but nevertheless marketed them for sale to consumers, and misled Plaintiffs and the Subclass Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

319.   FCA failed to adequately research, design, test, and manufacture the Class Vehicles before warranting, promoting, selling and distributing the Class Vehicles as suitable and safe for reasonably foreseeable uses.

320.   At the expense of Plaintiffs and the Subclass Members, FCA received and retained a benefit from Plaintiffs and Subclass Members and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Class Vehicles to Plaintiffs and the Subclass Members for more than they were worth as a result of FCA's conduct.

321.   Plaintiffs and the Subclass Members would not have purchased or leased the Class Vehicles, or would have paid less for them, had they known of the Fire Defect at the time of purchase or lease. Therefore, FCA profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiffs and the Subclass.

322.   Thus, Plaintiffs and the Subclass conferred tangible and material economic benefits upon FCA when they purchased or leased the Class Vehicles.

323.   FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

324.   As a licensed distributor of new motor vehicles, FCA sells Class Vehicles to Plaintiffs and the subclass through its numerous vehicle dealers across the United States. FCA therefore profits from sales of Class Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms.

325.   Plaintiffs and the Subclass were not aware of the true facts about the Class Vehicles when they acquired them and did not benefit from FCA's conduct.

326.   Plaintiffs and Subclass Members are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return Plaintiffs

and Subclass Members to the position they occupied prior to dealing with FCA,

with such amounts to be determined at trial.

**B.    California**

**COUNT V**
**VIOLATION OF THE CALIFORNIA**
**CONSUMER LEGAL REMEDIES ACT**
**(Cal. Civ. Code § 1750, *et seq.*)**
**(Alleged by Plaintiffs Carter and Kreb on behalf of the California Subclass)**

327.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

328.    Plaintiffs Carter and Kreb ("Plaintiffs," for purposes of the California claims) bring this claim on behalf of themselves and the California Subclass ("Subclass," for purposes of the California claims) for injunctive and equitable relief.[100]

329.    FCA is a person as defined in California Civil Code § 1761(c).

330.    Plaintiffs and the California Subclass Members are consumers as defined in California Civil Code § 1761(d).

331.    Defendants engaged in unfair and deceptive acts in violation of the California Consumer Legal Remedies Act (CLRA) through the practices described herein, and by knowingly and intentionally concealing the Fire Defect in the Class

---

[100] Pursuant to California Civil Code § 1780(d), Plaintiffs Kreb and Carter have provided a declaration attesting to the venue for this claim. *See* Exs. 59 and 60.

Vehicles, as well as the true nature of the Class Vehicles, from Plaintiffs and California Subclass Members, along with concealing the risks, costs, and monetary damage resulting from the defect. These acts and practices violate, at a minimum, the following sections of the CLRA, as defined in California Civil Code § 1770:

a. (a)(2) misrepresenting the source, sponsorship, approval, or certification of goods or services;

b. (a)(5) representing that goods or services have sponsorships, characteristics, uses, benefits, or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have;

c. (a)(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

d. (a)(9) advertising goods and services with the intent not to sell them as advertised, including but not limited to by selling Class Vehicles with actual or constructive knowledge that they were unsafe.

332. FCA's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk to the public.

- 132 -

333.   FCA knew the Class Vehicles were defectively designed and/or manufactured, were prone to cause fires, and were not suitable for their intended use.

334.   In the course of its business, FCA concealed and/or failed to disclose the Fire Defect in the Class Vehicles, as well as the true nature of the Class Vehicles, and its failure to adequately design and test the vehicles to ensure their safety as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

335.   FCA had a duty to Plaintiffs and Subclass Members to disclose the defective nature of the Class Vehicles because, among other things:

a.   As the manufacturer and designer of the Class Vehicles, and recipient of customer complaints and NHTSA communications, FCA was in a superior position to know the true state of facts about the Fire Defect and associated risks of combustion in the Class Vehicles, and the defect affects a core function of the Class Vehicle;

b.   Plaintiffs and Subclass Members could not reasonably have been expected to learn or discover that the Class Vehicles had a dangerous safety defect until repeated fires forced FCA to finally issue the recall without a fix;

    c.    FCA knew that Plaintiffs and Subclass Members could not reasonably have been expected to learn or discover the Fire Defect and the catastrophic consequences thereof until repeated fires forced FCA to finally disclose the risk; and

    d.    FCA actively concealed the defect and the consequences thereof by knowingly failing to recall the Class Vehicles at an earlier date and enacting a recall that was both insufficient and under-inclusive.

336.   In failing to disclose the Fire Defect and the associated safety risks and repair costs that result from it, FCA has knowingly and intentionally concealed material facts and breached its duty to disclose.

337.   FCA's concealed facts, omissions, and false or misleading representations to Plaintiffs and Subclass Members, as alleged herein, are material in that a reasonable consumer would have considered them important in deciding whether to purchase or lease the Class Vehicles or pay a lesser price.

338.   Plaintiffs and the Subclass reasonably relied on FCA's omissions of material fact and false or misleading representations.

339.   Had Plaintiffs and the Subclass Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

340.   Plaintiffs and the Subclass have incurred damages as a result of FCA's CLRA violations, in an amount to be proved at trial.

341.   FCA's violations present a continuing risk to Plaintiffs as well as the general public. In particular and as alleged herein, FCA's failure to provide a recall procedure leaves Class Vehicle owners facing three choices: follow FCA's instructions, if possible, at the great inconvenience of parking far from home and the expense and environmental impact of additional consumption of gasoline; ignore FCA's instructions and risk calamity; or sell the vehicles at a substantial loss as a result of FCA's conduct. FCA's unlawful acts and practices complained of herein affect the public interest.

342.   FCA is on notice of the issues raised in this count and this Complaint by way of investigations conducted by governmental regulators, complaints from consumers, and FCA's own testing. Additionally, on February 28, 2024, counsel for Plaintiffs sent a notice letter to FCA in accordance with California Civil Code § 1782(a) of the CLRA, on behalf of Plaintiffs and other similarly situated consumers, notifying FCA of its alleged violations of California Civil Code § 1770(a) and demanding that FCA correct or agree to correct the actions described therein within thirty (30) days of the notice letter.

343.   A copy of that letter is attached hereto as Ex. 61. FCA, through its counsel, acknowledged receipt of this letter but FCA has yet to correct or agree to correct the actions described therein, and also has not provided compensation or adequate compensation to Plaintiffs and the Subclass.

344.   Plaintiffs seek compensatory and monetary damages to which Plaintiffs and the Subclass are entitled under the CLRA.

345.   Plaintiffs also seek punitive damages for Plaintiffs and the Subclass against FCA because its conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith.

## COUNT VI
## VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (Cal. Bus. & Prof. Code § 17200)
### (Alleged by Plaintiffs Carter and Kreb on behalf of the California Subclass)

346.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

347.   Plaintiffs Carter and Kreb ("Plaintiffs," for purposes of the California claims) bring this claim on behalf of themselves and the California Subclass ("Subclass," for purposes of the California claims).

348.   The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

349.   FCA has engaged in at least the following unlawful, fraudulent, and unfair business acts and practices in the course of its business and in violation of the UCL:

a.   FCA made false or misleading representations about the Class Vehicles as alleged herein, including but not limited to falsely representing that the Class Vehicles conformed with all applicable federal motor vehicle safety standards;

b.   FCA concealed and/or failed to disclose the Fire Defect in the Class Vehicles, as well as true nature of the Class Vehicles, and its failure to adequately design and test the vehicles to ensure their safety from risk of a fire caused by the HV Battery as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

c.   FCA engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of material facts with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

350.   FCA engaged in unfair competition and unfair, unlawful, or fraudulent business practices through the conduct, statements, and omissions described herein, and by knowingly and intentionally concealing the Fire Defect in the Class Vehicles, as well as the true nature of the Class Vehicles, from Plaintiffs and Subclass Members, along with concealing the risks, costs, and monetary damage resulting from the defect. FCA should have disclosed this information because it was in a superior position to know the true facts related to the Fire Defect, and Plaintiffs and Subclass Members could not reasonably be expected to learn or discover the true facts related to the Fire Defect.

351.   The Fire Defect is a dangerous latent defect that causes catastrophic fires in the Class Vehicles. This constitutes a safety issue that further triggered FCA's duty to disclose the safety issue to consumers.

352.   FCA's acts and practices deceived Plaintiffs and are likely to deceive the public. In failing to disclose the Fire Defect and suppressing other material facts from Plaintiffs and Subclass Members, FCA breached its duty to disclose these facts, violated the UCL, and caused injuries to Plaintiffs and Subclass Members.

353.   FCA's concealed facts, omissions, and false or misleading representations to Plaintiffs and the Subclass Members, as alleged herein, are material in that a reasonable consumer would have considered them important in deciding whether to purchase or lease the Class Vehicles or to pay a lesser price.

354.   Plaintiffs and the Subclass reasonably relied on FCA's false and misleading representations and omissions. Had Plaintiffs and the Subclass Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

355.   The injuries suffered by Plaintiffs and Subclass Members are not outweighed by any potential countervailing benefit to consumers or to competition, nor are the injuries that Plaintiff and Subclass Members suffered injuries that could have been reasonably avoided.

356.    FCA's conduct alleged herein is immoral, unethical, oppressive, unscrupulous, unconscionable, and substantially injurious to Plaintiffs and the Subclass. There is no utility to FCA's conduct, and even if there were any utility, it would be significantly outweighed by the gravity of the harm caused by FCA's conduct alleged herein.

357.    FCA's conduct alleged herein also violates California public policy, including as such policy is reflected in California Civil Code §§ 1668, 1709, 1710, and 1750, *et seq.*, and California Commercial Code § 2313, and California common law.

358.    FCA's acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750, *et seq.*, and California Commercial Code § 2313. FCA knew or should have known its conduct violated the UCL.

359.    Plaintiffs and Subclass Members have suffered an injury in fact, including the loss of money, property, and use of property, because of FCA's unfair, unlawful, and deceptive practices.

360.    Plaintiffs seek to enjoin further unlawful, unfair, and fraudulent acts or practices by FCA, to obtain restitutionary disgorgement of all monies and revenues generated because of such practices, and all other relief allowed under California Business & Professions Code § 17200.

361.   Plaintiffs and the Subclass Members lack an adequate remedy at law to recover or fully recover amounts and benefits subject to restitution pursuant to this cause of action and to obtain or fully obtain the requested injunctive relief pursuant to this cause of action.

362.   Plaintiffs, on behalf of themselves and the Class, further seek an award of attorneys' fees and costs under California Code of Civil Procedure § 1021.5.

## COUNT VII
## VIOLATIONS OF CALIFORNIA FALSE ADVERTISING LAW
### (Cal. Bus. & Prof. Code § 17500, *et seq*.)
### (Alleged by Plaintiffs Carter and Kreb on behalf of the California Subclass)

363.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

364.   Plaintiffs Carter and Kreb ("Plaintiffs," for purposes of the California claims) bring this claim on behalf of themselves and the California Subclass ("Subclass," for purposes of the California claims).

365.   California Business & Professions Code § 17500 states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means

whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

366.   FCA caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or through the exercise of reasonable care should have been known to FCA, to be untrue and misleading to consumers, including Plaintiffs and the Subclass Members.

367.   FCA concealed and/or failed to disclose the Fire Defect in the Class Vehicles, as well as true nature of the Class Vehicles, and its failure to adequately design and test the vehicles to ensure their safety from risk of a fire caused by the HV Battery as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

368.   FCA violated California Business & Professions Code § 17500 because its misrepresentations and omissions regarding the safety, reliability, and functionality of the Class Vehicles as plug-in hybrid electric vehicles as described herein were material, untrue, and misleading, and likely to deceive a reasonable consumer.

369.   FCA's concealed facts, omissions, and false or misleading representations to Plaintiffs and the Subclass Members, as alleged herein, are

material in that a reasonable consumer would have considered them important in decideing whether to purchase or lease the Class Vehicles or to pay a lesser price.

370.   Plaintiffs and the Subclass reasonably relied on FCA's false and misleading representations and omissions. Had Plaintiffs and the Subclass Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

371.   Plaintiffs and Subclass Members have suffered an injury in fact, including the loss of money or property, because of FCA's deceptive advertising. In purchasing or leasing their Class Vehicles, Plaintiffs and Subclass Members relied on FCA's misrepresentations and omissions regarding the safety, reliability, and functionality of the vehicles. FCA's representations and omissions were untrue because the Class Vehicles were sold or leased with a defective hybrid propulsion system. Had Plaintiffs and the Subclass Members known this, they would not have purchased or leased their Class Vehicles or paid as much for them. Accordingly, Plaintiffs and the Subclass Members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

372.   All the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of FCA's business. FCA's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in California and nationwide.

373.   Plaintiffs, individually and on behalf of the Subclass Members, request that this Court enter such orders or judgments as necessary to enjoin FCA from continuing its unlawful and deceptive advertising, to restore to Plaintiffs and the Subclass Members any money FCA acquired by its deceptive advertising, including restitution and restitutionary disgorgement, and for such other relief as is permitted.

374.   Plaintiffs and the Subclass Members lack an adequate remedy at law to recover or fully recover amounts and benefits subject to restitution pursuant to this cause of action and to obtain or fully obtain the requested injunctive relief pursuant to this cause of action.

375.   Plaintiffs, on behalf of themselves and the Class, further seek an award of attorneys' fees and costs under California Code of Civil Procedure § 1021.5.

**COUNT VIII**
**VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY**
**ACT FOR BREACH OF IMPLIED WARRANTY OF**
**MERCHANTABILITY UNDER CALIFORNIA LAW**
**(Cal. Civ. Code §§ 1791.1 & 1792)**
**(Alleged by Plaintiffs Carter and Kreb on behalf of the California Subclass)**

376.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 143 -

377.   Plaintiffs Carter and Kreb ("Plaintiffs," for purposes of the California claims) bring this claim on behalf of himself and the California Subclass ("Subclass," for purposes of the California claims).

378.   Plaintiffs and the Subclass Members are "buyers" within the meaning of California Civil Code § 1791(b).

379.   The Class Vehicles are "consumer goods" within the meaning of California Civil Code § 1791(a).

380.   FCA is the "manufacturer" of the Class Vehicles within the meaning of California Civil Code § 1791(j).

381.   FCA impliedly warranted to Plaintiffs and the Subclass that the Class Vehicles were "merchantable" within the meaning of California Civil Code §§ 1791.1(a) & 1792; however, the Class Vehicles do not have the quality that a buyer would reasonably expect, and were therefore not merchantable.

382.   California Civil Code § 1791.1(a) states:

> "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:
>
> (1)   Pass without objection in the trade under the contract description.
>
> (2)   Are fit for the ordinary purposes for which such goods are used.
>
> (3)   Are adequately contained, packaged, and labeled.

>(4)   Conform to the promises or affirmations of fact made on the container or label.

383.   The Class Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to combustion and pose an unreasonable risk of fires due to the Fire Defect as described herein. Without limitation, the Class Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of combustion, causing an unreasonable risk of death, serious bodily harm, and/or property damage to lessees and owners of the Class Vehicles as well as their homes, passengers, and bystanders. This defect renders the Class Vehicles when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries, not to drive the Class Vehicles in electric mode, and not to park the vehicles in the vicinity of their homes or other vehicles.

384.   FCA breached the implied warranty of merchantability by selling Class Vehicles containing defects leading to the sudden combustion of the vehicles during ordinary operating conditions, or while parked. This defect has deprived Plaintiffs and the Subclass Members of the benefit of their bargain.

385.   Notice of breach is not required because Plaintiffs and the Subclass did not purchase their automobiles directly from FCA. Regardless, Plaintiffs' counsel sent notification to FCA prior to filing this Complaint.

386.   Plaintiff and the other Subclass Members were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiff and Subclass Members.

387.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and the Subclass Members received goods whose dangerous condition now renders them at least partially inoperable and substantially impairs their value. Plaintiffs and the Subclass Members have been damaged as they overpaid for their vehicles, and now suffer the partial or complete loss of use of their Class Vehicles.

388.   Under California Civil Code §§ 1791.1(d) & 1794, Plaintiffs and the Subclass Members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

389.   Under California Civil Code § 1794, Plaintiffs and the Subclass Members are entitled to costs and attorneys' fees.

**COUNT IX**
**UNJUST ENRICHMENT**
**(COMMON LAW)**
**(Alleged by Plaintiffs Carter and Kreb on behalf of the California Subclass)**

390.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

391.   Plaintiffs Carter and Kreb ("Plaintiffs," for purposes of the California claims) bring this claim on behalf of himself and the California Subclass ("Subclass," for purposes of the California claims).

392.   Pursuant to Federal Rule of Civil Procedure 8(d)(2) and (3), Plaintiffs plead this claim separately and in the alternative to their claims for breach of implied warranty and violation of the Magnuson Moss Act because if Plaintiffs' claims for damages are dismissed or judgment is entered in favor of FCA, Plaintiffs and the Subclass will have no adequate legal remedy.

393.   FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the lithium-ion batteries that it installed in the Class Vehicles, but nevertheless marketed them for sale to consumers, and misled Plaintiffs and the Subclass Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

394.   FCA failed to adequately research, design, test, and manufacture the Class Vehicles before warranting, promoting, selling and distributing the Class Vehicles as suitable and safe for reasonably foreseeable uses.

395.   FCA concealed and/or failed to disclose the Fire Defect in the Class Vehicles, as well as true nature of the Class Vehicles, and its failure to adequately design and test the vehicles to ensure their safety from risk of a fire caused by the HV Battery as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

396.   At the expense of Plaintiffs and the Subclass Members, FCA received and retained a benefit from Plaintiffs and Subclass Members and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Class Vehicles to Plaintiffs and the Subclass Members for more than they were worth as a result of FCA's conduct.

397.   Plaintiffs and the Subclass Members would not have purchased or leased the Class Vehicles, or would have paid less for them, had they known of the Fire Defect at the time of purchase or lease. Therefore, FCA profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiffs and the Subclass.

398.   Plaintiffs and the Subclass conferred tangible and material economic benefits upon FCA when they purchased or leased the Class Vehicles.

399. FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

400. As a licensed distributor of new motor vehicles, FCA sells Class Vehicles to Plaintiffs and the Subclass through its numerous vehicle dealers across the United States. FCA therefore profits from sales of Class Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms.

401. Plaintiffs and the Subclass were not aware of the true facts about the Class Vehicles when they acquired them and did not benefit from FCA's conduct.

402. Plaintiffs and the Subclass are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return Plaintiffs and Subclass Members to the position they occupied prior to dealing with FCA, with such amounts to be determined at trial.

C.     **Colorado**

**COUNT X**
**BREACH OF IMPLIED WARRANTY OF**
**MERCHANTABILITY UNDER COLORADO LAW**
**(Colo. Rev. Stat. Ann. § 4-2-314)**
(**Alleged by Plaintiff Park on behalf of the Colorado Subclass**)

403.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

404.   Plaintiff Park ("Plaintiff," for purposes of the Colorado claims) brings this claim on behalf of herself and the Colorado Subclass ("Subclass," for the purposes of Colorado claims).

405.   FCA is a "merchant" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and a "seller" of motor vehicles under § 4-2-103(1)(d).

406.   Under Colorado law, an implied warranty of merchantability attaches to the Class Vehicles pursuant to Colo. Rev. Stat. §§ 4-2-314 and 4-2.5-212.

407.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles are all afflicted by the Fire Defect, which, among other things, makes the vehicles susceptible to battery combustion and poses an

unreasonable risk of death, serious bodily harm, and/or property damage to

Plaintiff and Subclass Members. This dangerous latent defect renders the Class

Vehicles unmerchantable and unfit for their ordinary use of driving.

408.    As a result of the Fire Defect, and per FCA's instructions, Plaintiff

and Subclass Members had to limit their use and/or charging of the Class Vehicles,

and they were unable to rely on their Class Vehicles to provide them with safe

transportation. Notably, FCA's recall notice instructed Plaintiff and Subclass

Members to refrain from charging their Class Vehicles or parking inside of

buildings or structures, which deprived Plaintiff and Subclass Members of using

their vehicles' hybrid electric driving features, regardless of whether they

experienced a battery fire.

409.    Plaintiff has had sufficient direct dealings with FCA, its authorized

dealers, or its agents to establish privity of contract with FCA. Nonetheless, privity

is not required here because Plaintiff and the Subclass are the intended third-party

beneficiaries of agreements between FCA and its dealers regarding sales and leases

of the Class Vehicles, including FCA's implied warranties. Furthermore, privity is

also not required because the Class Vehicles are inherently dangerous and

defective due to the Fire Defect, which presents a hidden and unreasonable risk of

death, serious bodily harm, and/or property damage to Plaintiff and Subclass

Members.

410.    It was reasonable to expect that Plaintiff and the Subclass would use, consume, or be affected by the Class Vehicles.

411.    FCA was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Class Vehicles by correspondence from Plaintiff's counsel to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, the filing of Plaintiffs' March 4, 2024 Complaint (ECF No. 1), and/or by the allegations contained in this Complaint.

412.    Alternatively, Plaintiff and Subclass Members were excused from providing FCA with notice and an opportunity to cure the breach of warranty because it would have been futile. FCA did not have a repair available when it announced the recall for the Fire Defect, and it still has not identified the root cause of the Fire Defect or provided an effective recall remedy to address the actual cause of the defect. As a result, Plaintiff and Subclass Members had no reason to believe that FCA would have repaired the Fire Defect if they presented their Class Vehicles to FCA for repair.

413.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the Subclass have been damaged in an amount to be determined at trial.

## COUNT XI
## VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT
### (C.R.S. § 6-1-101 *et seq.*)
### (Alleged by Plaintiff Park on behalf of the Colorado Subclass)

414.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

415.    Plaintiff Park ("Plaintiff," for purposes of the Colorado claims) brings this Colorado Consumer Protection Act ("CCPA") claim on behalf of herself and the Colorado Subclass ("Subclass," for purposes of the Colorado claims).

416.    The Class Vehicles are "goods" within the meaning of the CCPA.

417.    Plaintiff and the Subclass are "actual or potential consumers" with respect to FCA's Class Vehicles within the meaning of the CCPA.

418.    Plainitff and the Subclass have been injured as a result of FCA's deceptive trade practices with repect to the Class Vehicles.

419.    FCA has without limitation engaged in the following specifically-enumerated deceptive trade practices in violation of Colo. Rev. Stat. § 6-1-105:

(e) Either knowingly or recklessly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods, food, services, or property or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith;

(g) Represents that goods, food, services, or property are of a particular standard, quality, or grade, or that goods are of a particular style or model, if he knows or should know that they are of another;

(i) Advertises goods, services, or property with intent not to sell them as advertised;

(u) Fails to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction;

(rrr) Either knowingly or recklessly engages in any unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice;

420.   FCA's actions, as set forth above, occurred in the course of FCA's business, vocation, or occupation.

421.   In the course of its business, vocation, or occupation, FCA concealed and/or failed to disclose the Fire Defect in the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

422.   By failing to disclose and/or actively concealing the Fire Defect in the Class Vehicles, which it marketed as safe, reliable, of high quality, and fit for use as plug-in hybrid electric vehicles, FCA engaged in unfair and deceptive business practices in violation of the CCPA.

423.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the Fire Defect in the Class Vehicles.

424.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and Subclass Members, about the true safety and reliability of their vehicles.

425.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead Plaintiffs and the Subclass.

426.   Specifically, FCA concealed and/or failed to disclose the Fire Defect in the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

427.   By failing to disclose and/or actively concealing the Fire Defect in the Class Vehicles, which it marketed as safe, reliable, of high quality, and fit for use as plug-in hybrid electric vehicles, FCA engaged in unfair and deceptive acts or practices in violation of the CCPA.

428.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the defects in the Class Vehicles.

429.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and Subclass Members, about the true safety and reliability of their vehicles.

430.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead Plaintiffs and the Subclass.

431.   FCA knew or should have known that its conduct violated the IFCA.

432.   As alleged above, FCA made material statements about the safety and reliability of the Class Vehicles when operating as plug-in hybrid electric vehicles that were either false or misleading.

433.   FCA owed Plaintiff and the Subclass a duty to disclose the true safety and reliability of the Class Vehicles because FCA:

    a.   Possessed exclusive knowledge about the Fire Defect;

    b.   Intentionally concealed the foregoing from Plaintiff and the Subclass;

    c.   Made incomplete representations about the safety and reliability of the Class Vehicles, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations; and/or

    d.   Had duties under the TREAD Act and related regulations to disclose and fix the defect.

434.    Because FCA fraudulently concealed the Fire Defect, as well as the true nature of the Class Vehicles, Plaintiff and other Subclass Members were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Had Plaintiffs and the other Subclass Members been aware of the defect in their Class Vehicles, they would not have bought or leased the Class Vehicles or would have paid less for them.

435.    FCA's concealment of the defects in the Class Vehicles was material to Plaintiffs and the Subclass.

436.    Plaintiff and the Subclass suffered actual damages caused by FCA's misrepresentations and its concealment of and failure to disclose the Fire Defect. Had they known the truth about the Class Vehicles, Plaintiff and Subclass Members either would have paid less for the Class Vehicles or would not have purchased or leased them at all.

437.    FCA's violations present a continuing risk to Plaintiffs and the Subclass as well as to the general public. In particular and as alleged herein, FCA has yet to offer any effective remedy for the Class Vehicles. FCA's unlawful acts and practices complained of herein affect the public interest.

438.    As a direct and proximate result of FCA's violations of the CCPA, Plaintiff and the Subclass have suffered injury-in-fact and/or actual damage as alleged above.

439.    FCA knew or should have known that its conduct violated the CCPA.

440.    FCA's conduct was in bad faith within the meaning of the CCPA, entitling Plaintiff and the Subclass to treble damages.

441.    Plaintiff and the Subclass are entitled to actual damages, pre and post judgment interest, treble damages, as well as attorney's fees and costs, in addition to any other relief available under the CCPA or as determined by the Court.

**COUNT XII**
**UNJUST ENRICHMENT**
**(COMMON LAW)**
**(Alleged by Plaintiff Park on behalf of the Colorado Subclass)**

442.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

443.    Plaintiff Park ("Plaintiff," for purposes of the Colorado claims) brings this claim on behalf of herself and the Colorado Subclass ("Subclass," for purposes of the Colorado claims).

444.    Pursuant to Federal Rule of Civil Procedure 8(d)(2) and (3), Plaintiff pleads this claim separately and in the alternative to her claims for breach of implied warranty and violation of the Magnuson Moss Act because if Plaintiff's

claims for damages are dismissed or judgment is entered in favor of FCA, Plaintiff and the Subclass will have no adequate legal remedy.

445.   FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the lithium-ion batteries that it installed in the Class Vehicles, but nevertheless marketed them for sale to consumers, and misled Plaintiff and the Subclass Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

446.   FCA failed to adequately research, design, test, and manufacture the Class Vehicles before warranting, promoting, selling and distributing the Class Vehicles as suitable and safe for reasonably foreseeable uses.

447.   At the expense of Plaintiff and the Subclass Members, FCA received and retained a benefit from Plaintiff and Subclass Members and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Class Vehicles to Plaintiff and the Subclass Members for more than they were worth as a result of FCA's conduct.

448.   Plaintiff and the Subclass Members would not have purchased or leased the Class Vehicles, or would have paid less for them, had they known of the Fire Defect at the time of purchase or lease. Therefore, FCA profited from the sale

and lease of the Class Vehicles to the detriment and expense of Plaintiff and the Subclass.

449.   Thus, Plaintiff and the Subclass conferred tangible and material economic benefits upon FCA when they purchased or leased the Class Vehicles.

450.   FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

451.   As a licensed distributor of new motor vehicles, FCA sells Class Vehicles to Plaintiff and the Subclass through its numerous vehicle dealers across the United States. FCA therefore profits from sales of Class Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms.

452.   Plaintiff and the Subclass were not aware of the true facts about the Class Vehicles when they acquired them and did not benefit from FCA's conduct.

453.   Plaintiff and Subclass Members are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return Plaintiff and Subclass Members to the position they occupied prior to dealing with FCA, with such amounts to be determined at trial.

**D.     Florida**

**COUNT XIII**
**VIOLATION OF FLORIDA'S UNFAIR &**
**DECEPTIVE TRADE PRACTICES ACT**
**(Fla. Stat. § 501.201, *et seq.*)**
**(Alleged by Plaintiffs Vasquez and Perkal on behalf of the Florida Subclass)**

454.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

455.   Plaintiffs Vasquez and Perkal ("Plaintiffs," for purposes of the Florida claims) bring this claim on behalf of themselves and the Florida Subclass ("Subclass," for purposes of the Florida claims).

456.   Plaintiffs and the Subclass are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), Florida Statutes § 501.203(7).

457.   FCA engaged in "trade or commerce" within the meaning of Florida Statutes § 501.203(8).

458.   The FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …." Fla. Stat. § 501.204(1). By concealing the Fire Defect in the Class Vehicles, FCA participated in unfair and deceptive trade practices that violated the FUDTPA as described herein.

- 161 -

459.   FCA's actions, as set forth above, occurred in the conduct of trade or commerce.

460.   In the course of its business, FCA concealed and/or failed to disclose the Fire Defect in the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

461.   By failing to disclose and/or actively concealing the Fire Defect in the Class Vehicles, which it marketed as safe, reliable, of high quality, and fit for use as plug-in hybrid electric vehicles, FCA engaged in unfair and deceptive business practices in violation of the FUDTPA.

462.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the defects in the Class Vehicles.

463.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and Subclass Members, about the true safety and reliability of their vehicles.

464.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead Plaintiffs and the Subclass.

465.    FCA knew or should have known that its conduct violated the FUDTPA.

466.    As alleged above, FCA made material statements about the safety and reliability of the Class Vehicles when operating as plug-in hybrid electric vehicles that were either false or misleading.

467.    FCA owed Plaintiffs and the Subclass a duty to disclose the true safety and reliability of the Class Vehicles because FCA:

    a.    Possessed exclusive knowledge about the Fire Defect;

    b.    Intentionally concealed the foregoing from Plaintiffs and the Subclass;

    c.    Made incomplete representations about the safety and reliability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and fix the defect.

468.    Because FCA fraudulently concealed the Fire Defect, as well as the true nature of the Class Vehicles, Plaintiffs and Class Members were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Had Plaintiffs and the other Subclass Members been aware of the defect in their Class Vehicles, they would not have bought or leased the Class Vehicles or would have paid less for them.

469.    FCA's concealment of the defects in the Class Vehicles was material to Plaintiffs and the Subclass.

470.    Plaintiffs and the Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose the Fire Defect. Plaintiffs and Subclass Members either would have paid less for the Class Vehicles or would not have purchased or leased them at all.

471.    FCA's violations present a continuing risk to Plaintiffs and the Subclass as well as to the general public. In particular, and as alleged herein, FCA has yet to offer any effective remedy for the Class Vehicles. FCA's unlawful acts and practices complained of herein affect the public interest.

472.    As a direct and proximate result of FCA's violations of the FUDTPA, Plaintiffs and the Subclass have suffered injury-in-fact and/or actual damage as alleged above.

473.    Plaintiffs and the Subclass are entitled to recover their actual damages under Florida Statutes § 501.211(2) and attorneys' fees under Florida Statutes § 501.2105(1).

474.    Plaintiffs also seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FUDTPA.

## COUNT XIV
## BREACH OF IMPLIED WARRANTY OF
## MERCHANTABILITY UNDER FLORIDA LAW
## (Fla. Stat. § 672.314)
## (Alleged by Plaintiffs Vasquez and Perkal on behalf of the Florida Subclass)

475.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

476.   Plaintiffs Vasquez and Perkal ("Plaintiffs," for purposes of the Florida claims) brings this claim on behalf of themselves and the Florida Subclass ("Subclass," for purposes of the Florida claims).

477.   FCA is a "merchant" within the meaning of Florida Statutes § 672.104, and a "seller" of motor vehicles within the meaning of Florida Statutes § 672.103(d).

478.   Under Florida law, an implied warranty of merchantability attaches to the Class Vehicles. Fla. Stat. § 672.314.

479.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles are all afflicted by the Fire Defect, which, among other things, makes the vehicles susceptible to battery combustion and poses an unreasonable risk of death, serious bodily harm, and/or property damage to

Plaintiffs and Subclass Members. This dangerous latent defect renders the Class Vehicles unmerchantable and unfit for their ordinary use of driving.

480.   As a result of the Fire Defect, and per FCA's instructions, Plaintiffs and Subclass Members had to limit their use and/or charging of the Class Vehicles, and they were unable to rely on their Class Vehicles to provide them with safe transportation. Notably, FCA's recall notice instructed Plaintiffs and Subclass Members to refrain from charging their Class Vehicles or parking inside of buildings or structures, which deprived Plaintiffs and Subclass Members of using their vehicles' hybrid electric driving features, regardless of whether they experienced a battery fire.

481.   Plaintiffs have had sufficient direct dealings with FCA, its authorized dealers, or its agents to establish privity of contract with FCA. Nonetheless, privity is not required here because Plaintiffs and the Subclass are the intended third-party beneficiaries of agreements between FCA and its dealers regarding sales and leases of the Class Vehicles, including FCA's implied warranties. *See* Fla. Stat. § 672.318. Furthermore, privity is also not required because the Class Vehicles are inherently dangerous and defective due to the Fire Defect, which presents a hidden and unreasonable risk of death, serious bodily harm, and/or property damage to Plaintiffs and Subclass Members.

482.   It was reasonable to expect that Plaintiffs and the Subclass would use, consume, or be affected by the Class Vehicles.

483.   FCA was provided notice of these issues within a reasonable time of Plaintiffs' knowledge of the non-conforming or defective nature of the Class Vehicles by correspondence from Plaintiffs' counsel to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, the filing of Plaintiffs' March 4, 2024 Complaint (ECF No. 1), and/or by the allegations contained in this Complaint.

484.   Alternatively, Plaintiffs and Subclass Members were excused from providing FCA with notice and an opportunity to cure the breach of warranty because it would have been futile. FCA did not have a repair available when it announced the recall for the Fire Defect, and it still has not identified the root cause of the Fire Defect or provided an effective recall remedy to address the actual cause of the defect. As a result, Plaintiffs and Subclass Members had no reason to believe that FCA would have repaired the Fire Defect if they presented their Class Vehicles to FCA for repair.

485.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and Subclass Members have been damaged in an amount to be determined at trial.

**COUNT XV**
**UNJUST ENRICHMENT**
**(COMMON LAW)**
**(Alleged by Plaintiff Vasquez and Perkal on behalf of the Florida Subclass)**

486.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

487.   Plaintiffs Vasquez and Perkal ("Plaintiffs," for purposes of the Florida claims) bring this claim on behalf of themselves and the Florida Subclass ("Subclass," for purposes of the Florida claims).

488.   Pursuant to Federal Rule of Civil Procedure 8(d)(2) and (3), Plaintiffs plead this claim separately and in the alternative to their claims for breach of implied warranty and violation of the Magnuson Moss Act because if Plaintiffs' claims for damages are dismissed or judgment is entered in favor of FCA, Plaintiffs and the Subclass will have no adequate legal remedy.

489.   FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the lithium-ion batteries that it installed in the Class Vehicles, but nevertheless marketed them for sale to consumers, and misled Plaintiffs and the Subclass Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

490.   FCA failed to adequately research, design, test, and manufacture the Class Vehicles before warranting, promoting, selling and distributing the Class Vehicles as suitable and safe for reasonably foreseeable uses.

491.   At the expense of Plaintiffs and the Subclass Members, FCA received and retained a benefit from Plaintiffs and Subclass Members and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Class Vehicles to Plaintiffs and the Subclass Members for more than they were worth as a result of FCA's conduct.

492.   Plaintiffs and the Subclass Members would not have purchased or leased the Class Vehicles, or would have paid less for them, had they known of the Fire Defect at the time of purchase or lease. Therefore, FCA profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiffs and the Subclass.

493.   Thus, Plaintiffs and the Subclass conferred tangible and material economic benefits upon FCA when they purchased or leased the Class Vehicles.

494.   FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

495.   As a licensed distributor of new motor vehicles, FCA sells Class Vehicles to Plaintiffs and the subclass through its numerous vehicle dealers across the United States. FCA therefore profits from sales of Class Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms.

496.   Plaintiffs and the Subclass were not aware of the true facts about the Class Vehicles when they acquired them and did not benefit from FCA's conduct.

497.   Plaintiffs and Subclass Members are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return Plaintiffs and Subclass Members to the position they occupied prior to dealing with FCA, with such amounts to be determined at trial.

**E.     Illinois**

**COUNT XVI**
**BREACH OF IMPLIED WARRANTY OF**
**MERCHANTABILITY UNDER ILLINOIS LAW**
**(810 ILCS 5/2-314 and 5/2A-212)**
**(Alleged by Plaintiff Liakhova on behalf of the Illinois Subclass)**

498.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

499.   Plaintiff Liakhova ("Plaintiff," for purposes of the Illinois claims) brings this claim on behalf of herself and the Illinois Subclass ("Subclass," for the purposes of Illinois claims).

500.    FCA is a "merchant" with respect to motor vehicles under 810 ILCS 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under 5/2-103(1)(d).

501.    Under Illinois law, an implied warranty of merchantability attaches to the Class Vehicles pursuant to 810 ILCS 5/2-314 and 5/2A-212.

502.    The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles are all afflicted by the Fire Defect, which, among other things, makes the vehicles susceptible to battery combustion and poses an unreasonable risk of death, serious bodily harm, and/or property damage to Plaintiff and Subclass Members. This dangerous latent defect renders the Class Vehicles unmerchantable and unfit for their ordinary use of driving.

503.    Indeed, Plaintiff's Class Vehicle was totaled after the vehicle's HV Battery caught on fire while it was charging. Plaintiff therefore has been deprived of using her Class Vehicle as a result of the Fire Defect.

504.    Plaintiff has had sufficient direct dealings with FCA, its authorized dealers, or its agents to establish privity of contract with FCA. Nonetheless, privity is not required here because Plaintiff and the Subclass are the intended third-party beneficiaries of agreements between FCA and its dealers regarding sales and leases

of the Class Vehicles, including FCA's implied warranties. Furthermore, privity is also not required because the Class Vehicles are inherently dangerous and defective due to the Fire Defect, which presents a hidden and unreasonable risk of death, serious bodily harm, and/or property damage to Plaintiff and Subclass Members.

505.   It was reasonable to expect that Plaintiff and the Subclass would use, consume, or be affected by the Class Vehicles.

506.   FCA was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Class Vehicles by correspondence from Plaintiff's counsel to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, the filing of Plaintiffs' March 4, 2024 Complaint (ECF No. 1), and/or by the allegations contained in this Complaint.

507.   Alternatively, Plaintiff and Subclass Members were excused from providing FCA with notice and an opportunity to cure the breach of warranty because it would have been futile. FCA did not have a repair available when it announced the recall for the Fire Defect, and it still has not identified the root cause of the Fire Defect or provided an effective recall remedy to address the actual cause of the defect. As a result, Plaintiff and Subclass Members had no

reason to believe that FCA would have repaired the Fire Defect if they presented their Class Vehicles to FCA for repair.

508.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the Subclass have been damaged in an amount to be determined at trial.

## COUNT XVII
## VIOLATION OF THE ILLINOIS CONSUMER FRAUD ACT
### (815 ILCS § 505/1 *et seq.*)
### (Alleged by Plaintiff Liakhova on behalf of the Illinois Subclass)

509.    Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

510.    Plaintiff Nataliia Liakhova ("Plaintiff," for purposes of the Illinois claims) brings this Illinois Consumer Fraud Act ("ICFA") claim on behalf of herself and the Illinois Subclass ("Subclass," for purposes of the Illinois claims).

511.    FCA is a "person" as defined in 815 ILCS 505/1(c).

512.    Plaintiff and the Subclass are "consumers" as defined in 815 ILCS 505/1(e).

513.    The Class Vehicles are "merchandise" within the meaning of 815 ILCS 505/1(b).

514.    FCA's marketing, distribution, and sale of the Class Vehicles constitutes "trade" and "commerce" within the meaning of the 815 ILCS 505/1(f).

515.    The ICFA prohibits "unfair or deceptive acts or practices, including, but not limited to, the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

516.    FCA engaged in unfair or deceptive acts or practices within the meaning of the ICFA.

517.    In the course of its trade or commerce, FCA exhibited the "use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act," approved August 5, 1965 within the meaning of the IFCA. 815 ILCS 505/2.

518.    Specifically, FCA concealed and/or failed to disclose the Fire Defect in the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or

concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

519.   By failing to disclose and/or actively concealing the Fire Defect in the Class Vehicles, which it marketed as safe, reliable, of high quality, and fit for use as plug-in hybrid electric vehicles, FCA engaged in unfair and deceptive acts or practices in violation of the ICFA.

520.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the defects in the Class Vehicles.

521.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and Subclass Members, about the true safety and reliability of their vehicles.

522.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead Plaintiffs and the Subclass.

523.   FCA knew or should have known that its conduct violated the IFCA.

524.   As alleged above, FCA made material statements about the safety and reliability of the Class Vehicles when operating as plug-in hybrid electric vehicles that were either false or misleading.

525.   FCA owed Plaintiffs and the Subclass a duty to disclose the true safety and reliability of the Class Vehicles because FCA:

a.      Possessed exclusive knowledge about the Fire Defect;

b.      Intentionally concealed the foregoing from Plaintiffs and the Subclass;

c.      Made incomplete representations about the safety and reliability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations; and/or

d.      Had duties under the TREAD Act and related regulations to disclose and fix the defect.

526.   Because FCA fraudulently concealed the Fire Defect, as well as the true nature of the Class Vehicles, Plaintiffs and Class Members were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Had Plaintiffs and the other Subclass Members been aware of the defect in their Class Vehicles, they would not have bought or leased the Class Vehicles or would have paid less for them.

527.   FCA's concealment of the defects in the Class Vehicles was material to Plaintiffs and the Subclass.

528.   Plaintiffs and the Subclass suffered actual damages caused by FCA's misrepresentations and its concealment of and failure to disclose the Fire Defect. Had they known the truth about the Class Vehicles, Plaintiffs and Subclass Members either would have paid less for the Class Vehicles or would not have purchased or leased them at all.

529.    FCA's violations present a continuing risk to Plaintiffs and the Subclass as well as to the general public. In particular and as alleged herein, FCA has yet to offer any effective remedy for the Class Vehicles. FCA's unlawful acts and practices complained of herein affect the public interest.

530.    As a direct and proximate result of FCA's violations of the ICFA, Plaintiffs and the Subclass have suffered injury-in-fact and/or actual damage as alleged above.

531.    Pursuant to 815 ILCS 505/10a(a), Plaintiffs seek monetary relief against FCA in the amount of actual damages, as well as punitive damages because FCA acted with fraud and/or malice and/or was grossly negligent.

532.    Plaintiffs also seek an order enjoining FCA's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1 *et seq*.

**COUNT XVIII**
**UNJUST ENRICHMENT**
**(COMMON LAW)**
**(Alleged by Plaintiff Liakhova on behalf of the Illinois Subclass)**

533.    Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

534.    Plaintiff Nataliia Liakhova ("Plaintiff," for purposes of the Illinois claims) brings this claim on behalf of herself and the Illinois Subclass ("Subclass," for purposes of the Illinois claims).

- 177 -

535.   Pursuant to Federal Rule of Civil Procedure 8(d)(2) and (3), Plaintiff pleads this claim separately and in the alternative to her claims for breach of implied warranty and violation of the Magnuson Moss Act because if Plaintiff's claims for damages are dismissed or judgment is entered in favor of FCA, Plaintiff and the Subclass will have no adequate legal remedy.

536.   FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the lithium-ion batteries that it installed in the Class Vehicles, but nevertheless marketed them for sale to consumers, and misled Plaintiff and the Subclass Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

537.   FCA failed to adequately research, design, test, and manufacture the Class Vehicles before warranting, promoting, selling and distributing the Class Vehicles as suitable and safe for reasonably foreseeable uses.

538.   At the expense of Plaintiff and the Subclass Members, FCA received and retained a benefit from Plaintiff and Subclass Members and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Class Vehicles to Plaintiff and the Subclass Members for more than they were worth as a result of FCA's conduct.

539.    Plaintiff and the Subclass Members would not have purchased or leased the Class Vehicles, or would have paid less for them, had they known of the Fire Defect at the time of purchase or lease. Therefore, FCA profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiff and the Subclass.

540.    Thus, Plaintiff and the Subclass conferred tangible and material economic benefits upon FCA when they purchased or leased the Class Vehicles.

541.    FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

542.    As a licensed distributor of new motor vehicles, FCA sells Class Vehicles to Plaintiff and the subclass through its numerous vehicle dealers across the United States. FCA therefore profits from sales of Class Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms.

543.    Plaintiff and the Subclass were not aware of the true facts about the Class Vehicles when they acquired them and did not benefit from FCA's conduct.

544.    Plaintiff and Subclass Members are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return Plaintiff

and Subclass Members to the position they occupied prior to dealing with FCA,

with such amounts to be determined at trial.

**F.     New Jersey**

**COUNT XIX**
**VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT**
**(N.J. Stat. Ann. § 56:8-1,** *et seq.***)**
**(Alleged by Plaintiffs Jade and Christopher Wadleigh on behalf of the New**
**Jersey Subclass)**

545.   Plaintiffs reallege and incorporate by reference all paragraphs as
though fully set forth herein.

546.   Plaintiffs Jade and Christopher Wadleigh ("Plaintiffs," for purposes of
the New Jersey claims) bring this claim on behalf of themselves and the New
Jersey Subclass ("Subclass," for purposes of the New Jersey claims).

547.   FCA and Plaintiffs are and were "persons" within the meaning of
New Jersey Statutes Annotated § 56:8-1(d).

548.   FCA engaged in "sales" of "merchandise" within the meaning of New
Jersey Statutes Annotated § 56:8-1(c), (d).

549.   FCA's actions, as set forth above, occurred in the conduct of trade or
commerce.

550.   The New Jersey Consumer Fraud Act ("New Jersey CFA") makes
unlawful "[t]he act, use or employment by any person of any unconscionable
commercial practice, deception, fraud, false pretense, false promise,

- 180 -

misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. Ann. § 56:8-2. FCA engaged in unconscionable or deceptive acts or practices that violated the New Jersey CFA as described above and below and did so with the intent that Plaintiffs and the Subclass rely upon their acts, concealment, suppression or omissions.

551.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the defects in the Class Vehicles.

552.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Subclass, about the true safety and reliability of their vehicles.

553.   FCA misrepresented material facts regarding the Class Vehicles with the intent to mislead Plaintiffs and the Subclass.

554.   FCA knew or should have known that its conduct violated the New Jersey CFA.

555.   As alleged above, FCA made material statements about the safety and reliability of the Class Vehicles and their ability to operate as plug-in hybrid vehicles that were either false or misleading.

556.   FCA owed Plaintiffs and the Subclass a duty to disclose the true safety and reliability of the Class Vehicles because FCA:

a.   Possessed exclusive knowledge about the Fire Defect in the Class Vehicles;

b.   Intentionally concealed the foregoing from Plaintiffs and the Subclass;

c.   Made incomplete representations about the safety and reliability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations; and/or

d.   Had duties under the TREAD Act and related regulations to disclose and fix the defects well before it issued the confounding recall notice in 2023.

557.   Because FCA fraudulently concealed the Fire Defect, as well as the true nature of the Class Vehicles, Plaintiffs and the Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the known serious safety defect. Had Class Vehicle owners been aware of the defects in their vehicles, they would not have bought their vehicles or would have paid less for them.

558.   FCA's concealment of the defect in the Class Vehicles was material to Plaintiffs and the Subclass.

559.   Plaintiffs and the Subclass suffered ascertainable losses caused by FCA's misrepresentations and/or its concealment of and failure to disclose the Fire Defect.

560.   FCA's violations present a continuing risk to Plaintiffs and the Subclass as well as to the general public. In particular and as alleged herein, FCA's failure to provide a recall procedure leaves Class Vehicle owners facing three choices: follow FCA's instructions, if possible, at the great inconvenience of parking far from home and the expense and environmental impact of additional consumption of gasoline; ignore FCA's instructions and risk calamity; or sell the vehicles at a substantial loss as a result of FCA's conduct. FCA's unlawful acts and practices complained of herein affect the public interest.

561.   As a direct and proximate result of FCA's violations of the New Jersey CFA, Plaintiffs and the Subclass have suffered injury-in-fact and/or actual damage, as alleged above.

562.   Plaintiffs are entitled to recover legal and/or equitable relief including an order enjoining FCA's unlawful conduct, treble damages, costs and reasonable attorneys' fees pursuant to New Jersey Statutes Annotated § 56:8-19, and any other just and appropriate relief.

## COUNT XX
## BREACH OF IMPLIED WARRANTY OF
## MERCHANTABILITY UNDER NEW JERSEY LAW
## (N.J. Stat. Ann. § 12A:2-314)
**(Alleged by Plaintiffs Jade and Christopher Wadleigh on behalf of the New Jersey Subclass)**

563.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

564.   Plaintiffs Jade and Christopher Wadleigh ("Plaintiffs," for purposes of the New Jersey claims) bring this claim on behalf of themselves and the New Jersey Subclass ("Subclass," for purposes of the New Jersey claims).

565.   FCA is a "merchant" and "seller" of motor vehicles and the Class Vehicles are "goods" under New Jersey law. N.J. Stat. Ann. § 12A:2-104(1).

566.   Under New Jersey law, an implied warranty of merchantability attaches to the Class Vehicles pursuant to New Jersey Statutes Annotated § 12A:2-314.

567.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles are all afflicted by the Fire Defect, which, among other things, makes the vehicles susceptible to battery combustion and poses an unreasonable risk of death, serious bodily harm, and/or property damage to

Plaintiffs and Subclass Members. This dangerous latent defect renders the Class

Vehicles unmerchantable and unfit for their ordinary use of driving.

568.    As a result of the Fire Defect, and per FCA's instructions, Plaintiffs

and Subclass Members had to limit their use and/or charging of the Class Vehicles,

and they were unable to rely on their Class Vehicles to provide them with safe

transportation. Notably, FCA's recall notice instructed Plaintiffs and Subclass

Members to refrain from charging their Class Vehicles or parking inside of

buildings or structures, which deprived Plaintiffs and Subclass Members of using

their vehicles' hybrid electric driving features, regardless of whether they

experienced a battery fire.

569.    Plaintiffs have had sufficient direct dealings with FCA, its authorized

dealers, or its agents to establish privity of contract with FCA. Nonetheless, privity

is not required here because Plaintiffs and the Subclass are the intended third-party

beneficiaries of agreements between FCA and its dealers regarding sales and leases

of the Class Vehicles, including FCA's implied warranties. Furthermore, privity is

also not required because the Class Vehicles are inherently dangerous and

defective due to the Fire Defect, which presents a hidden and unreasonable risk of

death, serious bodily harm, and/or property damage to Plaintiffs and Subclass

Members.

570.   It was reasonable to expect that Plaintiffs and the Subclass would use, consume, or be affected by the Class Vehicles.

571.   FCA was provided notice of these issues within a reasonable time of Plaintiffs' knowledge of the non-conforming or defective nature of the Class Vehicles by correspondence from Plaintiffs' counsel to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, the filing of Plaintiffs' March 4, 2024 Complaint (ECF No. 1), and/or by the allegations contained in this Complaint.

572.   Alternatively, Plaintiffs and Subclass Members were excused from providing FCA with notice and an opportunity to cure the breach of warranty because it would have been futile. FCA did not have a repair available when it announced the recall for the Fire Defect, and it still has not identified the root cause of the Fire Defect or provided an effective recall remedy to address the actual cause of the defect. As a result, Plaintiffs and Subclass Members had no reason to believe that FCA would have repaired the Fire Defect if they presented their Class Vehicles to FCA for repair.

573.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and Subclass Members have been damaged in an amount to be determined at trial.

## COUNT XXI
## UNJUST ENRICHMENT
## (COMMON LAW)
### (Alleged by Plaintiffs Jade and Christopher Wadleigh on behalf of the New Jersey Subclass)

574.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

575.   Pursuant to Fed. R. Civ. P. 8(d)(2) and (3), Plaintiffs plead this claim in the alternative to claims for breach of implied warranty and violation of the Magnuson Moss Act to the extent necessary.

576.   Plaintiffs Jade and Christopher Wadleigh ("Plaintiffs," for purposes of the New Jersey claims) brings this claim on behalf of themselves and the New Jersey Subclass ("Subclass," for purposes of the New Jersey claims).

577.   FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the lithium-ion batteries that it installed in the Class Vehicles, but nevertheless marketed them for sale to consumers.

578.   FCA failed to adequately research, design, test, and manufacture the Class Vehicles before warranting, promoting, selling and distributing the Class Vehicles as suitable and safe for reasonably foreseeable uses.

579.    At the expense of Plaintiffs and the Subclass Members, FCA received and retained a benefit from Plaintiffs and Subclass Members and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Class Vehicles to Plaintiffs and the Subclass Members for more than they were worth as a result of FCA's conduct.

580.    Plaintiffs and Subclass Members overpaid for the Class Vehicles and have been forced to pay other costs. Plaintiffs and the Subclass Members did not intend to overpay for the Class Vehicles.

581.    Thus, Plaintiffs and the Subclass conferred a measurable benefit on FCA.

582.    FCA knowingly accepted the benefits of its unjust conduct.

583.    It is unjust for FCA to retain these benefits without paying for them.

584.    As a licensed distributor of new motor vehicles, FCA sells them to numerous vehicle dealers across the United States. On information and belief, FCA tracks and accounts for its revenue from each dealer for each model of vehicle it sells to its dealers, including the Class Vehicles. Similarly, FCA must track and record the production costs for each model of vehicle it manufactures and sells to its dealers. Therefore, FCA knew or reasonably should have known the additional profitability of the Class Vehicles it sold to its dealers, intending the Class

Vehicles would be sold to consumers like Plaintiffs and the other Class Members.

Accordingly, FCA knowingly accepted the benefits of its unjust conduct.

585.   Plaintiffs and the Subclass were not aware of the true facts about the

Class Vehicles and did not benefit from FCA's conduct.

586.   As a result of FCA's conduct, the amount of its unjust enrichment

should be determined in an amount according to proof.

**G.   North Carolina**

**COUNT XXII**
**VIOLATION OF NORTH CAROLINA UNFAIR AND**
**DECEPTIVE ACTS AND PRACTICES ACT**
**(N.C. Gen. State §§ 75-1.1, *et seq.*)**
**(Alleged by Plaintiff Perrera on behalf of the North Carolina Subclass)**

587.   Plaintiffs reallege and incorporate by reference all paragraphs as

though fully set forth herein.

588.   Plaintiff David Perrera ("Plaintiff," for purposes of the North Carolina

claims) brings this claim on behalf of himself and the North Carolina Subclass

("Subclass," for the purposes of the North Carolina claims).

589.   FCA engaged in "commerce" within the meaning of N.C. Gen. Stat.

§ 75-1.1(b).

590.   The North Carolina UDTPA broadly prohibits "unfair or deceptive

acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). In the

course of FCA's business, it willfully failed to disclose and actively concealed the

- 189 -

Fire Defect. Accordingly, FCA engaged in unfair and deceptive trade practices because its practices (1) have the capacity or tendency to deceive, (2) offend public policy, (3) are immoral, unethical, oppressive or unscrupulous, or (4) cause substantial injury to consumers.

591.    In purchasing or leasing the Class Vehicles, Plaintiff and the Subclass were deceived by FCA's failure to disclose the Fire Defect.

592.    Plaintiff and the Subclass reasonably relied upon FCA's material omissions and false misrepresentations. They had no way of knowing that FCA's representations were false and gravely misleading. As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiff and the Subclass did not, and could not, unravel FCA's deception on their own.

593.    FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

594.    FCA intentionally and knowingly failed to disclose and misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Subclass.

595.    FCA knew or should have known that its conduct violated the North Carolina UDTPA.

596.    FCA owed Plaintiff and the Subclass a duty to disclose the truth about its Class Vehicles because FCA:

      a.     Possessed exclusive knowledge of the Fire Defect;

      b.     Intentionally concealed the foregoing from Plaintiff; and/or

      c.     Made incomplete representations while purposefully withholding material facts from Plaintiff that contradicted these representations; and/or

      d.     Had duties under the TREAD Act and related regulations to disclose and fix the defects well before it issued the confounding recall notice in 2023.

597.   FCA had a duty to disclose the Fire Defect, because, having volunteered to provide information to Plaintiff, FCA had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiff and the Subclass relied on FCA's material omissions and representations that the Class Vehicles they were purchasing were safe and free from defects.

598.   Plaintiff and the Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Class Vehicles manufactured by FCA, would have paid less, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff and the Subclass's actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiff.

599.   FCA's conduct proximately caused injuries to Plaintiff and the Subclass.

600.   Plaintiff and the Subclass were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiff and the Subclass overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

601.   FCA's violations present a continuing risk to Plaintiff and the Subclass as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

602.   Plaintiff and the Subclass seek an order for treble their actual damages, costs of Court, attorneys' fees, and any other just and proper relief available under the North Carolina Act, N.C. Gen. Stat. § 75-16.

603.   Plaintiff and the Subclass also seek punitive damages against FCA because FCA's conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith.

## COUNT XXIII
## BREACH OF IMPLIED WARRANTY OF
## MERCHANTABILITY UNDER NORTH CAROLINA LAW
## (N.C. Gen. Stat. §§ 25-2-314 and 25-2A-212)
## (Alleged by Plaintiff Perrera on Behalf of the North Carolina Subclass)

604.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

605.    Plaintiff David Perrera ("Plaintiff," for purposes of the North Carolina claims) brings this claim on behalf of himself and the North Carolina Subclass ("Subclass," for the purposes of the North Carolina claims).

606.    FCA is a "merchant" of the Class Vehicles within the meaning of N.C. Gen. Stat. § 25-2-104 (1), and the Class Vehicles are "goods" under N.C. Gen. Stat. § 25-2A-103(1)(h). With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under N.C. Gen. Stat. § 25-2A-103(1)(p).

607.    Under North Carolina law, an implied warranty of merchantability attaches to the Class Vehicles pursuant to N.C. Gen. Stat. §§ 25-2-314 and 25-2A-212.

608.    The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used.

Specifically, the Class Vehicles are all afflicted by the Fire Defect, which, among other things, makes the vehicles susceptible to battery combustion and poses an unreasonable risk of death, serious bodily harm, and/or property damage to Plaintiff and Subclass Members. This dangerous latent defect renders the Class Vehicles unmerchantable and unfit for their ordinary use of driving.

609.   As a result of the Fire Defect, and per FCA's instructions, Plaintiff and Subclass Members had to limit their use and/or charging of the Class Vehicles, and they were unable to rely on their Class Vehicles to provide them with safe transportation. Notably, FCA's recall notice instructed Plaintiff and Subclass Members to refrain from charging their Class Vehicles or parking inside of buildings or structures, which deprived Plaintiff and Subclass Members of using their vehicles' hybrid electric driving features, regardless of whether they experienced a battery fire.

610.   Plaintiff has had sufficient direct dealings with FCA, its authorized dealers, or its agents to establish privity of contract with FCA. Nonetheless, privity is not required here because Plaintiff and the Subclass are the intended third-party beneficiaries of agreements between FCA and its dealers regarding sales and leases of the Class Vehicles, including FCA's implied warranties. Furthermore, privity is also not required because the Class Vehicles are inherently dangerous and defective due to the Fire Defect, which presents a hidden and unreasonable risk of

death, serious bodily harm, and/or property damage to Plaintiff and Subclass Members.

611.   It was reasonable to expect that Plaintiff and the Subclass would use, consume, or be affected by the Class Vehicles.

612.   FCA was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Class Vehicles by correspondence from Plaintiff's counsel to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, the filing of Plaintiffs' March 4, 2024 Complaint (ECF No. 1), and/or by the allegations contained in this Complaint.

613.   Alternatively, Plaintiff and Subclass Members were excused from providing FCA with notice and an opportunity to cure the breach of warranty because it would have been futile. FCA did not have a repair available when it announced the recall for the Fire Defect, and it still has not identified the root cause of the Fire Defect or provided an effective recall remedy to address the actual cause of the defect. As a result, Plaintiff and Subclass Members had no reason to believe that FCA would have repaired the Fire Defect if they presented their Class Vehicles to FCA for repair.

614.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the Subclass have been damaged in an amount to be determined at trial.

**COUNT XXIV**
**UNJUST ENRICHMENT**
**(COMMON LAW)**
**(Alleged by Plaintiff Perrera on behalf of the North Carolina Subclass)**

615.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

616.   Plaintiff David Perrera ("Plaintiff," for purposes of the North Carolina claims) brings this claim on behalf of himself and the North Carolina Subclass ("Subclass," for the purposes of the North Carolina claims).

617.   Pursuant to Federal Rule of Civil Procedure 8(d)(2) and (3), Plaintiff pleads this claim separately and in the alternative to her claims for breach of implied warranty and violation of the Magnuson Moss Act because if Plaintiff's claims for damages are dismissed or judgment is entered in favor of FCA, Plaintiff and the Subclass will have no adequate legal remedy.

618.   FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the lithium-ion batteries that it installed in the Class Vehicles, but nevertheless marketed them for sale to

consumers, and misled Plaintiff and the Subclass Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

619.   FCA failed to adequately research, design, test, and manufacture the Class Vehicles before warranting, promoting, selling and distributing the Class Vehicles as suitable and safe for reasonably foreseeable uses.

620.   At the expense of Plaintiff and the Subclass Members, FCA received and retained a benefit from Plaintiff and Subclass Members and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Class Vehicles to Plaintiff and the Subclass Members for more than they were worth as a result of FCA's conduct.

621.   Plaintiff and the Subclass Members would not have purchased or leased the Class Vehicles, or would have paid less for them, had they known of the Fire Defect at the time of purchase or lease. Therefore, FCA profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiff and the Subclass.

622.   Thus, Plaintiff and the Subclass conferred tangible and material economic benefits upon FCA when they purchased or leased the Class Vehicles.

623.   FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the

expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

624. As a licensed distributor of new motor vehicles, FCA sells Class Vehicles to Plaintiff and the subclass through its numerous vehicle dealers across the United States. FCA therefore profits from sales of Class Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms.

625. Plaintiff and the Subclass were not aware of the true facts about the Class Vehicles when they acquired them and did not benefit from FCA's conduct.

626. Plaintiff and Subclass Members are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return Plaintiff and Subclass Members to the position they occupied prior to dealing with FCA, with such amounts to be determined at trial.

**H.    Oklahoma**

**COUNT XXV**
**BREACH OF IMPLIED WARRANTY OF**
**MERCHANTABILITY UNDER OKLAHOMA LAW**
**(Okla. Stat. Ann. tit. 12A, §§ 2-314 and 2A-212)**
**(Alleged by Plaintiff May on behalf of the Oklahoma Subclass)**

627. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

628.   Plaintiff May ("Plaintiff," for purposes of the Oklahoma claims) brings this claim on behalf of herself and the Oklahoma Subclass ("Subclass," for the purposes of Oklahoma claims).

629.   FCA is a "merchant" with respect to motor vehicles under Okla. Stat. Ann. tit. 12A, §§ 2-104(1) and 2A-103(3), and a "seller" of motor vehicles under § 2-103(1)(c).

630.   Under Oklahoma law, an implied warranty of merchantability attaches to the Class Vehicles pursuant to Okla. Stat. Ann. tit. 12A, §§ 2-314 and 2A-212.

631.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles are all afflicted by the Fire Defect, which, among other things, makes the vehicles susceptible to battery combustion and poses an unreasonable risk of death, serious bodily harm, and/or property damage to Plaintiff and Subclass Members. This dangerous latent defect renders the Class Vehicles unmerchantable and unfit for their ordinary use of driving.

632.   As a result of the Fire Defect, and per FCA's instructions, Plaintiff and Subclass Members had to limit their use and/or charging of the Class Vehicles, and they were unable to rely on their Class Vehicles to provide them with safe

transportation. Notably, FCA's recall notice instructed Plaintiff and Subclass Members to refrain from charging their Class Vehicles or parking inside of buildings or structures, which deprived Plaintiff and Subclass Members of using their vehicles' hybrid electric driving features, regardless of whether they experienced a battery fire.

633.   Plaintiff has had sufficient direct dealings with FCA, its authorized dealers, or its agents to establish privity of contract with FCA. Nonetheless, privity is not required here because Plaintiff and the Subclass are the intended third-party beneficiaries of agreements between FCA and its dealers regarding sales and leases of the Class Vehicles, including FCA's implied warranties. Furthermore, privity is also not required because the Class Vehicles are inherently dangerous and defective due to the Fire Defect, which presents a hidden and unreasonable risk of death, serious bodily harm, and/or property damage to Plaintiff and Subclass Members.

634.   It was reasonable to expect that Plaintiff and the Subclass would use, consume, or be affected by the Class Vehicles.

635.   FCA was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Class Vehicles by correspondence from Plaintiff's counsel to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, the filing of

Plaintiffs' March 4, 2024 Complaint (ECF No. 1), and/or by the allegations contained in this Complaint.

636.   Alternatively, Plaintiff and Subclass Members were excused from providing FCA with notice and an opportunity to cure the breach of warranty because it would have been futile. FCA did not have a repair available when it announced the recall for the Fire Defect, and it still has not identified the root cause of the Fire Defect or provided an effective recall remedy to address the actual cause of the defect. As a result, Plaintiff and Subclass Members had no reason to believe that FCA would have repaired the Fire Defect if they presented their Class Vehicles to FCA for repair.

637.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the Subclass have been damaged in an amount to be determined at trial.

## COUNT XXVI
## VIOLATION OF THE OKLAHOMA CONSUMER PROTECTION ACT
### (Okla. Stat. Ann. Tit. 15 § 751 *et seq*.)
### (Alleged by Plaintiff May on behalf of the Oklahoma Subclass)

638.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

639.   Plaintiff May ("Plaintiff," for purposes of the Oklahoma claims) brings this claim on behalf of herself and the Oklahoma Subclass ("Subclass," for the purposes of Oklahoma claims).

640.    Plaintiff and Subclass are consumers within the meaning of the

Oklahoma Consumer Protection Act ("OCPA").

641.    FCA is and was engaged in "consumer transactions" within the

meaning of Okla. Stat. tit. 15, § 752(2).

642.    Plaintiff and the Subclasses purchases and leases of the Class Vehicles

are consumer transactions within the meaning of the OCPA.

643.    Defendant FCA committed deceptive and/or unfair trade practices in

connection with its marketing, distribution, and sale of the Class Vehicles as

defined in 15 Okla. Stat. §§ 752(13) & (14) & 753(21).

644.    FCA likewise violated without limitation the following specific

prohibitions as set forth in 15 Okla. Stat. § 753:

- (5) [Making] a false representation, knowingly or with reason to know, as to the characteristics, ingredients, uses, benefits, alterations, or quantities of the subject of a consumer transaction;
- (7) Represent[ing], knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another;
- (9) Advertis[ing], knowingly or with reason to know, the subject of a consumer transaction with intent not to sell it as advertised;

645.    Defendant's violations of the OCPA occurred in the course of

Defendant's business.

646.    Specifically, FCA concealed and/or failed to disclose the Fire Defect

in the Class Vehicles as described herein and otherwise engaged in activities with a

tendency or capacity to deceive. FCA also engaged in unlawful trade practices by

employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

647.   By failing to disclose and/or actively concealing the Fire Defect in the Class Vehicles, which it marketed as safe, reliable, of high quality, and fit for use as plug-in hybrid electric vehicles, FCA engaged in unfair and deceptive acts or practices in violation of the OCPA.

648.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the defects in the Class Vehicles.

649.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Subclass Members, about the true safety and reliability of their vehicles.

650.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead Plaintiff and the Subclass.

651.   FCA knew or should have known that its conduct violated the OCPA.

652.   As alleged above, FCA made material statements about the safety and reliability of the Class Vehicles when operating as plug-in hybrid electric vehicles that were either false or misleading.

653.   FCA owed Plaintiff and the Subclass a duty to disclose the true safety and reliability of the Class Vehicles because FCA:

a.   Possessed exclusive knowledge about the Fire Defect;

b.   Intentionally concealed the foregoing from Plaintiffs and the Subclass;

c.   Made incomplete representations about the safety and reliability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations; and/or

d.   Had duties under the TREAD Act and related regulations to disclose and fix the defect.

654.   Because FCA fraudulently concealed the Fire Defect, as well as the true nature of the Class Vehicles, Plaintiff and Class Members were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Had Plaintiff and the other Subclass Members been aware of the defect in their Class Vehicles, they would not have bought or leased the Class Vehicles or would have paid less for them.

655.   FCA's concealment of the defects in the Class Vehicles was material to Plaintiff and the Subclass.

656.   Plaintiff and the Subclass suffered actual damages caused by FCA's misrepresentations and its concealment of and failure to disclose the Fire Defect. Had they known the truth about the Class Vehicles, Plaintiff and Subclass

Members either would have paid less for the Class Vehicles or would not have purchased or leased them at all.

657.   FCA's violations present a continuing risk to Plaintiffs and the Subclass as well as to the general public. In particular and as alleged herein, FCA has yet to offer any effective remedy for the Class Vehicles. FCA's unlawful acts and practices complained of herein affect the public interest.

658.   As a direct and proximate result of FCA's violations of the OCPA, Plaintiff and the Subclass have suffered injury-in-fact and/or actual damage as alleged above.

659.   Defendants violations of the OCPA are unconscionable pursuant to 15 Okla. Stat. §761.1(B).

660.   Plaintiff and the Subclass's damages were caused by Defendant's unlawful practices amounting to violations of the OCPA.

661.   Plaintiff seeks on behalf of herself and Subclass Members all available damages, civil penalties, and attorney's fees and costs pursuant to 15 Okla. Stat. § 761.1(A) and (B), as well as any other relief the Court deems proper.

**COUNT XXVII**
**UNJUST ENRICHMENT**
**(Common Law)**
**(Alleged by Plaintiff May on behalf of the Oklahoma Subclass)**

662.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

663.    Plaintiff May ("Plaintiff," for purposes of the Oklahoma claims) brings this claim on behalf of herself and the Oklahoma Subclass ("Subclass," for the purposes of Oklahoma claims).

664.    Pursuant to Federal Rule of Civil Procedure 8(d)(2) and (3), Plaintiff pleads this claim separately and in the alternative to her claims for breach of implied warranty and violation of the Magnuson Moss Act because if Plaintiff's claims for damages are dismissed or judgment is entered in favor of FCA, Plaintiff and the Subclass will have no adequate legal remedy.

665.    FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the lithium-ion batteries that it installed in the Class Vehicles, but nevertheless marketed them for sale to consumers, and misled Plaintiff and the Subclass Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

666.    FCA failed to adequately research, design, test, and manufacture the Class Vehicles before warranting, promoting, selling and distributing the Class Vehicles as suitable and safe for reasonably foreseeable uses.

667.    At the expense of Plaintiff and the Subclass Members, FCA received and retained a benefit from Plaintiff and Subclass Members and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Class Vehicles

to Plaintiff and the Subclass Members for more than they were worth as a result of FCA's conduct.

668.   Plaintiff and the Subclass Members would not have purchased or leased the Class Vehicles, or would have paid less for them, had they known of the Fire Defect at the time of purchase or lease. Therefore, FCA profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiff and the Subclass.

669.   Thus, Plaintiff and the Subclass conferred tangible and material economic benefits upon FCA when they purchased or leased the Class Vehicles.

670.   FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

671.   As a licensed distributor of new motor vehicles, FCA sells Class Vehicles to Plaintiff and the subclass through its numerous vehicle dealers across the United States. FCA therefore profits from sales of Class Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms.

672.   Plaintiff and the Subclass were not aware of the true facts about the Class Vehicles when they acquired them and did not benefit from FCA's conduct.

673.   Plaintiff and Subclass Members are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return Plaintiff and Subclass Members to the position they occupied prior to dealing with FCA, with such amounts to be determined at trial.

## I.   Pennsylvania

**COUNT XXVIII**
**VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES**
**AND CONSUMER PROTECTION LAW**
**(73 Pa. Cons. Stat. § 201-1, *et seq*.)**
**(Alleged by Plaintiff Berns on behalf of the Pennsylvania Subclass)**

674.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

675.   Plaintiff Berns ("Plaintiff," for purposes of the Pennsylvania claims) brings this claim on behalf of himself and the Pennsylvania Subclass ("Subclass," for the purposes of Pennsylvania claims).

676.   Plaintiff purchased or leased his Class Vehicle primarily for personal, family, or household purposes within the meaning of 73 P.S. § 201-9.2.

677.   All of the acts complained of herein were perpetrated by FCA in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

678.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have … characteristics, ….

Benefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another;" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

679.   FCA engaged in unlawful trade practices, including representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard and quality when they are not; advertising Class Vehicles with the intent not to sell them as advertised; and engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

680.   In purchasing or leasing the Class Vehicles, Plaintiff and the Subclass were deceived by FCA's failure to disclose the Fire Defect.

681.   Plaintiff and the Subclass reasonably relied upon FCA's material omissions and false misrepresentations. They had no way of knowing that FCA's representations were false and gravely misleading. Plaintiff and the Subclass did not, and could not, unravel FCA's deception on their own.

682.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

683.   FCA intentionally and knowingly failed to disclose and
misrepresented material facts regarding the Class Vehicles with an intent to
mislead Plaintiff and the Subclass.

684.   FCA knew or should have known that its conduct violated the
Pennsylvania CPL.

685.   FCA owed Plaintiff and the Subclass a duty to disclose the truth about
its Class Vehicles because FCA:

> a.   Possessed exclusive knowledge of the Fire Defect;
>
> b.   Intentionally concealed the foregoing from Plaintiff and the Subclass;
>
> c.   Made incomplete representations while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations; and/or
>
> d.   Had duties under the TREAD Act and related regulations to disclose and fix the defects.

686.   FCA had a duty to disclose the Fire Defect, because, having
volunteered to provide information to Plaintiff and the Subclass, FCA had the duty
to disclose not just the partial truth, but the entire truth. Further, Plaintiff and the
Subclass relied on FCA's material omissions and representations that the Class
Vehicles they were purchasing were safe and free from serious safety defects.

687.   Plaintiff and the Subclass were unaware of the omitted material facts
referenced herein, and they would not have acted as they did if they had known of
the concealed and/or suppressed facts, in that they would not have purchased the

Class Vehicles manufactured by FCA, would have paid less, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and the Subclass Members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, or to Plaintiff and the Subclass.

688.   FCA's conduct proximately caused injuries to Plaintiff and the Subclass.

689.   Plaintiff and the Subclass were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiff and the Subclass overpaid for their Class Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

690.   FCA is liable to Plaintiff and the Subclass for treble their actual damages or $100 each, whichever is greater, and attorneys' fees and costs. 73 P.S. § 201-9.2(a). Plaintiff is also entitled to an award of punitive damages given that FCA's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## COUNT XXIX
## BREACH OF IMPLIED WARRANTY OF
## MERCHANTABILITY UNDER PENNSYLVANIA LAW
## (13 Pa. Cons. Stat. Ann. §§ 2314 and 2A212)
### (Alleged by Plaintiff Berns on behalf of the Pennsylvania Subclass)

691.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

692.   Plaintiff Berns ("Plaintiff," for purposes of the Pennsylvania claims) brings this claim on behalf of himself and the Pennsylvania Subclass ("Subclass," for the purposes of Pennsylvania claims).

693.   FCA is a "merchant" with respect to motor vehicles under 13 Pa. Cons. Stat. Ann. §§ 2104 and 2A103(c), and "sellers" of motor vehicles under § 2103(a).

694.   Under Pennsylvania law, an implied warranty of merchantability attaches to the Class Vehicles pursuant to 13 Pa. Cons. Stat. Ann. §§ 2314 and 2A212.

695.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles are all afflicted by the Fire Defect, which, among other things, makes the vehicles susceptible to battery combustion and poses an

unreasonable risk of death, serious bodily harm, and/or property damage to Plaintiff and Subclass Members. This dangerous latent defect renders the Class Vehicles unmerchantable and unfit for their ordinary use of driving.

696.   As a result of the Fire Defect, and per FCA's instructions, Plaintiff and Subclass Members had to limit their use and/or charging of the Class Vehicles, and they were unable to rely on their Class Vehicles to provide them with safe transportation. Notably, FCA's recall notice instructed Plaintiff and Subclass Members to refrain from charging their Class Vehicles or parking inside of buildings or structures, which deprived Plaintiff and Subclass Members of using their vehicles' hybrid electric driving features, regardless of whether they experienced a battery fire.

697.   Plaintiff has had sufficient direct dealings with FCA, its authorized dealers, or its agents to establish privity of contract with FCA. Nonetheless, privity is not required here because Plaintiff and the Subclass are the intended third-party beneficiaries of agreements between FCA and its dealers regarding sales and leases of the Class Vehicles, including FCA's implied warranties. Furthermore, privity is also not required because the Class Vehicles are inherently dangerous and defective due to the Fire Defect, which presents a hidden and unreasonable risk of death, serious bodily harm, and/or property damage to Plaintiff and Subclass Members.

698.   It was reasonable to expect that Plaintiff and the Subclass would use, consume, or be affected by the Class Vehicles.

699.   FCA was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Class Vehicles by correspondence from Plaintiff's counsel to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, the filing of Plaintiffs' March 4, 2024 Complaint (ECF No. 1), and/or by the allegations contained in this Complaint.

700.   Alternatively, Plaintiff and Subclass Members were excused from providing FCA with notice and an opportunity to cure the breach of warranty because it would have been futile. FCA did not have a repair available when it announced the recall for the Fire Defect, and it still has not identified the root cause of the Fire Defect or provided an effective recall remedy to address the actual cause of the defect. As a result, Plaintiff and Subclass Members had no reason to believe that FCA would have repaired the Fire Defect if they presented their Class Vehicles to FCA for repair.

701.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the Subclass have been damaged in an amount to be determined at trial.

**COUNT XXX**
**UNJUST ENRICHMENT**
**(COMMON LAW)**
**(Alleged by Plaintiff Berns on behalf of the Pennsylvania Subclass)**

702.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

703.   Plaintiff Berns ("Plaintiff," for purposes of the Pennsylvania claims) brings this claim on behalf of himself and the Pennsylvania Subclass ("Subclass," for the purposes of Pennsylvania claims).

704.   Pursuant to Federal Rule of Civil Procedure 8(d)(2) and (3), Plaintiff pleads this claim separately and in the alternative to her claims for breach of implied warranty and violation of the Magnuson Moss Act because if Plaintiff's claims for damages are dismissed or judgment is entered in favor of FCA, Plaintiff and the Subclass will have no adequate legal remedy.

705.   FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the lithium-ion batteries that it installed in the Class Vehicles, but nevertheless marketed them for sale to consumers, and misled Plaintiff and the Subclass Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

706.   FCA failed to adequately research, design, test, and manufacture the Class Vehicles before warranting, promoting, selling and distributing the Class Vehicles as suitable and safe for reasonably foreseeable uses.

707.   At the expense of Plaintiff and the Subclass Members, FCA received and retained a benefit from Plaintiff and Subclass Members and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Class Vehicles to Plaintiff and the Subclass Members for more than they were worth as a result of FCA's conduct.

708.   Plaintiff and the Subclass Members would not have purchased or leased the Class Vehicles, or would have paid less for them, had they known of the Fire Defect at the time of purchase or lease. Therefore, FCA profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiff and the Subclass.

709.   Thus, Plaintiff and the Subclass conferred tangible and material economic benefits upon FCA when they purchased or leased the Class Vehicles.

710.   FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

711.   As a licensed distributor of new motor vehicles, FCA sells Class Vehicles to Plaintiff and the subclass through its numerous vehicle dealers across the United States. FCA therefore profits from sales of Class Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms.

712.   Plaintiff and the Subclass were not aware of the true facts about the Class Vehicles when they acquired them and did not benefit from FCA's conduct.

713.   Plaintiff and Subclass Members are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return Plaintiff and Subclass Members to the position they occupied prior to dealing with FCA, with such amounts to be determined at trial.

**J.    Texas**

**COUNT XXXI**
**BREACH OF THE IMPLIED WARRANTY OF**
**MERCHANTABILITY UNDER TEXAS LAW**
**(Tex. Bus. & Com. Code § 2.314)**
**(Alleged by Plaintiff Liscano on behalf of the Texas Subclass)**

714.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

715.   Plaintiff Liscano ("Plaintiff," for purposes of the Texas claims) brings this claim on behalf of himself and the Texas Subclass ("Subclass" for the purposes of the Texas claims).

716.   FCA was and is a merchant with respect to motor vehicles under Texas Business and Commerce Code § 2.104.

717.   Under Texas Business and Commerce Code § 2.314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and the Subclass purchased or leased their Class Vehicles.

718.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles are all afflicted by the Fire Defect, which, among other things, makes the vehicles susceptible to battery combustion and poses an unreasonable risk of death, serious bodily harm, and/or property damage to Plaintiff and Subclass Members. This dangerous latent defect renders the Class Vehicles unmerchantable and unfit for their ordinary use of driving.

719.   As a result of the Fire Defect, and per FCA's instructions, Plaintiff and Subclass Members had to limit their use and/or charging of the Class Vehicles, and they were unable to rely on their Class Vehicles to provide them with safe transportation. Notably, FCA's recall notice instructed Plaintiff and Subclass Members to refrain from charging their Class Vehicles or parking inside of

buildings or structures, which deprived Plaintiff and Subclass Members of using their vehicles' hybrid electric driving features, regardless of whether they experienced a battery fire.

720.   Plaintiff has had sufficient direct dealings with FCA, its authorized dealers, or its agents to establish privity of contract with FCA. Nonetheless, privity is not required here because Plaintiff and the Subclass are the intended third-party beneficiaries of agreements between FCA and its dealers regarding sales and leases of the Class Vehicles, including FCA's implied warranties. Furthermore, privity is also not required because the Class Vehicles are inherently dangerous and defective due to the Fire Defect, which presents a hidden and unreasonable risk of death, serious bodily harm, and/or property damage to Plaintiff and Subclass Members.

721.   It was reasonable to expect that Plaintiff and the Subclass would use, consume, or be affected by the Class Vehicles.

722.   FCA was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Class Vehicles by correspondence from Plaintiff's counsel to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, the filing of Plaintiffs' March 4, 2024 Complaint (ECF No. 1), and/or by the allegations contained in this Complaint.

723.   Alternatively, Plaintiff and Subclass Members were excused from providing FCA with notice and an opportunity to cure the breach of warranty because it would have been futile. FCA did not have a repair available when it announced the recall for the Fire Defect, and it still has not identified the root cause of the Fire Defect or provided an effective recall remedy to address the actual cause of the defect. As a result, Plaintiff and Subclass Members had no reason to believe that FCA would have repaired the Fire Defect if they presented their Class Vehicles to FCA for repair.

724.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the Subclass have been damaged in an amount to be determined at trial.

## COUNT XXXII
### Violations of the Texas Deceptive Trade Practices Act
### Tex. Bus. & Com. Code §§ 17.41, *et seq*.
### (Alleged by Plainitff Liscano on behalf of the Texas Subclass)

725.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

726.   Plaintiff Liscano ("Plaintiff," for purposes of the Texas claims) brings this Texas Deceptive Trade Practices Act claim on behalf of himself and the Texas Subclass ("Subclass" for the purposes of the Texas claims).

727.   Plaintiffs and the Subclass Members are "Consumers" pursuant to the Texas Deceptive Trade Practices Act ("DTAP"), Tex. Bus. & Com. Code §

17.45(4), as they sought to acquire goods by purchase or lease, namely the Class

Vehicle Jeep Wrangler 4xe. Defendant is a proper defendant under the DTPA.

728.   The Class Vehicles are "Goods" as defined by the DTPA. Tex. Bus. &

Com. Code § 17.45(1).

729.   Defendant FCA violated the DTPA in multiple ways, including

without limitation: (i) breaching express and/or implied warranties; (ii) engaging in

a course of unconscionable conduct or course of conduct; and (iii) using or

employing the following false, misleading, or deceptive acts and practices

enumerated under Tex. Bus. & Com. Code § 17.46(b):

> (5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not;

> (7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

> (9) advertising goods or services with intent not to sell them as advertised;

> (24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

730.   Specifically, Defendant FCA has breached the implied warranties of

merchantability by marketing, advertising, distributing and/or selling the Class

Vehicles, which are not fit for their ordinary purposes. As alleged herein, a plug-in hybrid vehicle that cannot be charged safely is not fit for its ordinary purpose.

731.    Defendant FCA has likewise engaged in a course of unconscionable conduct with respect to the Class Vehicles. In an effort to increase the advertised all-electric and overall range of the Jeep Wrangler 4xe, FCA disregarded best safety practices regarding mitigating the known risk of thermal runaway in its HV battery systems for these vehicles, all while playing up the marketing of these vehicles as safe and reliable. In addition, FCA's course of unconscionable conduct extends to its so-called recall "remedy" which is both insufficient to address the Fire Defect and being inappropriately executed by FCA.

732.    FCA also concealed and/or failed to disclose the Fire Defect in the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

733.    By failing to disclose and/or actively concealing the Fire Defect in the Class Vehicles, which it marketed as safe, reliable, of high quality, and fit for use

as plug-in hybrid electric vehicles, FCA engaged in unfair and deceptive acts or practices in violation of the DTPA.

734.  In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the defects in the Class Vehicles.

735.  FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Subclass Members, about the true safety and reliability of their vehicles.

736.  FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead Plaintiff and the Subclass.

737.  FCA knew or should have known that its conduct violated the DTPA.

738.  As alleged above, FCA made material statements about the safety and reliability of the Class Vehicles when operating as plug-in hybrid electric vehicles that were either false or misleading.

739.  FCA owed Plaintiff and the Subclass a duty to disclose the true safety and reliability of the Class Vehicles because FCA:

    a.    Possessed exclusive knowledge about the Fire Defect;

    b.    Intentionally concealed the foregoing from Plaintiff and the Subclass;

    c.    Made incomplete representations about the safety and reliability of the Class Vehicles, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations; and/or

d.    Had duties under the TREAD Act and related regulations to disclose and fix the defect.

740.   Because FCA fraudulently concealed the Fire Defect, as well as the true nature of the Class Vehicles, Plaintiff and Subclass Members were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Had Plaintiff and the other Subclass Members been aware of the defect in their Class Vehicles, they would not have bought or leased the Class Vehicles or would have paid less for them.

741.   FCA's concealment of the defects in the Class Vehicles was material to Plaintiff and the Subclass.

742.   Plaintiff and the Subclass suffered actual damages caused by FCA's misrepresentations and its concealment of and failure to disclose the Fire Defect. Had they known the truth about the Class Vehicles, Plaintiff and Subclass Members either would have paid less for the Class Vehicles or would not have purchased or leased them at all.

743.   FCA's violations present a continuing risk to Plaintiff and the Subclass as well as to the general public. In particular and as alleged herein, FCA has yet to offer any effective remedy for the Class Vehicles. FCA's unlawful acts and practices complained of herein affect the public interest.

744.   As a direct and proximate result of FCA's violations of the DTPA, Plaintiff and the Subclass have suffered injury-in-fact and/or actual damage as alleged above.

745.   As a result of FCA's conduct, Plaintiff seeks to recover from Defendant, all actual, economic damages incurred in the past, economic damages that continue to accrue into the future, mental anguish damages, treble damages, and attorney's fees and costs, along with any orders necessary to enjoin Defendant's acts or failures to act, as authorized by Tex. Bus. & Com. Code § 17.50.

746.   Plaintiff has provided on behalf of himself and Subclass Members sufficient notice pursuant to Tex. Bus. & Com. Code § 17.505.

## COUNT XXXIII
## UNJUST ENRICHMENT
## (COMMON LAW)
### (Alleged by Plaintiff Liscano on behalf of the Texas Subclass)

747.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

748.   Plaintiff Liscano ("Plaintiff," for purposes of the Texas claims) brings this claim on behalf of himself and the Texas Subclass ("Subclass" for the purposes of the Texas claims).

749.   Pursuant to Federal Rule of Civil Procedure 8(d)(2) and (3), Plaintiff pleads this claim separately and in the alternative to his claims for breach of

implied warranty and violation of the Magnuson Moss Act because if Plaintiff's claims for damages are dismissed or judgment is entered in favor of FCA, Plaintiff and the Subclass will have no adequate legal remedy.

750. FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the lithium-ion batteries that it installed in the Class Vehicles, but nevertheless marketed them for sale to consumers, and misled Plaintiff and the Subclass Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

751. FCA failed to adequately research, design, test, and manufacture the Class Vehicles before warranting, promoting, selling and distributing the Class Vehicles as suitable and safe for reasonably foreseeable uses.

752. At the expense of Plaintiff and the Subclass Members, FCA received and retained a benefit from Plaintiff and Subclass Members and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Class Vehicles to Plaintiff and the Subclass Members for more than they were worth as a result of FCA's conduct.

753. Plaintiff and the Subclass Members would not have purchased or leased the Class Vehicles, or would have paid less for them, had they known of the Fire Defect at the time of purchase or lease. Therefore, FCA profited from the sale

and lease of the Class Vehicles to the detriment and expense of Plaintiff and the Subclass.

754.   Thus, Plaintiff and the Subclass conferred tangible and material economic benefits upon FCA when they purchased or leased the Class Vehicles.

755.   FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

756.   As a licensed distributor of new motor vehicles, FCA sells Class Vehicles to Plaintiff and the Subclass through its numerous vehicle dealers across the United States. FCA therefore profits from sales of Class Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms.

757.   Plaintiff and the Subclass were not aware of the true facts about the Class Vehicles when they acquired them and did not benefit from FCA's conduct.

758.   Plaintiff and Subclass Members are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return Plaintiff and Subclass Members to the position they occupied prior to dealing with FCA, with such amounts to be determined at trial.

## XI.   <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class and Subclasses, respectfully request that the Court enter judgment in their favor and against FCA, as follows:

A.     Certification of the proposed Nationwide and State Subclasses, including appointment of Plaintiffs' counsel as Class Counsel;

B.     Restitution, including at the election of Class and Subclass Members, recovery of the purchase price of their Class Vehicles, or the overpayment for their vehicles;

C.     Damages, including punitive damages, costs, and disgorgement in an amount to be determined at trial;

D.     An order requiring FCA to pay both pre- and post-judgment interest on any amounts awarded;

E.     An award of costs and attorneys' fees; and

F.     Such other or further relief as may be appropriate.

## XII.  <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: June 27, 2024                    Respectfully submitted,

                                        */s/ E. Powell Miller*
                                        E. Powell Miller (P39487)
                                        Dennis A. Lienhardt (P81118)
                                        Dana E. Fraser (P82873)
                                        **THE MILLER LAW FIRM PC**
                                        950 W. University Drive, Suite 300
                                        Rochester, MI 48307
                                        Telephone: (248) 841-2200
                                        epm@millerlawpc.com
                                        dal@millerlawpc.com
                                        def@millerlawpc.com

                                        Roger N. Heller
                                        Phong-Chau G. Nguyen
                                        Nicholas W. Lee
                                        **LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
                                        275 Battery Street, 29th Floor
                                        San Francisco, CA 94111
                                        Telephone: (415) 956-1000
                                        rheller@lchb.com
                                        pgnguyen@lchb.com
                                        nlee@lchb.com

                                        John R. Davis
                                        Michael L. Slack
                                        **SLACK DAVIS SANGER, LLP**
                                        6001 Bold Ruler Way, Suite 100
                                        Austin, TX 78746
                                        Telephone: (512) 795-8686
                                        jdavis@slackdavis.com
                                        mslack@slackdavis.com

                                        Robert K. Shelquist
                                        Rebecca A. Peterson
                                        Craig S. Davis
                                        Krista K. Freier
                                        **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**

100 Washington Ave., Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
rkshelquist@locklaw.com
rapeterson@locklaw.com
csdavis@locklaw.com
kkfreier@locklaw.com

*Attorneys for Plaintiffs and the Proposed Classes*